18B3FREC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FRESH DEL MONTE,

4               Plaintiff,

5          v.                        08 CV 8718 (SHS)

6   DEL MONTE,

7               Defendant.

8   ------------------------------x
                                    New York, N.Y.
9                                   August 11, 2011
                                    3:40 p.m.
10
    Before:
11
                    HON. SIDNEY H. STEIN,
12
                                       District Judge
13
                        APPEARANCES
14
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM
15       Attorneys for Plaintiff
    BY:  ANTHONY J. DREYER
16          LAUREN E. AGUIAR
            JORDAN FEIRMAN
17
    DEBEVOISE & PLIMPTON
18       Attorneys for Defendant
    BY:  BRUCE KELLER
19          MICHAEL J. BEAM

20

21

22

23

24

25
```

18B3FREC

1              (In open court)

2              THE DEPUTY CLERK:  Fresh Del Monte v. Del Monte.  08

3    CV 8718.  Counsel, please state your name for the record.

4              MR. DREYER:  Good afternoon, your Honor.  For the

5    plaintiff, Anthony Dreyer with the firm of Skadden Arps Slate

6    Meagher & Flom.  With me is my partner Lauren Aguiar and our

7    associate Jordan Feirman.

8              THE COURT:  Welcome to all of you.

9              MR. KELLER:  Bruce Keller, your Honor, of Debevoise &

10   Plimpton for Del Monte Corporation.  With me is Michael Beam,

11   my colleague, and from Del Monte Corporation Scott Rickman.

12             THE COURT:  Good afternoon to you.  Please be seated.

13   This is Fresh Del Monte's motion for summary judgment on the

14   contract claim, and I've read the material, thought about it.

15   I don't think any of us have to debate the legal standard.

16   That doesn't seem to be at issue here.  Summary judgment is

17   appropriate only if the evidence shows there is no genuine

18   dispute as to any material fact and the moving party is

19   entitled to judgment as a matter of law.  I can't rely on

20   merely conclusory statements.  Summary judgment on a claim for

21   breach of contract is appropriate only when the contractual

22   language on which the moving party's case rests is found to be

23   wholly unambiguous and to convey a definite meaning.  That's a

24   quote from *Topps v. Cadbury*, 526 F.3d 63, 68 (2d Cir. 2008).

25   And an ambiguity exists where the terms of the contract can

18B3FREC

suggest more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of

the entire integrated agreement.  I should consider extrinsic

evidence only if I first find that the disputed contractual

language is ambiguous.

I take it that everybody can adopt those as the basic

building blocks of how I am to proceed.  Plaintiff?

MR. DREYER:  Yes, your Honor.

THE COURT:  Defendant?

MR. KELLER:  Agreed, your Honor.

THE COURT:  All right.  So the issue then is rather

straightforward.  Is the contractual language clear and

unambiguous.  If yes, plaintiff wins.  If no, I go to the

extrinsic evidence, and there are affidavits and so forth on

extrinsic evidence to see if using extrinsic evidence things

become clear.  And that's the way I approach this.

Those of you who have been here before know that I try

not to hide the ball.  And my thinking -- I'll refer to

plaintiff as Fresh if that's okay.  I don't mean to be fresh.

My thinking is that the language is not unambiguous.  And the

extraneous evidence, when I go to it, is all over the lot.  I

have to credit one view or the other with the extraneous

evidence which ultimately I may be called upon to do.  But not

here and now.  I can't do that here and now.

So, as of now, Fresh, I think you lose.  And I try to

18B3FREC

always do this in the simplest possible way.  I think there is
some theory that the simplest answer is usually the correct
answer.  I forget who said that.  But my approach here is
pretty basic.  And I don't mean to put too heavy a burden on
you, sir, but I'm telling you how I see it.  You're free to
convince me otherwise.

         The license agreement.  The products are fresh food,
fresh vegetables, and fresh produce and shall include, blah,
blah, but shall exclude any products which have been heat
treated or sterilized for the purpose of rendering such
products shelf stable.

         That by itself is fairly clear.  But then we go down
to the refrigeration clause.

         In addition, the products shall also include, B,
refrigerated pineapple products.  And there are certain
qualifications.  It strikes me as pretty basic that the issue
is whether I just ended at shelf stable clause, the products
are fresh fruit and exclude any products which are heat treated
or sterilized.  That seems to exclude the refrigerated
pineapple, berries and papaya products.  But then it says the
products shall include refrigerated pineapple, berries and
papaya products.  I don't see how you can argue that that's
clear.  Because it seems to me at the end of the day it may be
clear.  But I need to figure out what I do with that
refrigeration clause vis-a-vis the first clause which I'll call

18B3FREC

1     the shelf stable clause, and it doesn't leap out at me even

2     after looking at all of this.

3          Fresh is arguing that the refrigeration clause

4     unambiguously gives it the right to use Del Monte marks on

5     refrigerated pineapples, berries and papayas.  But, look, shelf

6     stable says but shall exclude.  I'm with you, Fresh, if all I

7     had to do was look at the refrigeration clause.  In addition,

8     the products include, on an exclusive basis, refrigerated

9     pineapple, berries and papaya.  You've won there.  But I'm just

10    not faced alone with the refrigeration clause.  I've got the

11    shelf stable clause, and lo and behold, the shelf stable clause

12    says but shall exclude any products which have been heat

13    treated or sterilized for the purpose of rendering such

14    products shelf stable.  And that's what the products we are

15    talking about are.

16         Speak to me.  Tell me I'm wrong.

17         MR. DREYER:  Let me try and convince your Honor to the

18    contrary.

19         THE COURT:  Sure.

20         MR. DREYER:  There is no dispute that the first

21    paragraph sets forth the basic division between the parties.

22    Fresh products on the one hand, that fall within Fresh Del

23    Monte's rights, and non-fresh products that fall within Del

24    Monte's Corp's rights.  That's of course what Judge Rakoff held

25    in 1999.

18B3FREC

1          THE COURT:  Right.  Rakoff -- that decision is

2    separate from what I'm dealing with now.  I don't think I'm

3    bound by that.  I don't think it really speaks to this.  Go

4    ahead.

5          MR. DREYER:  But, the point is, as your Honor points

6    out, that's not where the agreement ends.  The agreement

7    continues, the products in addition shall also include -- now

8    Del Monte Corp wants the Court to believe the grant of rights

9    to refrigerated pineapple products is limited to fresh

10   refrigerated pineapple products.  That the grant of right to

11   non-utilized fruits should be limited to fresh non-utilized

12   fruits.  And there is no doubt that in the agreement that the

13   parties use the term "fresh" as a limiting term.  They use it

14   eight times in the first paragraph.  Then they stop.  Of course

15   if the parties intended to use the term "fresh" as a limiting

16   term below the line, after the words "in addition the products

17   shall also include," they could have easily had done so.  But

18   they didn't.  And basic principles of interpretation show when

19   parties use a limiting term in one portion of an agreement and

20   don't use it in another, the clear import of that is they did

21   not intend the rights below the line to be limited to fresh.

22         THE COURT:  Let me make sure I understand that.  They

23   did not intend the language below the line to be limited to

24   fresh.  In other words, "the products shall also include," in

25   your interpretation, is in addition to fresh?

18B3FREC

1          MR. DREYER:  Yes, your Honor, for these very specified

2     and very limited exceptions.  These are basic exceptions to --

3     or special exceptions to the basic division that's set forth in

4     the first paragraph.

5          THE COURT:  What do you ask me to rely on when, to me,

6     the language cuts against what you've just said?  You're saying

7     a contractual interpretation maxim that says when you stop

8     using a limiting word it means there is no limitation?

9          MR. DREYER:  Yes.  In other words, where the parties

10     use a limiting term in one portion of their agreement, in this

11     case fresh, to limit the rights that Fresh Del Monte has, and

12     elsewhere in the agreement where they articulate a grant of

13     rights and don't use the word fresh, the import of that --

14          THE COURT:  It's not elsewhere in the agreement.  Here

15     it is.  Pineapple by papaya.

16          MR. DREYER:  Sure.  What Del Monte Corp would do is

17     have the Court add the words "fresh" to fresh refrigerated

18     pineapple, fresh non-utilized fruit.  That's the point we're

19     making.  When the drafters of this agreement intended to limit

20     the grant of rights to fresh products, there is a very easy way

21     to do it.  They use the term "fresh."  They didn't do that

22     anywhere in subparagraphs A, B or C.

23          THE COURT:  Help me with this.  They didn't have to

24     because -- I grant you one way of looking at it is yours.  And

25     I remark again I'm not coming to an ultimate conclusion here,

18B3FREC

1   I'm trying to determine whether this thing is unambiguous,

2   enough so that partial summary judgment can be granted to

3   Fresh.

4           How can you say that it is so clear that the

5   refrigeration clause is in addition to and separate from the

6   exclusion in the first sentence?  I know that's what you are

7   trying to address.  Go ahead.

8           MR. DREYER:  If I may, your Honor.  One is those are

9   the words the parties used.  "In addition the products shall

10  also include."  So you have a basic division and you have

11  specialized exceptions.

12          THE COURT:  Now we're going back to Rakoff.  Doesn't

13  that simply show -- I forget his phrase.  It was pretty firm.

14  Rife with inconsistencies, whatever his phrasing was.  Isn't

15  that all that does?

16          MR. DREYER:  I think in a summary judgment opinion he

17  said it was riddled with ambiguities.  That may be the phrase

18  you're recalling.

19          THE COURT:  I think there were some adjectives there

20  too.

21          MR. DREYER:  In his ultimate decision he backed off

22  from that.  But there were certainly ambiguities in the

23  agreement.  They were clarified by that decision.  The parties

24  do have to live with that decision.  What he found and what I

25  think the words clearly convey is there is a basic division in

18B3FREC

the first paragraph, as your Honor points out.  But, what then
follows in addition to that basic division, are special
exceptions that don't have to do with the division between
fresh and not fresh.

In fact, look at the other things, if I may, your
Honor, direct your attention, the other grant of rights below
the line after the phrase "in addition the products shall also
include."  We've got frozen pineapple products.  There is no
dispute that's a non-fresh product.  Not shelf stable.  I
wouldn't put a frozen pineapple on a shelf.  Pineapple
concentrate, pineapple purees.  These are all non-fresh
products.  This entire grant are basic separate rights in
addition to the division that's set forth in the first
paragraph.

That's what they mean and that's why the parties chose
the words that they did.  That's why they chose the words "in
addition," that's why they chose "shall also include."

If Del Monte Corp is right and all paragraph B gives
us is the right to sell refrigerated pineapple products that
are fresh, we already had that right.  We don't need this
clause at all.  This clause means something else.  It is a
separate grant over and above for all forms of refrigerated
pineapple products without exclusion.  Without being limited to
fresh.  And the same thing is true for the non-utilized fruit
grant in subparagraph B.

18B3FREC

1          We also know that, your Honor, because of the

2     definition of surplus fruit.  So in paragraph B our right to

3     sell non-utilized fruit, which is defined as papaya, berry,

4     melon and banana, we can only sell those products if we use

5     surplus fruit.  And surplus fruit is defined on the next page,

6     your Honor, as fruit that was intended to be sold for sale as

7     fresh fruit, but which has not been sold as fresh fruit.

8          So the very definition of surplus fruit, which is the

9     only type of fruit we can sell refrigerated, under the

10    non-utilized fruit provision, is not fresh fruit.  We can't

11    sell fresh fruit.  What Del Monte Corp says is, well, what the

12    parties really meant in the definition of surplus fruit was

13    whole fresh fruit.  Fruit that was intended to be sold as whole

14    fresh fruit but was not sold as whole fresh fruit.  That's

15    requiring the Court to add terms to the agreement.

16         Their interpretation requires the Court to strike out

17    the terms "in addition to," and the products shall also

18    include, to strike out the word "also."  And to graft the words

19    "fresh" before refrigerated pineapple products and before

20    non-utilized fruit in subparagraph B.  You have to alter the

21    agreement.

22         THE COURT:  No, it doesn't.  Because in part it

23    depends upon the extent of primacy you give to the first

24    sentence in the shelf stable clause.  It doesn't require any

25    excision if you say that the first sentence controls everything

18B3FREC

1   else as it were.  That is, the products are fresh fruit but

2   shall exclude any products which have been heat treated or

3   sterilized for the purpose of rendering such products shelf

4   stable.

5           MR. DREYER:  I think, respectfully, your Honor, the

6   interpretation you're advocating, which would have to be found

7   to be a reasonable one for us to continue, would be one in

8   which the general swallows the specific.  There is a general

9   division.  No doubt about that.  But there are specific

10  exceptions, and we know that general division can't trump what

11  follows the "in addition the products shall also include"

12  because then we couldn't sell frozen.  They're not fresh.  We

13  couldn't sell purees or concentrates.  They're not fresh.  So

14  respectfully, I think it is on its head.  The general doesn't

15  trump the specific.  It is the other way around.

16           I think in this regard the case that you decided, the

17  *Georgia Pacific* case which Del Monte Corp cites, is directly on

18  point.  In that case there was a general assumption of all

19  liabilities.  General Pacific assumed all liabilities for

20  International Paper.  Later on in the agreement there was an

21  exclusion for liabilities that arose after the contract.  And

22  of course your Honor held in that case while there was a

23  general assumption, the specific carve-out trumped the general

24  assumption of liabilities.  And that's what we have here.  We

25  have very narrow specific carve-outs for very specific product

18B3FREC

 1  categories that are not fresh and are not tied to the basic

 2  division of fresh.  That's what the phrase "in addition" means.

 3  That's what the phrase "the products shall also include means."

 4          THE COURT:  What else did you want to tell me?

 5          MR. DREYER:  Okay.

 6          THE COURT:  Do you want to go to the extraneous

 7  evidence?

 8          MR. DREYER:  Well, your Honor, with respect to the

 9  extrinsic evidence, I believe you only get there --

10          THE COURT:  I said extraneous.  Extrinsic is the right

11  word, go ahead.

12          MR. DREYER:  With respect to the extrinsic evidence

13  you only get there if you adopt Del Monte's Corp --

14          THE COURT:  I understand.  Unless there's something

15  else you want to tell me about how to parse this.

16          MR. DREYER:  Again, and the reason for the

17  demonstrative, if I may, your Honor.

18          THE COURT:  Of course.

19          MR. DREYER:  Their interpretation requires the

20  prohibition to be all preserved products.  We cannot do any

21  preserved products.  Not just heat treated or sterilized

22  products.  We're also talking about chemically preserved

23  products.  That's one of the products that Del Monte Corp is

24  selling refrigerated.  They are saying we can't do any.  We'd

25  have to rewrite the very first paragraph.  We'd have to ignore

18B3FREC

1    the "in addition" language and the "shall also include"

2    language.  We'd have to add limiting terms to paragraph B.

3    That our rights are limited to refrigerated fresh pineapple,

4    refrigerated fresh non-utilized fruit, and we'd have to rewrite

5    the surplus fruit definition to be restricted to fresh fruit

6    that was intended to be sold as whole fresh fruit but was not

7    sold as whole fresh fruit.  And we'd have to accept that the

8    general prohibition in the very first paragraph trumps

9    everything that follows, even though the parties chose very

10   careful words to set those off as exceptions.

11          We submit that is not a reasonable interpretation.  It

12   is not one the Court should adopt.  Because it does require a

13   rewriting of the agreement.  Our interpretation does not.  It

14   is based on the four corners of the agreement, nothing more,

15   nothing less.

16          THE COURT:  Thank you.  Before you go on to the

17   extrinsic, let me hear from Mr. Keller on the contractual

18   language.  Not the extrinsic evidence.  He'll hit the extrinsic

19   evidence.

20          I'm sure you've agreed with everything I've said so

21   far, sir, so let me assure you that the questions are for

22   discussion purposes.  So go ahead.

23          MR. KELLER:  The legal maxim that I am most mindful of

24   at this moment is quit while you are ahead.  So I'm going to be

25   very specific in responding to Mr. Dreyer's points about the

18B3FREC

1    rewriting.

2            The first point that he's really making is the above

3    the line, the below the line point, but that's disproven.  This

4    is an awful agreement.  This is really poorly drafted.  The

5    above the line, below the line argument is disproven by the

6    full text of the very first paragraph.  Because as you can see

7    from the demonstrative in front of you, notwithstanding an

8    unambiguous grant of fresh fruit, fresh vegetables and fresh

9    produce, it then goes on to say in addition, well, literally it

10   says "the products shall also include other types of fresh

11   fruit and vegetables" so we know --

12           THE COURT:  Wait.

13           MR. KELLER:  The very last sentence of the first

14   paragraph, your Honor.

15           THE COURT:  Okay.

16           MR. KELLER:  The products shall also include, and it

17   has A, B, C, right.  Those are all additional fresh products.

18   Completely superfluous if one thinks that the first grant is

19   for all forms of fresh fruit, fresh vegetables and fresh

20   produce.  Nonetheless it is there.

21           THE COURT:  Because your point is each of those are

22   talking about fresh products.

23           MR. KELLER:  Correct.

24           THE COURT:  So what you're doing, I take it, is just

25   showing me inherent within this poorly drafted agreement is

18B3FREC

1  surplusage to begin with.  Is that your point here?

2             MR. KELLER:  Exactly so.  And I think that's the best

3  response to the above the line, below the line argument that

4  Mr. Dreyer started with.

5             His second point really had to do with the geographic

6  location of the refrigerated fruit clause.  And there he points

7  out that B sits between paragraphs A and paragraph C.

8  Paragraph A being a reference to concentrates and purees,

9  something that's not fresh.  We agree.  And C, being frozen

10  pineapple, something that's not fresh.  We agree.  But all that

11  shows you, given the ambiguities inherent in this agreement, is

12  that when the parties specifically intended to single out

13  something that wasn't fresh, they knew how to say so, and did

14  so.  It doesn't tell you anything about how B itself is

15  supposed to be interpreted.

16             The next argument that he made had to do with

17  something that's not within the grant language at all.  It is

18  the definition of surplus fruit.  And he points out that

19  surplus fruit is in either case something that was originally

20  grown for sale as fresh fruit, but which has not been sold as

21  fresh fruit.

22             The response to that is two fold, your Honor.  First,

23  that doesn't tell you anything about how it can be sold.  It

24  doesn't say that surplus fruit is in fact fruit that will be

25  sold as something other than fresh.  I understand one can read

18B3FREC

1     it that way.  But that's not literally what it says.

2             But the more powerful reason to reject that argument

3     is actually the analysis you applied to *Rosetta Books*.  You

4     can't use a subsequent definition to modify the scope of a

5     prior grant unless that definition itself clearly modifies the

6     grant.  And it doesn't here.  It is a definitional term.  It is

7     not a grant term.  Another example of the poor drafting that is

8     inherent throughout this entire agreement, short though it may

9     be.

10            So none of the arguments that he has raised really are

11    without responses.  The reason they're such easy responses to

12    point out is it is bad drafting, it is the epitome of bad

13    drafting.  But you can't look at the refrigerated fruit clause

14    alone, stare at it, and think about it, without recognizing it

15    is completely unclear given the unequivocal exclusion, and this

16    is where you started, your Honor, with your comments before

17    Mr. Dreyer got to say anything, the unequivocal exclusion of

18    any products that are heat treated or sterilized for the

19    purposes of rendering them shelf stable.

20            THE COURT:  You're right.  That's where I started.

21            MR. KELLER:  That is such a broad exclusion.  By the

22    way, it is not the limits of the exclusion, your Honor.

23    Because I think the parties themselves agree they are bound by

24    Judge Rakoff's rule of interpretation which is that if it is

25    not clear, the default is the license granted Fresh rights to

18B3FREC

1  fresh, and nothing else, except as specifically and expressly

2  granted.  So this exclusion is simply some of the things that

3  are excluded.  But under Judge Rakoff's rule, it is not the

4  full scope of the exclusion.  So I have to reject the efforts

5  on Mr. Dreyer's part to X it out or say it doesn't deal with

6  the concept of chemically treated products.  If it is preserved

7  it's ours, unless there is an express grant to Fresh.

8          So for all of those reasons, I think that -- I

9  understand the arguments they are making, but they are not

10  without completely reasonable responses.  And I have to submit,

11  when you look at the extrinsic evidence, and I know you were

12  going to let them address that first.  I think the extrinsic

13  evidence takes you to only one place, which is any effort on

14  their part to now claim rights to sell any type of preserved

15  fruit can't be sustained by all of the objective evidence from

16  the people who had first-hand knowledge, the course of conduct

17  of the parties, the way the businesses were operated at the

18  time --

19          THE COURT:  That's certainly not their position,

20  right?

21          MR. KELLER:  It is not their position now.  But when

22  they first sued, your Honor, when they came into court seeking

23  a preliminary injunction, even though they had a breach of

24  contract claim, they didn't make this argument.

25          THE COURT:  I saw that in the papers.  All right.

18B3FREC

1      Thank you.

2              Let's go to extrinsic evidence, sir.  Mr. Dreyer.

3              MR. DREYER:  If I may make one rebuttal point before I

4      move on.

5              THE COURT:  Of course.

6              MR. DREYER:  I agree with Mr. Keller the parties knew

7      how to designate when rights were limited to fresh.  They chose

8      the word "fresh."  It is not as if they suddenly forgot how to

9      use the word fresh after the first paragraph.  It's not like

10     the typewriter ran out of the letters f-r-e-s-h.

11             THE COURT:  I got the point.

12             MR. DREYER:  With respect to the extrinsic evidence,

13     your Honor, and we've addressed every single one of the pieces

14     of extrinsic evidence in their brief.  A couple of points I

15     wanted to tease out.  The witnesses that have so-called

16     first-hand information.  Let's look at some of those witnesses

17     they have.

18             Mr. Haycox who they purport was involved in the

19     negotiations of the agreement.  He talks about what the parties

20     intended.  The problem with Mr. Haycox is he tried that in '99.

21     He put in a declaration that said I negotiated the license

22     agreement.  I negotiated exhibit B.  And it came to trial and

23     he was subject to some pretty skilled cross-examination by none

24     other than Judge Rakoff.  And he admitted to Judge Rakoff not

25     only did he not negotiate the agreement, he had no role in its

18B3FREC

negotiation.  Mr. Haycox's testimony on the parties' intent
while they were negotiating the agreement, he's completely
unqualified to give that testimony, your Honor.

One thing he is qualified to testify to, though, are
the products that Del Monte Tropical Fruit was doing before
this agreement was entered into, and the products Polypack was
doing after this agreement was entered into.  You'll recall
that Del Monte Topical Fruit was the business division that
Polypack bought, and the business that was going to operate
under this agreement.  At the time this agreement was
negotiated, they were selling a preserved refrigerated fruit
salad product.  In paragraph B we have fruit salad covered.

We also know after he joined Polypack, he headed up a
project to sell under the Del Monte mark preserved refrigerated
pineapple products.  And the product moved out of planning
stage into test marketing.  And in fact the only reason it
didn't launch was customers hated the product when they test
marketed it.  They didn't like the taste of it.  So that's
Mr. Haycox.

Mr. Haase, whom they cite, also had no involvement in
negotiating the agreement.  And his deposition he said he never
consulted it, and at most may have peeked at it.  Well, you
know, as dense as it is, I don't think you can get the meaning
of this document by peeking at it.  Mr. Haase is not qualified
to testify to the parties' intent.

18B3FREC

1          As to Mr. Carbonell, whatever he had in his head about

2     what the agreement meant, there is no evidence he ever

3     communicated that to Polypack, so of course his uncommunicated

4     intent is entirely irrelevant.  Those are the people they are

5     relying on.

6          THE COURT:  What you are asking me to do is to judge

7     their credibility at this stage.  That's really what you are

8     asking me to do.

9          MR. DREYER:  I think with respect to Mr. Haase and

10    Mr. Haycox their testimony can't be even considered credible or

11    not because they're simply not qualified.  With Mr. Carbonell,

12    although Judge Rakoff found him not credible, I am not asking

13    you to do that.  I'm simply saying there is no evidence that

14    whatever he had in his head about what this agreement meant was

15    ever communicated to Polypack.  And the law is clear,

16    uncommunicated intent during negotiations is not to be

17    considered.

18         So that deals with their witnesses, your Honor.  And

19    that deals with what the parties were doing at the time.  Let

20    me briefly address the issue of enforcement of our rights.  It

21    simply is not true we've not raised this before.  In the '99

22    lawsuit in our summary judgment papers we plainly stated that

23    we believed that as part of exhibit B, Fresh Del Monte had the

24    right to do non-fresh products.  This is not something we're

25    stating for the first time in this case.  While it's true we

18B3FREC

could have been more vigilant in our rights, paragraph 10.3
states the failure of a party to assert a right under the
agreement does not mean they waived or lost that right.  We set
that forth in the moving papers.  We cited cases dealing with
similar provisions that have upheld that provision.  Del Monte
Corp never challenged that at all in their opposition brief.

There is a very important reason why clauses like that
are necessary.  This is a perpetual royalty free agreement.
While the parties do some business together, they are not in
close business contact with each other.  They have to live with
this agreement --

THE COURT:  They're in close legal contact with each
other.

MR. DREYER:  Imagine what it would be without the
non-waiver clause.  I understand a lawsuit once every 10 years
seems like a lot.  If they had to challenge every perceived
violation and bring a lawsuit, we would be here much more
frequently than once a decade.

The point of that provision is that if there is a
perceived violation, the party doesn't have to do anything
about it until it becomes a problem.  At that point they can
assert the right and they haven't waived it, and that's what
happened here.

THE COURT:  Thank you.

MR. KELLER:  Your Honor, just two or three quick

18B3FREC

1    points.  First, if I could ask you to look at one piece of

2    extrinsic evidence while you're considering what finally to do,

3    it would be exhibit 29 to my declaration.  Dr. Carbonell's

4    letter.  It is very clear what his view of exhibit B is all

5    about.

6            THE COURT:  Just a moment.  Yes, sir.

7            MR. KELLER:  So, in exhibit 29, Dr. Carbonell -- this

8    is just a couple of weeks a months or so before the execution

9    of exhibit B on the page that's Bate stamped SS 0000083.  Under

10   paragraph 7, other.

11           THE COURT:  Yes.

12           MR. KELLER:  Says very clearly what the concept of

13   paragraph B was all about.  How to sell what he termed there to

14   be residual fruit, came up in exhibit B as surplus fruit.  And

15   the reason I direct your attention to that and you can see what

16   we said about it in our papers and look for it, because it

17   speaks for itself, is that that exhibit fits perfectly with the

18   reason that we put in the Haycox declaration and testimony that

19   was obtained in the deposition excerpts from Mr. Haase.  Not so

20   much for the purpose of what the parties intended, although

21   there is some of that there for sure.  But to show you how

22   reasonable the interpretation we are urging upon you is.

23           I agree credibility is key here.  You should hear from

24   these witnesses.  No question about it.  But unlike Fresh's,

25   and I have to say it is an after-the-fact interpretation, like

18B3FREC

that interpretation, ours fits together perfectly like a jigsaw
puzzle.  It all works.  The starting point of what was intended
was that paragraph in exhibit 29.

As for being vigilant about their rights and what they
thought their rights really were, everyone can read the 1999
decision for what it was and what Fresh said at the time.  But
they did not say, the way that Mr. Dreyer just said it, that
they had rights to preserved products.  What they carefully
said was they have rights to sell fruits that are processed to
some extent.  We agree.  Judge Rakoff held.  But processed to
some extent never meant preserved.  It meant the types of
things that are right in the middle of paragraph B there.
Coring, peeling --

THE COURT:  He was focusing on cutting, right.

MR. KELLER:  Cutting was specifically before Judge
Rakoff there.  It is a question that I have as to why paragraph
B didn't resolve that issue for Judge Rakoff.  He went in a
different direction.  I think in part because the parties for
whatever reasons wanted to do a little bit more with the
exhibit B.  But the fact that processing in the form of
cutting, peeling, or as exhibit B, paragraph B says right in
front of you, making fruit salad, those are the sorts of
processing things that were really being argued about by Fresh
in 1999.

That takes me to the last point of extrinsic evidence,

18B3FREC

which is the fruit salad that they sell.  The preserved fruit

salad that they sell under the Rosy brand.  Now, Judge, they

would not create a brand that has no marketplace popularity, no

good will, for the purpose of selling a preserved fruit salad

unless they thought they couldn't use the Del Monte mark on it.

That piece of evidence in and of itself shows what they thought

until now.

THE COURT:  I'm not sure.  I'm not sure how far you

can carry that piece of evidence.  Your argument is because

they are doing this under another brand name is proof that they

knew they couldn't do it under this contract, under utilizing a

very valuable brand name.  That's what you're arguing.

MR. KELLER:  That is my argument.

THE COURT:  That doesn't get you very far.

MR. KELLER:  It is a brick in the wall.

THE COURT:  I accept that.

MR. KELLER:  Thank you.

THE COURT:  Thank you.  Let me step off the bench and

everybody should take like a 10 minute break if that's okay and

come back, and I'll try to have something for you.  All right.

10 minutes.  Thank you.

(Recess)

(In open court)

THE COURT:  I went over in my mind the arguments that

were made.  Obviously I was doing it as the discussion was

18B3FREC

1  taking place and I thought about this in advance.  And I'm

2  going to maintain the position that I started with and deny

3  Fresh's motion for partial summary judgment.

4          The fact of the matter is, the contractual language is

5  simply not unambiguous.  I end where I started.  Shelf stable

6  clause, the products are fresh fruit, the products are fresh,

7  but shall exclude any products which have been heat treated or

8  sterilized for the purpose of rendering such product shelf

9  stable.  Then they say in the refrigeration clause, in addition

10 the products shall also include on an exclusive basis

11 refrigerated pineapple products.

12         There is an inconsistency or at least there is an

13 ambiguity there which I just need fleshed out in a trial.  The

14 extrinsic evidence is not all one way or the other.  I just

15 need a better sense of this.  It is not unambiguous and I'm

16 denying the motion on that basis.

17         All right.  Where do we stand?  All discovery is over.

18 Expert discovery is over.  Fact discovery.  I don't have a

19 final pretrial order.  Do I?  I don't see one.

20         MS. AGUIAR:  You do not, your Honor, no.

21         THE COURT:  Let's set a timetable for that, for the

22 submission of a pretrial order and for a trial date.  Do the

23 parties want to talk amongst yourselves now to establish

24 something?  I like to do what the parties want.  Or have you

25 already done that?

18B3FREC

1              MS. AGUIAR:  We've done that to some extent, your

2      Honor.  And I think where we came out based on the trial

3      schedules of the counsel involved, with some consultation with

4      the client, that in terms of the trial date, and Mr. Keller

5      will correct me if I'm wrong, in terms of the length of the

6      trial just for your own scheduling purposes looking at your

7      calendar we were thinking of something between seven and nine

8      days.

9              Is that fair?

10             MR. KELLER:  Yes.

11             MS. AGUIAR:  And in terms of when we would be looking

12     to get on your calendar, sometime --

13             THE COURT:  As I said, I could try it whenever you

14     want.

15             MS. AGUIAR:  We were looking at maybe early February.

16     And the reason for that is there are a number of trials that

17     both counsel have going through the end of the year.

18             THE COURT:  That's true for me too.  But as I say, I

19     can try it whenever you want.  Let's take a look.  Does anybody

20     have a 2012 calendar?  Off the record.

21             (Discussion off the record)

22             THE COURT:  I'm setting the trial date as February 13.

23     Obviously if that's a holiday we'll just move it one day.

24     9:30 a.m.  I'll set aside two weeks.  Do we have a jury here?

25             MS. AGUIAR:  Yes, we do, your Honor.  And just to go

18B3FREC

1   back and close out, it looks like for some reason on my

2   calendar Lincoln's birthday is listed as the 12th which is a

3   Sunday, so if that means that Monday is an official court

4   holiday maybe we should start on Tuesday.

5           THE COURT:  I don't know if it is or not.  Let's set

6   it down for the 13th.  If it is a court holiday I'll move it

7   one day.

8           MS. AGUIAR:  Great.

9           THE COURT:  In my own calendar I'll set aside two

10  weeks, jury trial.  Let's have by the second week in January,

11  what is the second Monday in January?

12          MS. AGUIAR:  The 9th, your Honor.

13          THE COURT:  January 9, joint pretrial order.  Any

14  motions in limine.

15          MS. AGUIAR:  I apologize.  I was trying to consult

16  with Mr. Keller.  We had discussed this this morning, and of

17  course only if it was acceptable to you, that with regard to

18  the joint pretrial order and motions in limine, since we know

19  where we stand largely with the case right now, we might submit

20  them earlier than that.

21          THE COURT:  Better for me.  You tell me.  I'll take

22  them as soon as you're ready for them.

23          MS. AGUIAR:  So would it be preferrable for you if we

24  set those dates right now or we consulted with each other?

25          THE COURT:  You can consult with each other.  What I

18B3FREC

1    want is on one day, I want the joint pretrial order, any

2    motions in limine, proposed jury charges, and if you wish, voir

3    dire.  Voir dire is entirely up to you.  I do my own voir dire.

4    If you can give me any questions you want and then I decide

5    whether or not to give them.  But the others I want.  And then

6    one week later responses to the motions in limine.  Unless you

7    think they're going to be extensive motions in limine, then I

8    have two suggestions.  One, don't make them.  Or two, give

9    yourselves 10 days or two weeks to respond.

10            MS. AGUIAR:  The motions in limine may concern each

11   other's experts and possible issues like that, so I think 10

12   days might be more in line.  But --

13            THE COURT:  I leave that scheduling up to you.  The

14   sooner the better.  October is probably good for me.  But

15   whenever you get it to me you'll get it to me.  I'll handle it.

16   Anything else?

17            MS. AGUIAR:  No, your Honor.  Your rules mention a

18   pretrial memo if the parties think it is useful, and we did

19   discuss it this morning and don't think it's necessary.

20            THE COURT:  I'm comfortable I understand the issues

21   here.  It is really up to you.  I don't need it.  Anything

22   else?

23            MS. AGUIAR:  Not from us.

24            MR. KELLER:  No, your Honor.

25                            o0o