C42Wfre1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FRESH DEL MONTE PRODUCE, INC.,

4                   Plaintiff,

5            v.                              08 CV 8718 (SHS)

6   DEL MONTE FOODS COMPANY and
    DEL MONTE CORPORATION,

7
                    Defendants.
8
    ------------------------------x
9                                            New York, N.Y.
                                             April 2, 2012
10                                           9:30 a.m.

11  Before:

12                      HON. SIDNEY H. STEIN,

13                                            District Judge

14                          APPEARANCES

15  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         Attorneys for Plaintiff, Counterclaim Defendant
16  BY:  RAOUL D. KENNEDY
         KENNETH A. PLEVAN
17       ANTHONY J. DREYER
         LAUREN E. AGUIAR
18       JORDAN A. FEIRMAN

19  MORRISON & FOERSTER LLP
         Attorneys for Defendants, Counterclaim Plaintiffs
20  BY:  ARTURO J. GONZALEZ
         DENNIS P. ORR
21       LaSHANN M. DeARCY

22

23

24

25

C42Wfre1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Good morning.  Please be seated.  The jury |
| 3 | is here.  My recollection is our expert could not be here until |
| 4 | later.  So what is the plaintiff intending to put in his place? |
| 5 | MR. DREYER:  We have the deposition read from |
| 6 | Mr. Spielmann.  We then have videotape and deposition read from |
| 7 | Mr. Carbonell, and we had two issues, one of which affects |
| 8 | those readings and some documents from those readings, and one |
| 9 | of which affects, again, our damages expert's testimony that |
| 10 | we'd like to raise with the Court this morning. |
| 11 | THE COURT:  I'm not sure I understand.  You're going |
| 12 | to put in deposition reading? |
| 13 | MR. DREYER:  Yes. |
| 14 | THE COURT:  At least until your expert can get here. |
| 15 | MR. DREYER:  Yes, your Honor.  Forgive me. |
| 16 | THE COURT:  There are questions on the depositions?  I |
| 17 | thought I handled all of those. |
| 18 | MR. DREYER:  The only issue is for the witnesses who |
| 19 | were shown documents we would like to put up the documents |
| 20 | before the jury, some of them we would like to move into |
| 21 | evidence beforehand.  In discussing that process with opposing |
| 22 | counsel, they raised the issue that it's their belief that |
| 23 | unless a document is authenticated and there is a foundation |
| 24 | laid for each document, it doesn't come in, and that's counter |
| 25 | to what we had understood about the meet and confer process. |

C42Wfre1

1          If you recall, we exchanged exhibit lists back in

2    December.  Each side raised a number of objections, including

3    foundation.  We spent the past three or four months working

4    those objections out.  We have on each side probably dozens of

5    documents that each side is not objecting to.  So we don't

6    have --

7          THE COURT:  Wait.  Dozens of documents in connection

8    with these deposition readings?

9          MR. DREYER:  For the case as a whole.  For the

10   deposition readings, there are five documents at issue.

11         THE COURT:  All right.

12         MR. DREYER:  But it also relates to a larger issue,

13   which is that many of our exhibits we were told they were not

14   objected to or there were objections that were withdrawn,

15   including foundation objections.

16         THE COURT:  Wait.  More slowly.

17         MR. DREYER:  Sure.

18         THE COURT:  So if the objections were withdrawn, that

19   is, you or somebody listed documents in the pretrial order and

20   there either were objections or there weren't objections and if

21   there were objections they've been withdrawn, what is the

22   issue?

23         MR. DREYER:  I have, that's my question to opposing

24   counsel.

25         THE COURT:  Let me hear from the other side.

C42Wfre1

1          MR. GONZALEZ:  Your Honor, there's one document, not a

2     whole bunch.  Just one.  If you'll remember that we had an in

3     limine motion based on a witness named Funk, and we argued that

4     the plaintiff had not made an adequate showing that they tried

5     to find Funk for this trial, and the Court said, Let's see what

6     they come back with.  They didn't come back with anything

7     because I think it's pretty clear they hadn't made an effort to

8     find Funk.  That's fine.

9          So we had not objected to this one document that's at

10    issue right now in the Carbonell reading because Funk was going

11    to lay the foundation.  However, now that your Honor has ruled

12    and they have withdrawn Funk, there's no longer foundation for

13    that one document, and what they want to do with Carbonell is

14    read from that document in the Carbonell deposition.

15          THE COURT:  At the Carbonell deposition, they showed

16    him this document.

17          MR. GONZALEZ:  And he said he's never seen it.

18          THE COURT:  He said he never saw it and the

19    questioning went forward?

20          MR. GONZALEZ:  Correct.

21          THE COURT:  Okay.

22          MR. GONZALEZ:  And they read from it.  That's the only

23    objection I have.

24          THE COURT:  Just a minute.  He said he had never seen

25    it, but he read from it anyway?

C42Wfre1

1          MR. GONZALEZ:  Counsel did.  Counsel read to him.

2          THE COURT:  And he answered questions on it and they

3    want to put in the questions and the answers, is that correct?

4          MR. GONZALEZ:  Yes.  There's really just one question

5    and one answer I'm objecting to.

6          THE COURT:  Mr. Dreyer.

7          MR. DREYER:  First of all, your Honor, Mr. Gonzalez

8    has the order wrong.  We withdrew Mr. Funk after they withdrew

9    their foundation objection.  We sent them an e-mail on March

10   14, 2012.

11         THE COURT:  Where was their foundation objection

12   lodged?

13         MR. DREYER:  In the exhibits to the pretrial order.

14   It was one of the documents that we listed on the pretrial

15   order.  They lodged the foundation objection.

16         THE COURT:  All right.

17         MR. DREYER:  And we worked that out, and, as a result,

18   we stopped trying to get Mr. Funk to fly all the way from

19   Seattle to here, and what we wrote was, As you have withdrawn

20   your objections to the documents relevant to the testimony of

21   Daniel Funk, we are withdrawing him as a witness."  This is

22   after we had worked out the foundation issue.

23         I would also note the document is over 20 years old.

24   So as to that document, we think they have already stipulated

25   to its admissibility and we think it would come in under the

C42Wfre1

1    ancient document rule.

2               THE COURT:  Read me that phrase again.

3               MR. DREYER:  "As you have withdrawn your objections to

4    the documents relevant to the testimony of Daniel Funk, we are

5    withdrawing him as a witness."

6               THE COURT:  All right.

7               MR. DREYER:  Then we have --

8               THE COURT:  Just a moment.  Step by step.

9               Mr. Gonzalez, Mr. Dreyer says you withdrew your

10   foundation objection to the Funk document.

11              MR. GONZALEZ:  Your Honor, we never made an agreement

12   that they didn't have to bring Funk and we were going to allow

13   this document into evidence at trial.  There was no such

14   agreement.  I don't think that they can tell you in good faith

15   that they were trying to bring Funk here live.  Counsel just

16   said, So we stopped the effort to fly him out.  I don't think

17   they've ever --

18              THE COURT:  No, no.  I understand your point, and we

19   had had a discussion about the phone book, it's my

20   recollection.  But if he's writing you and saying, Since you've

21   given up objecting to the documents, in essence, we want to put

22   in through Carbonell in regard to Funk, we're not calling Funk

23   because we don't need him to lay a foundation for this

24   document.

25              MR. GONZALEZ:  And, so, your Honor, what I would ask

C42Wfre1

1    is to see whatever document Mr. Dreyer is referring to and

2    perhaps the two of us can talk.

3              THE COURT:  He's got to be referring to this document,

4    one would think.

5              Mr. Dreyer.

6              MR. DREYER:  Yes, it's Trial Exhibit 7, your Honor.

7              MR. GONZALEZ:  I'm talking about the communication

8    about the document.  The one thing that didn't happen --

9              THE COURT:  Show Mr. Gonzalez what you were just

10   reading from.

11             MR. GONZALEZ:  Your Honor, all I'm going to say is

12   even reading this right now, it's very vague.  It says you have

13   withdrawn your objections to the documents relevant to the

14   testimony of Daniel Funk.  I'm not even sure what that means.

15             THE COURT:  It's got to mean the documents that they

16   wanted to put in, based on the deposition of Funk, one would

17   think.

18             MR. GONZALEZ:  Your Honor, I'll drop the issue.

19             THE COURT:  All right.

20             MR. GONZALEZ:  In the interest of fairness, I'll drop

21   the issue.

22             THE COURT:  And getting the jury here to hear

23   testimony.

24             MR. GONZALEZ:  We're ready to go.

25             MR. DREYER:  There's the damages issue, and since it

C42Wfre1

1    relates to a witness who may have to do some work because of

2    the objection Del Monte Corp. has raised, I want to explain

3    this issue to you as well.

4              THE COURT:  Does this have to do with the readings?

5              MR. DREYER:  It doesn't, but it relates to objections

6    they made to our damages expert's calculation.  He's one of our

7    next witnesses, so if the objection is sustained, it may affect

8    what he has to do between now and his testimony.

9              THE COURT:  I understand.

10             MR. DREYER:  As you recall, the fact cutoff was in

11   March of 2010 in this case.  Our expert report was produced in

12   May of 2010, and his damages cutoff at the time was in January

13   of 2010, and that was based on the financial information that

14   Del Monte Corp. produced.

15             In preparing for trial, he made three updates to his

16   damages calculation.  The first was to cut off damages six

17   years prior to the filing of the lawsuit that was the subject

18   of Del Monte Corp.'s motion in limine, and they don't object to

19   that change.

20             The second change was to take out two products from

21   the contract damages.  There was a dispute between the parties

22   as to whether or not they contained one of the five fruits in

23   the contract, and so we withdrew the calculations on those, and

24   there's no objection to that.

25             The third area where there is an objection is the

C42Wfre1

1  updated, the damages calculation for sales through May 2011,

2  actually, May 1, 2011, and the information that he used for

3  that was projections from a document that Del Monte Corp.

4  produced.  He stopped at May 2011 because that's where the

5  document ends.

6          THE COURT:  Was this in his report?

7          MR. DREYER:  It wasn't in his report.  His report was

8  produced in May of 2010.  So he was updating his damages

9  calculation to include additional revenues and his calculation

10  is a very straightforward one.  It's a royalty-based

11  calculation, your Honor, so it's sales times the royalty rate

12  equals damages.  So all he did to adjust for the fact that

13  we're two years ahead of time is fold in an additional damages

14  period through May 2011, and we produced his calculations to

15  the other side.

16          THE COURT:  When?

17          MR. DREYER:  Wednesday night.

18          THE COURT:  Last Wednesday night?

19          MR. DREYER:  Yes, your Honor.

20          THE COURT:  What is the objection?

21          MS. DeARCY:  Your Honor, that is our objection.  They

22  produced this information to us last Wednesday night in the

23  middle of trial.  They never provided Del Monte with a

24  supplement to Mr. Phillips' report.  Mr. Dreyer suggests to you

25  that they have been updating their expert report on an ongoing

C42Wfre1

basis.  That characterization is not quite accurate.  They

updated or revised the report with respect to the statute of

limitations issue, your Honor, in response to your ruling with

regard to our motion in limine saying that they were not

entitled to seek damages outside the limitation period.

          With respect to the fruit issue, whether or not two

products, including pineapple, was an issue of debate between

both damages experts throughout this litigation and indeed that

issue was teed up in their reports.  Unlike those two issues,

your Honor, we had absolutely no notice whatsoever that they

intended to use forecasted figures for the purposes of their

damages, which, by the way, revises their damages upwards by

millions of dollars.

          Your Honor, they had the forecasted information which

they used to supplement this report in the middle of this

trial.

          THE COURT:  Wait just a moment.  They have updated the

expert's report on damages to account for sales of your

products through May of 2011, whereas earlier it had only been

through January 2010, is that right?

          MS. DeARCY:  Well, that's not exactly accurate.

They're not actual sales, your Honor.  These are forecasted

sales.

          THE COURT:  That was what one of my questions was

going to be.  When did you give them that sales forecast?

C42Wfre1

1          MS. DeARCY:  They had that sales forecast when the

2     initial damages numbers and the revenue figures were produced

3     to them, the same numbers that their expert relied on in

4     preparing the report.

5          THE COURT:  When was that?

6          MS. DeARCY:  In 2009, I believe.  The report was

7     submitted in May 2010.  So they had this information for years.

8          THE COURT:  All right.  So your position is that it's

9     not an update of damages for DMC's sales, but it's an update of

10    damages for a forecast provided by DMC in 2009?

11         MS. DeARCY:  Correct, your Honor.

12         THE COURT:  Mr. Dreyer.

13         MR. DREYER:  This is what they produced in litigation.

14    They never updated that document.  They never said here are the

15    real sales figures.  When they raised that objection on

16    Saturday, I said, Okay, give us the sales figures, we can

17    probably stipulate to them because again the calculation, his

18    methodology hasn't changed.  All he's doing is accounting for

19    the interval period.

20         THE COURT:  I understand.

21         MR. DREYER:  They won't give us the actual sales

22    figures, so we can't use what they produced and they went

23    produce the numbers they say he should use, your Honor.  I

24    understand this is an area for the Court's discretion, but I

25    think without the damages figure, if we prevail, there's

C42Wfre1

1    basically a two-year free pass for either breach of contract.

2              THE COURT:  January 2010 to the present?

3              MR. DREYER:  Correct, your Honor.  And we were

4    prepared to use the forecast that went only up to May of 2011,

5    to give them the production for a year because the production

6    wasn't updated.  If they want to give us actual numbers we were

7    prepared to do that, but there's no question here because the

8    calculation is two percent times whatever those numbers are.

9              THE COURT:  I understand.  Is the sales forecast

10   somewhere in the record?

11             MR. FEIRMAN:  I believe it is, your Honor.

12             THE COURT:  Is it in your expert's report?

13             MR. DREYER:  I believe it's in the expert report.

14   It's a trial exhibit that I don't believe has been objected to.

15   It hasn't been referred to.  It hasn't been moved into evidence

16   yet, your Honor.

17             MS. DeARCY:  Your Honor --

18             THE COURT:  Just a moment.

19             Yes, ma'am.

20             MS. DeARCY:  The sales forecasting information for

21   2010 and 2011 was not addressed in Mr. Phillips' report.  They

22   had the information, your Honor.  They have had the ability to

23   address the forecast information in that report, but they chose

24   not to do so.

25             THE COURT:  It sounds like they were counting on or

C42Wfre1

1   assuming they would get the actual sales figures, is that

2   right, Mr. Dreyer?

3        MR. DREYER:  I mean, there was a duty to supplement,

4   your Honor.  We never got a Rule 26 update.  If they want to do

5   that, we can use the sales figures and the calculation can be

6   done today.

7        MS. DeARCY:  Your Honor, they never asked for the

8   actual information.  I'm not sure what the document request was

9   in 2009, but they certainly never made a request --

10       THE COURT:  No, but you are under a duty to supplement

11  interrogatory responses.

12       MS. DeARCY:  Yes, your Honor.  If they weren't

13  intending to use actual information, then they had the ability

14  at any time in the last few years, certainly before last

15  Wednesday, to supplement their report in a timely manner, to

16  include forecasted information that they have had at all times.

17  This is very prejudicial to us, your Honor.  We have not had an

18  opportunity to examine their witness.

19       THE COURT:  No, it's your forecasted numbers and all

20  he's done is apply the same royalty rate that he applied in the

21  report.

22       MS. DeARCY:  They are our forecasted numbers, your

23  Honor, but we have not had an opportunity to examine the

24  witness on the use of forecasted numbers in his deposition.  We

25  also have not an opportunity to talk about what the actual cost

C42Wfre1

 1   could be or would be.

 2              THE COURT:  The cost of?

 3              MS. DeARCY:  Of the product, the sale of the product.

 4              THE COURT:  That's even pre this forecast issue,

 5   right?

 6              MS. DeARCY:  That's correct, your Honor.

 7              Mr. Dreyer suggested that we won't give him the actual

 8   figures.

 9              THE COURT:  He hasn't suggested it.  He has said it.

10              MS. DeARCY:  That is not true, your Honor.  Mr. Dreyer

11   knows that I worked diligently maintaining constant

12   communication letting him know we were attempting in response

13   to their belated supplement to their report to get the actual

14   figures.  We simply ran out of time because the plaintiffs did

15   not give us a full opportunity to be able to respond to the

16   supplement.

17              THE COURT:  Aren't those sales figures readily

18   available?  Aren't they, in fact, one of the primary tools your

19   business people use in terms of either claiming credit or

20   proceeding blame for various targets.

21              MS. DeARCY:  It certainly is information that our

22   salespeople and business people regularly use.  But it's not

23   necessarily compiled in the way we need it where it's extracted

24   out.

25              THE COURT:  I understand that.  When can you get that

C42Wfre1

1    to him?

2              MS. DeARCY:  We can work that out.  I can talk with

3    our client and see how quickly we can get the actual sales

4    figures.

5              THE COURT:  Weren't you asked that at some point?

6              MS. DeARCY:  I did, and they're working to get it now.

7    Unfortunately, they're in California, your Honor.  I haven't

8    had an opportunity to speak with them again.

9              THE COURT:  Was this something that you were going to

10   deal with your expert on when he takes the stand?

11             MR. DREYER:  To the extent the ruling was that he

12   could use the forecast to take the stand today, if not, I think

13   that work can be done tonight and then we'll know when we get

14   the actually numbers and hopefully he can take the stand

15   tomorrow and deal with that.

16             THE COURT:  Let's do it that way.  I'd prefer you work

17   on the actual sales figures.  Let's have him work on the actual

18   sales figures.  It's simply a matter of updating the report.

19   There's no change in methodology.  It doesn't sound like a

20   surprise one way or the other.  I would prefer that he had

21   actual figures.  I think there is some gamesmanship going on on

22   both sides.  Have him use those sales figures.  Otherwise, he

23   can use the forecasts that DMC itself supplied.

24             Any other ruling?

25             MS. AGUIAR:  So, your Honor, if there's no objection

C42Wfre1

1    to the exhibits, we would like to move in some of which may

2    relate to the reading we're about to do.  Can I read those out?

3              THE COURT:  Sure.

4              MS. AGUIAR:  Yes, and there's no objection.

5              THE COURT:  We're going to move in, on consent, the

6    following exhibits.

7              MS. AGUIAR:  Trial Exhibit 1, 5, 7, 68, 69, and 207.

8              THE COURT:  Admitted without objection.

9              (Plaintiff's Exhibits 1, 5, 7, 68, 69, and 207

10   received in evidence)

11             THE COURT:  I had a couple of questions on the

12   charges, but let's bring the jury in.

13             MS. AGUIAR:  Just as a housekeeping matter, when the

14   quote/unquote Mr. Spielmann takes the stand, you'll explain to

15   the jury what's going on, or shall I do that?

16             THE COURT:  But he's not taking the stand.

17             MS. AGUIAR:  No, I understand that.

18             THE COURT:  I will tell the jury that for scheduling

19   of witness purposes, we're going to have a deposition reading,

20   and I'll say they're play-acting and when the people are doing

21   the reading, I want the reader to, these are not professionals

22   the way the court reporters are, but I want them to be as

23   affectless as possible; in other words, no drama.  Okay?

24             (Continued on next page)

25

C42Wfre1

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              Good morning, ladies and gentlemen.  Thank you for

4      being here.  I hope you enjoyed the three days that you had.  I

5      apologize for the half hour that you were here and waiting.

6      Some legal matters came up.  I really don't like to have to

7      have the jury sit around while these things are happening, but

8      sometimes it just happens.

9              Something else happens sometimes, and that's that we

10     have to take witnesses out of order.  So we're going to

11     interrupt the testimony of the witness who was here last week

12     and we're going to have other witnesses now and the witness who

13     was here last Thursday will come in later in the morning.

14             The other witnesses are going to be witnesses by

15     deposition.  What that means is their depositions have been

16     taken.  In other words, they gave testimony under oath in this

17     action at a prior time.  Those witnesses are not going to be

18     here in person, so the relevant deposition portions are going

19     to be read to you.  We will have somebody who is affiliated

20     with one law firm sitting on the witness stand, and he will act

21     as if he is the person responding, and one of the lawyers will

22     ask him questions.  The questions are straight from the

23     deposition transcript and the answers will be from the

24     deposition transcript.  So people on the stand here, these are

25     not the actual witnesses, but it just is a better why to do

C42Wfre1                          "Spielmann"

1     that and to give you the testimony rather than hand you the

2     deposition transcript.  It's more realistic and makes sense.

3     That's what we're going to do.

4              Plaintiff, call your next witness who will testify by

5     deposition.

6              MR. KENNEDY:  Yes, your Honor.  Mr. Spielmann.

7              THE COURT:  All right.  Mr. Spielmann will testify to

8     you by deposition.

9      RODOLFO SPIELMANN,

10             THE COURT:  You may be seated, sir.

11             I'm not going to ask your name because you'll be

12    Mr. Spielmann.

13             MS. AGUIAR:  Mr. Spielmann is an employee of Del Monte

14    Corporation.

15             THE COURT:  Just so the record is correct, tell the

16    reporter your name.

17             THE WITNESS:  Jamie Stockton.

18             THE COURT:  Welcome Mr. Stockton.  You'll act as

19    Mr. Spielmann.  And you said Mr. Spielmann is an employee of?

20             MS. AGUIAR:  Del Monte Corporation, one of the

21    defendants.

22             THE COURT:  You may ask the questions.

23    BY MS. AGUIAR:

24    "Q.  And I will use FDM or Fresh Del Monte to refer to my

25    client, Fresh Del Monte Produce.  Do you understand that?

C42Wfre1                         "Spielmann"

1   "A.   Perfect.

2   "Q.   Okay.  One last point.  As I'm sure you know, we will be

3   discussing today several products that DMC offers; in

4   particular, the Sunfresh product line, the Orchard Select

5   product line, the Fruit Naturals product line, the Superfruit

6   product line, and the Fruit Bowls product line.  You're

7   familiar with all of those products?

8   "A.   Yes, I am.

9   "Q.   And for simplicity's sake, from time to time I may refer

10  to those as the DMC cut-fruit products or the DMC refrigerated

11  products.  Do you understand that?

12  "A.   Okay.

13  Q.   With that long-winded introduction, sir, what is your

14  title?

15  "A.   Vice president of marketing for consumer growth.

16  "Q.   How long have you had that position?

17  "A.   Since June 2008, so it will be close to two years.

18  "Q.   What are your responsibilities as the vice president of

19  marketing for consumer growth?

20  "A.   Well, I'm the head of marketing for two businesses.  Our

21  refrigerated fruit business and our college in broth business.

22  "Q.   With respect to the DMC cut-fruit product, what specific

23  responsibilities do you have?

24  "A.   Overall strategy, full P & L responsibility, and all the

25  marketing business.

C42Wfre1                         "Spielmann"

1    "Q.  Could you briefly describe the work that you did while you

2    oversaw the innovation business?  What sort of things did you

3    do?

4    "A.  It's normal in innovation work.  Trying to uncover

5    consumer insights, develop concepts on the -- how we address

6    those insights or unmet needs.

7    "Q.  One of the things you mentioned was uncovering consumer

8    insights.  Could you explain what you mean by that?

9    "A.  We constantly talk with consumers to try to understand

10   what needs are not filled right now.  It's a pretty broad

11   scope.

12   "Q.  You said what consumer needs are not being filled?

13   "A.  Mm-hmm.

14   "Q.  And does DMC use that information in any way to develop

15   new products, the consumer insight information?

16   "A.  Yes.

17   "Q.  When did you start with Del Monte, by the way?

18   "A.  I come from the Heinz acquisition, so I think the

19   acquisition was December 2002.

20   "Q.  Do you have a college degree?

21   "A.  Yes.

22   "Q.  From where?

23   "A.  From Chile.

24   "Q.  And what is the degree in?

25   "A.  It's engineering, industrial engineering.

C42Wfre1                         "Spielmann"

1    "Q.  Do you have any postgraduate degrees?

2    "A.  Also from Chile, also industrial engineering.

3    "Q.  What's your postgraduate degree?

4    "A.  I'm a master in industrial engineering.

5    "Q.  Do you know Xander Shapiro?

6    "A.  Yes.

7    "Q.  And so Mr. Shapiro reported to you for approximately 18

8    months?

9    "A.  Yes.

10   "Q.  During that time, what were his responsibilities with the

11   company?

12   "A.   Innovation for refrigerated products.

13   "Q.  Meaning what?  What responsibilities did he have?

14   "A.  To make it simple, he needed to come up with new products.

15   "Q.  Have all of the DMC cut-fruit products been preserved in

16   some form, to your knowledge?

17   "A.  Yes.

18   "Q.  They either contain preservatives or have been heat

19   treated, correct?

20   "A.  Yes.

21   "Q.  Has DMC ever analyzed who its direct competitors are or

22   more direct competitors are for the DMC cut-fruit products?

23   "A.  Yes.

24   "Q.  Who are they or what types of products?

25   "A.  Their direct competition is Sundia, Sunkist, and Chiquita.

1    "Q.  Why those companies?

2    "A.  Sundia and Sunkist offer similar products to the one we

3    use.  We have a really high level of interaction.  Lower

4    quality than ours, but similar products.  Chiquita --

5    "Q.  I would expect you to say nothing less.

6    "A.  Chiquita mainly because their vision is similar to our

7    vision in the segment, which is about healthy snacking.  So the

8    more we both talk about healthy snacking, the more consumers

9    will start seeing the products comparable one to each other.

10   "Q.  Does Chiquita sell any preserved refrigerated fruit

11   products?

12   "A.  Yes.

13   "Q.  Which products?

14   "A.  Fruit cups.

15   "Q.  Do the DMC cut-fruit products also compete with fresh-cut

16   fruit?

17   "A.  If you keep opening the circles, it's farther competition.

18   But absolutely there is some volume from one to the other.

19   "Q.  Has anybody at the company ever tried to quantify the

20   level of competition that DMC has with fresh-cut fruit?

21   "A.  More than the level of competition, the level of

22   interaction.

23   "Q.  Okay.  Does DMC provide any recommendations to retailers

24   as to where the cut-fruit products should be sold --

25   "A.  Yes.

C42Wfre1                              "Spielmann"

1     "Q.  Within a store?

2     "A.  Yes.

3     "Q.  What is their recommendation?

4     "A.  In the value added refrigerated produce section.

5     "Q.  Has DMC conducted any adjacency studies with respect to

6     any of the cut-fruit products?

7     "A.  Yes.

8     "Q.  What have they conducted?

9     "A.  Bowls.

10    "Q.  Okay.  The fruit bowl products?

11    "A.  The fruit bowl products.

12    "Q.  When was that study conducted?

13    "A.  It was not a study.  Again.  It was also a Nielsen poll.

14    "Q.  Okay.  If you could take a look at the document that has

15    been marked as plaintiff's 83.  Do you have an understanding as

16    to what this document is?

17    "A.  Yes, I do.

18    "Q.  What is it?

19    "A.  A sales presentation to the Stop & Shop customers where it

20    covers first business performance to date and then bowls'

21    introduction.

22    "Q.  Can you turn to page DMC80017150?

23    "A.  Done.

24    "Q.  Do you have an understanding as to what this slide is?

25    "A.  Yes.

C42Wfre1                          "Spielmann"

1    "Q.   What is it?

2    "A.   What the salesperson recommended the buyer, where to

3    locate the products.

4    "Q.   And the salesperson is recommending that the Del Monte

5    Corp. fruit bowl product be placed near other, or be placed

6    near fresh-cut fruit bowls, correct?

7    "A.   That's correct.

8    "Q.   Do you know whether DMC has recommended to other retailers

9    that the fruit bowl product be placed near fresh-cut fruit bowl

10   products?

11   "A.   In the very beginning when we launched this, as I

12   mentioned before in the Nielsen study, we ended up both next to

13   fresh-cut fruit and also within our own section.  Since then,

14   and since we realized that there is absolutely no difference

15   between one and the other, and from a strategic perspective, we

16   preferred to be all together.  The direction has been

17   consistent to place it together with the rest of the Del Monte

18   items.

19   "Q.   But you would agree that at least for some period DMC was

20   recommending that the fruit bowl product be placed next to

21   fresh-cut fruit bowls, correct?

22   "A.   At the launch period, that's correct.

23   "Q.   How long a period of time was that the case, that DMC was

24   recommending that the fruit bowl product be placed next to

25   fresh-cut fruit bowls?

C42Wfre1                          "Spielmann"

1    "A.   Six to nine months.

2    "Q.   And what is DMC's current recommendation, just so I

3    understand it, with respect to the fruit bowl placement?

4    "A.   To be placed together with the rest of the Del Monte

5    portfolio.

6    "Q.   And just so I understand, about what time period did that

7    recommendation change?   Sometime in 2009?

8    "A.   Yes.   Mid-year 2009.

9    "Q.   Prior to that point, do you know whether retailers were

10   placing the Del Monte fruit bowls next to cut fresh fruit bowl

11   products?

12   "A.   Based on the sample we got from that Nielsen analysis, I

13   would say half and half.   Half of them were next to fresh-cut

14   fruit bowls, the other half was next to the rest of our line.

15   "Q.   Since the time when DMC's recommendation changed, has DMC

16   tried to measure whether the placement in stores has also

17   changed?

18   "A.   No, we haven't.

19   "Q.   Do you have any idea whether the placement in stores has

20   changed since DMC changed its recommendation?

21   "A.   I really don't know.

22   "Q.   Have you been to stores where the DMC cut-fruit products

23   are grouped all together in accordance with DMC's

24   recommendation?

25   "A.   Yes.

C42Wfre1                         "Spielmann"

1    "Q.  Approximately how many stores have you seen that occur?

2    "A.  You're asking me to guess on that one.  I really don't

3    know.

4    "Q.  If you can give me a ballpark.  More than 50?

5    "A.  Probably I visited 50 stores in the last year, so I would

6    say at least 40 of them were the way we're recommending it

7    today.

8    "Q.  That is all the DMC cut-fruit products groups together?

9    "A.  Yes.

10   "Q.  And in those approximately 40 or so stores, how many of

11   them also had fresh-cut fruit products in the same display

12   container?

13   "A.  Most of them.

14   "Q.  Are you aware of any retailers who have, who are selling

15   the DMC cut-fruit products in sections of the supermarket other

16   than the refrigerated produce section?

17   "A.  Not the complete lines but certain items of our line, yes.

18   "Q.  Which retailers are selling certain DMC cut-fruit products

19   in sections other than the produce section?

20   "A.  Publix for Fruit Naturals, which we discussed before in

21   the discussion, and we go man's.

22   "Q.  So when we talked earlier about the analysis of the Fruit

23   Naturals velocity in the deli versus the produce section, the

24   data for the deli section sales for Fruit Naturals, that was

25   from Publix?

C42Wfre1                          "Spielmann"

1    "A.   Yes.

2    "Q.   How long has Publix been selling the Fruit Naturals

3    products in the deli section?

4    "A.   Since day one.

5    "Q.   Are they sold refrigerated at Publix?

6    "A.   Yes.

7    "Q.   So let's just make sure this is clear.  In Costco if a

8    product has a shelf life of more than 14 days, it cannot be

9    sold in the produce section?

10   "A.   Yes.

11   "Q.   Do you have an understanding as to why that's the case?

12   "A.   I would love to.  No.

13   "Q.   So no DMC cut-fruit products are sold in the produce

14   section at Costco, correct?

15   "A.   That's correct.

16   "Q.   They're sold in the dairy section or in the dairy cooler?

17   "A.   That's correct.

18   "Q.   How about at Sam's club, are any of the DMC cut-fruit

19   products sold in the produce section?

20   "A.   No.

21   "Q.   Earlier we talked about consumer perception studies.  Does

22   DMC use consumer perception studies to help them design

23   products?

24   "A.   We use consumer research to design products, yes.

25   "Q.   Do you know if the study that we just discussed on

C42Wfre1                          "Spielmann"

1   Superfruit, do you know whether that was a qualitative or

2   quantitative study?

3   "A.   I don't recall.

4   "Q.   Do you know what the results or conclusions of the study

5   were?

6   "A.   The new label that we designed, which has been on the

7   market for six months right now, was better than the old one.

8   "Q.   What about the new label was better than the old one?

9   "A.   The communication was clearer.

10  "Q.   What was changed?

11  "A.   We changed -- we made it very clear with a mnemonic device

12  of color, the fruit plus this juice.  So it was very clear it

13  was fruit plus juice versus everything combined.

14  "Q.   Were there any other changes that were made to the product

15  packaging?

16  "A.   The structural packaging, we made it shorter and with a

17  different shape than Fruit Naturals in order to differentiate.

18  "Q.   Differentiate it from what?

19  "A.   From Fruit Naturals.

20  "Q.   Are you aware of any studies done by or for DMC in which

21  it was concluded that products in the refrigerated section

22  seemed fresher?

23  "A.   No, I do not.

24  "Q.   How large is the data source for the home scan analysis?

25  "A.   I really don't know.  It's large enough to get a

C42Wfre1                          "Spielmann"

1    representative sample.  I really don't know the number.

2    "Q.  Reliable information?

3    "A.  Yes.

4    "Q.  How does DMC use the information it gets from Nielsen in

5    the context of the cut fruit business?  What does it do with

6    the information?

7    "A.  We try to understand how we're performing in the market,

8    and that's pretty broad.

9    "Q.  And DMC relies on the Nielsen information for that?

10   "A.  Because it's factual information, yes.

11   "Q.  At the time that the red grapefruit bowl was introduced,

12   DMC was also selling some Sunfresh red grapefruit, correct?

13   "A.  Yes.

14   "Q.  And I believe, and you can correct me if I am wrong, the

15   contents of the Sunfresh red grapefruit product are identical

16   to the contents of the Fruit Bowl red grapefruit product,

17   right?

18   "A.  I believe there is a slight difference in the juice.  So I

19   believe there is a small difference, not huge.  But I believe

20   there's a small difference in the formulations.

21   "Q.  What's the difference in the formulation, to your

22   understanding?

23   "A.  The amount of juice you have inside.  I forget which one

24   has more, the amount of juice.  And also the ratio.

25   "Q.  Go ahead.  I'm sorry.

C42Wfre1                          "Spielmann"

1    "A.  No problem.

2         -- the ratio fruit to juice is different.

3    "Q.  So how does the ratio vary from the, let's just focus on

4    the 24 ounce Sunfresh product.

5    "A.  Okay.

6    "Q.  Allow does the ratio in juice from that product differ

7    from the fruit bowl product?

8    "A.  You have more fruit to juice in the glass jar than in the

9    bowl.

10   "Q.  Are you familiar with the type of packaging that other

11   companies use for their fresh-cut fruit products?

12   "A.  Yes.

13   "Q.  What type of packaging is used for fresh-cut fruit

14   products?

15   "A.  Normally clear bowls with minimal labeling.

16   "Q.  Do you know why DMC decided to use clear plastic packaging

17   for the fruit bowl product?

18             MR. GONZALEZ:  You just missed a couple of words.

19             MS. AGUIAR:  It was on the errata.  It was taken out.

20   The witness corrected it.

21   "Q.  And have you had any discussions with them on this issue,

22   whether you offer fresh fruit or not?

23   "A.  No.

24   "Q.  Have any of them indicated to you that they're aware that

25   DMC does not offer any fresh-cut fruit products?

C42Wfre1                          "Spielmann"

1    "A.  We have never discussed fresh-cut fruit.  We have never

2    discussed salad dressing either.  I mean, we don't discuss

3    categories we don't compete in.

4    "Q.  And how does the Citrus Bowl product line help your

5    customers enhance their fresh cut assortment?

6    "A.  If they get consumers to have a destination of, say, if

7    you want to get product, fruit, from here to the table and they

8    want to create a destination, the ability of providing the full

9    scope of fruit is good for them.

10   "Q.  I guess what I'm focusing on is what, if anything, about

11   this product specifically helps them enhance their fresh-cut

12   fruit assortment?

13   "A.  Going back to they don't have -- only two percent of

14   citrus, so clearly they don't have a lot of citrus available.

15   If the customers who are -- and this is again if, the customers

16   want that section to be a destination for consumers to get

17   fruit ready to go to the table, having more products, having

18   more variety would help create the destination.

19   "Q.  Do you think the Sunfresh red grapefruit product helps

20   your customers enhance the fresh-cut fruit assortment?

21   "A.  No.

22   "Q.  Do you think that the Citrus Bowl product helps them

23   enhance their fresh-cut fruit assortment?

24   "A.  That was the thinking at that point in time.

25   "Q.  Can you turn to page seven, please.  Do you see the

C42Wfre1                        "Spielmann"

1    heading risk assessment?

2    "A.   Yes.

3    "Q.   And am I right that one of the things that DMC worried

4    about going wrong is that the consumer would not view the bowls

5    as similar to fresh-cut fruit?

6    "A.   Thank you.   Actually, what it says here is the consumer

7    does not view bowl as similar to fresh-cut fruit or different

8    from Sunfresh products.

9    "Q.   Right.   They're two separate risks?

10   "A.   Yes.

11   "Q.   One risk would be that consumers saw the product as

12   similar to the Sunfresh product, that there was no material

13   difference?

14   "A.   That's correct.

15   "Q.   But another risk, you would agree, that DMC was concerned

16   about was consumers not viewing the bowls as similar to

17   fresh-cut fruit, right?

18   "A.   I don't understand the risk.   But this is what is written,

19   yes.

20   "Q.   What do you mean you don't understand the risk?

21   "A.   I have no idea why that would be a risk.   It's not a

22   fresh-cut fruit item.   I don't care, consumers clearly know

23   that.   I don't really care.   I don't see that as a risk.

24   "Q.   Okay.   Well, let's talk about this test.   What was the

25   purpose of the test that is discussed in this e-mail."

C42Wfre1                        "Spielmann"

1    "A.   Then absolutely everything in that packaging and product

2    tells them that this is processed, between swimming in liquid,

3    the NLEA ingredients statement, country of origin, heavily

4    branded, so there are a lot of pieces that tells them that this

5    is clearly not fresh fruit.

6          MR. GONZALEZ:   I'm sorry, counsel.   After ingredients

7    statement.

8    "Q.   And have you had any discussions with them on this issue,

9    whether you offer fresh fruit or not?

10   "A.   No.

11   "Q.   Have any of them indicated to you that they're aware that

12   DMC does not offer any fresh-cut fruit products?

13   "A.   We have never discussed fresh-cut fruit.   We have never

14   discussed salad dressing either.   I mean, we don't discuss

15   categories we don't compete in.

16   "Q.   And how does the Citrus Bowl product line help your

17   customers enhance their fresh cut assortment?

18   "A.   If they get consumers to have a destination of, say, if

19   you want to get product, fruit, from here to the table and they

20   want to create a destination, the ability of providing the full

21   scope of fruit is good for them.

22   "Q.   I guess what I'm focusing on is what, if anything, about

23   this product specifically helps them enhance their fresh-cut

24   fruit assortment?

25   "A.   Going back to they don't have -- only two percent of

C42Wfre1                         "Spielmann"

 1    citrus, so clearly they don't have a lot of citrus available.

 2    If the customers who are -- and this is again if, the customers

 3    want that section to be a destination for consumers to get

 4    fruit ready to go to the table, having more products, having

 5    more variety would help create the destination.

 6    "Q.  Do you think the Sunfresh red grapefruit product helps

 7    your customers enhance the fresh-cut fruit assortment?

 8    "A.  No.

 9    "Q.  Do you think that the Citrus Bowl product helps them

10    enhance their fresh-cut fruit assortment?

11    "A.  That was the thinking at that point in time.

12    "Q.  Can you turn to page seven, please.  Do you see the

13    heading risk assessment?

14    "A.  Yes.

15    "Q.  And am I right that one of the things that DMC worried

16    about going wrong is that the consumer would not view the bowls

17    as similar to fresh-cut fruit?

18    "A.  Thank you.  Actually, what it says here is the consumer

19    does not view bowl as similar to fresh-cut fruit or different

20    from Sunfresh products.

21    "Q.  Right.  They're two separate risks?

22    "A.  Yes.

23    "Q.  One risk would be that consumers saw the product as

24    similar to the Sunfresh product, that there was no material

25    difference?

C42Wfre1                          "Spielmann"

 1   "A.  That's correct.

 2   "Q.  But another risk, you would agree, that DMC was concerned

 3   about was consumers not viewing the bowls as similar to

 4   fresh-cut fruit, right?

 5   "A.  I don't understand the risk.  But this is what is written,

 6   yes.

 7   "Q.  What do you mean you don't understand the risk?

 8   "A.  I have no idea why that would be a risk.  It's not a

 9   fresh-cut fruit item.  I don't care, consumers clearly know

10   that.  I don't really care.  I don't see that as a risk.

11   "Q.  Okay.  Well, let's talk about this test.  What was the

12   purpose of the test that is discussed in this e-mail?"

13              MS. AGUIAR:  Trial Exhibit 58, Todd.

14   "A.  To compare our product performance in consumers' eyes

15   versus the Sundia 20 ounce item.

16   "Q.  Do you know which specific Del Monte product or products

17   were used?

18   "A.  Red grapefruit bowl.

19   "Q.  What about the Sundia product; is it the red grapefruit

20   cup or tub?

21   "A.  Tub.

22   "Q.  You received this report, correct, from Mr. Shapiro?

23   "A.  Yes.

24   "Q.  Do you recall when?

25   "A.  I don't, but give me a second.

C42Wfre1                          "Spielmann"

1          Mid-2008, but I don't know the specific date.
2     "Q.   And am I reading this right, that nearly three quarters of
3     the consumers that were shown your red grapefruit bowl thought
4     it looked like fresh fruit?
5     "A.   What it says is 55 percent of consumers believe that the
6     Sundia tub looked like fresh-cut fruit and 72 percent think the
7     bowl looked like fresh fruit.
8     "Q.   The bowl meaning the DMC fruit bowl?
9     "A.   That's correct.
10    "Q.   And you were pleased with that result, weren't you?
11    "A.   I don't know.  This is not my not.
12    "Q.   Do you remember your reaction to this study or the results
13    of this?
14    "A.   Mainly on the three to one winner.  And that was my
15    comment before when you said have you ever done a test, I said
16    if we have ever done one, most likely we did really well in
17    taste.  So I recall the tub one and nothing else.
18    "Q.   Well, I'm focusing now not on taste but consumers'
19    perception of whether your product looks like fresh fruit.
20    "A.   And you asked my reaction to that.  I don't recall that
21    reaction because it wasn't one of my objectives.
22    "Q.   Did it concern you that nearly three quarters of the
23    consumers polled thought your product looked like fresh fruit?
24    "A.   No.
25    "Q.   Why not?

C42Wfre1                        "Spielmann"

1    "A.  Why should it.

2    "Q.  Is your product fresh fruit?

3    "A.  No, and it doesn't say here that it's fresh fruit.  It

4    says that it looked like.  So this is not about consumers being

5    misled.  It's about consumers saying it looked like fresh

6    fruit.

7    "Q.  But it's not fresh fruit?

8    "A.  It's not.

9    "Q.  So it doesn't trouble you that a consumer thinks your

10   product looks like something it's not?

11   "A.  No.

12   "Q.  Mr. Spielmann, I marked what appears to be your response

13   to the e-mail we just discussed.  Do you see that?

14   "A.  Yes.

15   "Q.  And I am right, based on your e-mail, that you were

16   pleased with the result of the test?

17   "A.  Absolutely.  We're preferred three to one to Sundia.

18   That's good.

19   "Q.  Are you familiar with the Fruit Undressed ad campaign?

20   "A.  Yes, I am.

21   "Q.  What involvement, if any, did you have with that campaign?

22   "A.  Similar to my statement before.  I approved the brief.  I

23   was in the presentation.  I approved the final execution.

24   "Q.  When did that campaign launch?

25   "A.  September, October 2008.

C42Wfre1                          "Spielmann"

1   "Q.  For how long did the Fruit Undressed campaign run in

2   print?

3   "A.  In print, I think the last print we had was in January

4   2010, so if you go from September to January.

5   "Q.  Could you approximate how much was spent on print

6   advertising in connection with the Fruit Undressed ad campaign?

7   "A.  Roughly $6 million.

8   "Q.  Have you seen any statistics indicating how many people

9   were exposed to the Fruit Undressed advertising?

10   "A.  Not as a total.  I know that the plan in the first year

11   was roughly an 80 percent reach, if I'm not wrong, and I forget

12   the second year.

13   "Q.  What do you mean by 80 percent reach?

14   "A.  80 percent households would see it.

15   Q.  80 percent of all households in the United States?

16   "A.  Have the ability to see it.  It doesn't mean that they saw

17   it, but have the ability to see it.

18   "Q.  Mr. Spielmann, have you seen this document before?

19   "A.  Yes.

20   "Q.  What is it?

21   "A.  It's an advertising tracking.  The idea was to benchmark

22   where we were at that point before the advertising started,

23   that's why it's October.  To then be able to track afterwards

24   if we moved the needle or not.

25   "Q.  And this document says October 2008 benchmark report, but

C42Wfre1                          "Spielmann"

1   then to the right it says presented by Hall & Partners for Del

2   Monte Foods, November 24, 2008.  Do you see that?

3   "A.  Yes.

4   "Q.  And do you recall what Hall & Partners was asked to do?

5   "A.  As I mentioned before, trying to understand if advertising

6   moved the needle.  So they needed to do a benchmark before

7   starting and then a rate afterwards to see if it moved or not.

8   "Q.  I think I know what you mean, but can you explain what you

9   mean by moved the needle?

10  "A.  If it made any effect on, if it moved sales or not.

11  "Q.  And what condition, if any, was reached on that issue?

12  "A.  Actually, I don't recall because I, this is a benchmark,

13  then when it came afterwards, our sales were significantly up

14  and our household penetration was significantly up, so I didn't

15  really care about research.  I saw the end market results and

16  that was fine.

17  "Q.  So does that mean, in your view, that the advertising was

18  effective?

19  "A.  Yes.

20  "Q.  Who came up with the Fruit Undressed slogan?

21  "A.  Smith brothers.

22  "Q.  What did DMC want to convey with that slogan?

23  "A.  The same as the slogan as part of the advertising.  So,

24  again, convenient, just the fruit, great to eat, peeled so that

25  you can eat it.

C42Wfre1                          "Spielmann"

1     "Q.  Doesn't that message convey that the product consists of

2     fruit and nothing else?

3     "A.  It conveys that it's just the fruit, no peeling, no

4     pitting, no anything like that.  It's just the fruit.

5     "Q.  No preservatives?

6     "A.  It means that it doesn't contain the pits.  The definition

7     of Fruit Undressed is we peel the fruit for you, we pit the

8     fruit for you, we leave you only the fruit.

9     "Q.  You do that with the canned fruit products too though,

10    right?

11    "A.  Yes.

12    "Q.  Did you ever use the Fruit Undressed campaign for any of

13    the canned fruit products?

14    "A.  No.

15    "Q.  I think we covered this before, but you would agree that

16    the Fruit Naturals peach product that's depicted here is not a

17    fresh product, correct?

18    "A.  It's not a fresh product.

19    "Q.  You would agree with me that the Sunfresh mango product

20    depicted here is not a fresh product?

21    "A.  It's not a fresh product.

22    "Q.  And you would agree that the red grapefruit bowl is not a

23    fresh product, correct?

24    "A.  It is not a fresh product.

25    "Q.  If you turn to page 1510 again, one to zero.  This is Hall

C42Wfre1                    "Spielmann"

1    & Partners' report or summary of the results of the

2    quantitative study, correct?

3    "A.  Yes.

4    "Q.  At the top, Hall & Partners reports that most respondents

5    were able to play back that the advertising was about fresh

6    products that are healthy and ready to eat.  These, of course,

7    are not fresh products, right?

8    "A.  They're not.

9    "Q.  Was DMC at all concerned that most respondents who are

10   exposed to this advertising believed that the advertising is

11   about fresh products?

12   "A.  There are a couple of things before we start.  The

13   paragraph from the top is a statement, not a fact.  The facts

14   are in the table.  So now if you refer to the facts, what you

15   have here is fresh, freshness of the product, fresh look of the

16   product.  So they lump a lot of different things together.

17       We already saw before that they probably look fresh is

18   something that happens when you're able to see the product and

19   you see that it's good quality.  I don't know what match up

20   each one of them was here.  It wasn't relevant for me.  The one

21   that I cared about was actually the one that is two pages

22   behind, which is when it says what is the ad's central message.

23   "Q.  You're referring to page 1512?

24   "A.  That's correct.  And the message is the products have been

25   peeled so I don't have to.  That's close to 90 percent of

C42Wfre1                          "Spielmann"

1   consumers saying that.  That's our central message.

2   "Q.  Do you know what the term verbatims means related in this

3   context?

4   "A.  Yes.

5   "Q.  What's a verbatim?

6   "A.  A verbatim is before you lump things together, the way to

7   do this is you get a consumer phrase, a verbatim of what you

8   can quote.  And the person doing the survey, they get all these

9   verbatims and based on their own judgment, they lump them

10  together.

11  "Q.  Did you ever see the verbatims?

12  "A.  No.

13  "Q.  If you looked at the verbatims, you would agree that you

14  would be better able to tell what the individuals were saying

15  in response to the questions, correct?  That's the purpose of

16  looking at verbatims?

17  "A.  In general, yes.

18  "Q.  And some of the verbatims are listed here, correct?

19  "A.  11 out of 500, yes.

20  "Q.  So, for example, one of the verbatims is nothing but the

21  fruit already peeled for your convenience, correct?

22  "A.  Yes.

23  "Q.  That's not a truthful statement, is it?  The products

24  contain preservatives, don't they?

25  "A.  Peaches, no.  For example, they don't contain

C42Wfre1                         "Spielmann"

1   preservatives.  You get the fruit peeled for your convenience.

2   Q.  But you also get sodium benzoate and potassium sorbate with

3   the citrus bowls, correct?

4   "A.  It's correctly labeled.  That's correct.

5   "Q.  And you also get those ingredients with the Sunfresh

6   manage goes, correct?

7   "A.  I actually don't know.  But whatever ingredients you get

8   should be on the label.

9   "Q.  The red grapefruit product contains preservatives, right?

10  "A.  The red grapefruit product contains preservatives, yes.

11  "Q.  The first document, No. 88, I'll represent to you is a

12  copy of the verbatims for this advertisement.  What we've done

13  with the next exhibit I'll represent to you is we extrapolated

14  some of the columns from the verbatims just because they were

15  difficult to read and blow up.  So I'll represent to you for

16  the record that we extracted, not extrapolated, extracted some

17  of the columns from the verbatims, and that's what appears in

18  89.

19      Mr. Spielmann, I'll represent to you that the column O QAD2

20  in 89 and AD1, at least according to the data we received,

21  appears to be the responses recorded to the question that I

22  read earlier; that is, what was the main message that the ad

23  was trying to communicate?  What were your impressions of Del

24  Monte?  Do you see that?

25  "A.  Okay.  Yes.

C42Wfre1                          "Spielmann"

1    "Q.  If you turn to the second page, row 121, you see the

2    heading O QAD 2 on that and it reads, it is all natural,

3    nothing is added to it.  Do you see that?

4    "A.  Yes.

5    "Q.  With respect to the red grapefruit product, that's not

6    correct, right?  The red grapefruit product is not all natural?

7    "A.  That's correct.

8    "Q.  It contains preservatives?

9    "A.  Yes.

10   "Q.  If you turn to the next page, for example, respondent 164

11   refers to the product as fresh fruit, ready to eat.  Do you see

12   that?

13   "A.  Yes.

14   "Q.  And, again, you would agree with me that the red

15   grapefruit bowl is not a fresh fruit product?  If you look back

16   to the questionnaire, and No. 1 is the mango ad, ad No. 2 is

17   the peach ad, and No. 3 is the grapefruit bowl ad.

18   "A.  Thank you.

19   "Q.  If you turn, for example, to line 422, the respondent 422,

20   which is on page 10.

21   "A.  Yes.

22   "Q.  This respondent replied very fresh and natural, no

23   preservatives, bursting with natural goodness.  And this is in

24   response to the mapping go product.  Do you see that, ad No. 1?

25   "A.  Yes, I do.

C42Wfre1                         "Spielmann"

1    "Q.  You would agree with me that the mango product is not a

2    fresh product, correct?

3    "A.  Correct.

4    "Q.  And if, in fact, the mango product contained potassium

5    sorbate or sodium benzoate, then this customer would be

6    confused about the fact that the product has no preservatives,

7    correct?  You can answer the question.

8    "A.  I don't know what to infer from a consumer.  If the

9    consumer would ever buy this product, he would see the label.

10   It's correctly labeled.  There are ingredients.  They can make

11   their own assessment.

12   "Q.  I'm focusing on the ad, though.  You would agree with

13   me --

14   "A.  If the consumer is buying the product, if you're telling

15   me how the consumers would react to the ad, this what it says

16   here.  That one consumer out of 165 or 162 reacted to the ad

17   this way.

18   "Q.  Okay.  I'm just focusing on the advertising.

19   "A.  Okay.

20   "Q.  Okay.  Based on the advertising, right, the consumers

21   weren't shown the product: they were shown the advertising.  Is

22   that right?

23   "A.  That's correct.

24   "Q.  Based on the advertising, this consumer believes that the

25   message for the mango ad is that the product is very fresh and

C42Wfre1                        "Spielmann"

1   natural, no preservatives, right?

2   "A.  Yes.

3   "Q.  And that's not the case, is it?

4   "A.  That's correct.

5   "Q.  Are you aware of any evidence that consumers were misled

6   by any of the ads we just saw?

7   "A.  No.

8   "Q.  Are you aware that any consumer, of evidence that a

9   consumer saw the Fruit Undressed ad campaign, believed that the

10  products were fresh --

11  "A.  Other than what you just told me, no, nothing.

12  Q.  -- other than what we just looked at?  Other than what we

13  just looked at, are you aware of any evidence that consumers

14  who saw the Fruit Undressed ad campaign believed the products

15  featured in the ads were all natural?

16  "A.  No."

17          MR. GONZALEZ:  I'm sorry.  I don't think he finished

18  the answer.

19          MS. AGUIAR:  Oh.  I thought you said --

20          Sorry.  We'll do it again.

21          THE COURT:  Ask the question again.

22          MS. AGUIAR:  Sure.

23  "Q.  Are you aware that any consumer, of evidence that a

24  consumer saw the Fruit Undressed ad campaign, believed that the

25  products were fresh --

C42Wfre1                         "Spielmann"

1    "A.   Other than what you just told me, no, nothing.

2    "Q.   -- other than what we just looked at?  Other than what we

3    just looked at, are you aware of any evidence that consumers

4    who saw the Fruit Undressed ad campaign believed the products

5    featured in the ads were all natural?

6    "A.   No.

7              MS. AGUIAR:  Thank you, Mr. Spielmann.

8              THE WITNESS:  Thank you.

9              THE COURT:  Is there a second witness by deposition.

10             MR. DREYER:  There is, your Honor.  Dr. Carbonell.

11   Most of it will be by video.  There's a portion we will do by

12   read.

13             MR. GONZALEZ:  Your Honor, two things of the prior

14   reading.  I'm not sure if we got the date into the record.

15             THE COURT:  What was the date of the deposition?

16             MR. GONZALEZ:  April 8, 2010.

17             The other thing at the outset it was represented that

18   he was our employee.  He's our former employee.

19             THE COURT:  At that time.

20             MS. AGUIAR:  At that time.

21             THE COURT:  On the date of the deposition, was he

22   employed by Del Monte Corporation?

23             MR. GONZALEZ:  Yes.  And he is not to date.

24             THE COURT:  Fine.

25             MR. GONZALEZ:  Thank you.

C42Wfre1                    "Carbonell"

1              THE COURT:  Does the jury understand that?  Looks like

2     we're now going to have a second witness, partly by video

3     because sometimes these depositions are video'd, and partly by

4     a reading.  So you now will see the deposition by video.

5              MR. DREYER:  And for the reading portion, just to move

6     things along we can have the "witness" take the stand, if

7     that's okay, your Honor.

8              THE COURT:  All right.

9     "Q.  You understand that you are under oath today, correct?

10    "A.  Yes, I do.

11    "Q.  And you understand that you are to give truthful answers

12    today, is that correct?

13    "A.  Yes, I do.

14    "Q.  How long have you worked for Del Monte, sir?

15    "A.  I was associated with Del Monte ever since the merger from

16    NaBisCo brands with whom it was affiliated and Reynolds

17    Industries, which owned the Del Monte Corporations businesses

18    at the time so ever since that time, I was, which was in 1985,

19    I became associated with the Del Monte business in various

20    capacities.

21    "Q.  How long did you continue to work for Del Monte?

22    "A.  I continued to work with Del Monte Corporation after the

23    management buyout in, I believe, 1990.  And I stayed through my

24    retirement with them in 1992, I believe.

25    "Q.  At the time of the management buyout in 1989, what was

C42Wfre1                    "Carbonell"

1    your title with Del Monte?

2    "A.   I was chairman and chief executive officer.

3    "Q.   Dr. Carbonell, in late 1988, as we discussed, KKR acquired

4    Del Monte as part of its acquisition of RJR NaBisCo, correct?

5    "A.   Yes.

6    "Q.   At the time, Del Monte was wholly owned by NaBisCo,

7    correct?

8    "A.   Correct.

9    "Q.   Prior to KKR's acquisition, though, didn't Del Monte

10   operate a processed division as well as a tropical fruit

11   division?

12   "A.   Again, to be correct and helpful, if we go back to 1985

13   when Reynolds Industries acquired NaBisCo brands, Del Monte

14   Corporation existed pretty much as a single corporation, but it

15   always had as a separate division what was then called Del

16   Monte Fresh fruit, Del Monte Fresh fruit, as an, as an isolated

17   division.   Then when NaBisCo took it over, they divided the

18   processed foods into U.S.A., international, and Canada, but

19   kept fresh as a single entity, as it pretty much was.   When I

20   took it over as CEO of Del Monte Corp., my assignment, my first

21   assignment was to reconstitute all of the business back

22   together of process, which I did.   And so, I had processed as a

23   totally perfect, the consolidated company and fresh.   The two

24   were never broken apart or commingled, sir.   That was always

25   kept fresh as a separate unit.

C42Wfre1                         "Carbonell"

1    "Q.  Why was fresh kept as a separate unit, if you recall?

2    "A.  This is an entirely different business, that process is.

3    Fresh is a growing of an imported business.  Heavy component in

4    agriculture.  Even heavier component in shipping, and also in

5    taxation because of offshore locations and offshore marks.

6    And, therefore, there was no benefit to integration.

7    Therefore, there was no benefit to integration."

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C42FFRE2                              "Carbonell"

1     "Q.  Did the two businesses source different types of fruit

2     from each other at that time?

3     "A.  There were some areas where I think pineapple was a common

4     denominator.

5     "Q.  Meaning both businesses sold pineapple?  I'm trying to

6     understand what you mean when you say common denominator.

7     "A.  Let me explain, please.  The business of Fresh were -- was

8     primarily bananas, fresh bananas and there was no commingling

9     at all.  That was entirely unutilized by Del Monte process.  I

10    don't recall this maybe some fruit cocktails might have had

11    some banana component, but that was a minor deal.

12    "Q.  Other than possibly bananas do you recall any other

13    specific fruits or vegetables that were sold only by what

14    you're calling the Fresh business?

15    "A.  Yes.

16    "Q.  What products?

17    "A.  Products like mangos, berries, except for fruit cocktail,

18    you know, components.

19    "Q.  Did Fresh sell berries as part of the fruit cocktail?

20    "A.  Under the Del Monte brand?

21    "Q.  Yes.

22    "A.  I don't recall Fresh selling a Del Monte branded fruit

23    cocktail.

24    "Q.  Did they sell any fruit cocktail under any other brand?

25    "A.  There's an affiliation and an acquisition with a company

C42FFRE2                      "Carbonell"

1   by the name J. Nichols that had a -- the name Sun something, I

2   don't recall.  That was a chemically treated fruit cocktail.

3   "Q.  And was that sold as part of the Fresh operations?

4   "A.  That was part of the Fresh operations to use surplus

5   fruit.

6   "Q.  And that was a preserved product?

7   "A.  To the best of my recollection, it was.

8   "Q.  Do you recall what fruits, what parts, what fruits were

9   part of that fruit cocktail?

10  "A.  I remember pineapple, I remember papaya and I remember

11  berries.  But other than that, I don't -- I don't think were

12  more.

13  "Q.  Just so we're clear, during this time period did the

14  process business sell any melon products, do you recall?

15  "A.  Melons?

16  "Q.  Melons.

17  "A.  No, I don't recall.

18  "Q.  Do you recall whether the Fresh business sold melons

19  during this time period?

20  "A.  Again, part of the J. Nichols acquisition brought a melon

21  business in the U.S., I think a trucking business, that J.

22  Nichols was doing at the time.

23  "Q.  Dr. Carbonell, earlier we were talking about the J.

24  Nichols business.  Do you recall specifically what line of

25  business J. Nichols was in when it was acquired by Del Monte?

C42FFRE2                        "Carbonell"

1    "A.   I know that an important part of the acquisition was that

2    J. Nichols' operation in Costa Rica, which I visited

3    personally, J. Nichols had in Costa Rica a packing plant for

4    refrigerated chemically processed fruit salads and might have

5    also had other products to export, but I don't recall that they

6    were prominent or of interest to us.   And then in the United

7    States, as I mentioned, I recall his having a melon, a

8    watermelon trucking business, and that was of interest to us in

9    the sense of expanding the number of fresh fruits that Del

10   Monte Tropical would market.   And that's all I recall, sir.

11   "Q.   The refrigerated fruit salad that you talked about, I know

12   we talked about this a little bit earlier, do you recall

13   specifically what fruits are contained within the J. Nichols

14   fruit salad?

15   "A.   As I believe I said, they were, besides pineapple, they

16   had berries, they had papaya and they may have melons like

17   cantaloupe and the like.

18   "Q.   And when those products were sold to consumers were they

19   sold in --

20   "A.   As fresh fruit.

21   "Q.   Were they sold in a refrigerated container?

22   "A.   Yes, I believe so.

23   "Q.   And you said that they were treated with chemicals, is

24   that right?

25   "A.   I believe they had sodium benzoate, yes.

C42FFRE2                          "Carbonell"

1   "Q.  Do you know whether they also had potassium sorbate?

2   "A.  Yes, they might have that also, but I am not a hundred

3   percent sure which antimycotic mixture they used, why they

4   relied on benzoate, which is the cheaper way of doing it or

5   whether they also used sorbate.  I don't know.

6   "Q.  Do you recall whether the product used ascorbic acid?

7   "A.  Ascorbic acid is used to preserve color normally.  It's an

8   antioxidant.  And they might have, but I don't know for a fact.

9   "Q.  Let me see if I can refresh your recollection.  If you

10  could turn to Exhibit 42, which is your trial testimony,

11  correct?  Starting on page 61.  Then there is another question

12  that's asking about that operation and you describe it starting

13  at 62 as: 'Very similar to what I described for Hawaii.  In

14  addition, in Costa Rica, we owned a subsidiary at the time by

15  the name of J. Nichols Company, which was in the business of

16  growing melons and other fruits, berries, and they had a fruit

17  salad operation which was preserved fruit salad, through what I

18  would call antimycotics, which comprises everything you

19  mentioned earlier, benzoate, sorbate, ascorbic acid and they

20  made small fruit salad exports that were not under the Del

21  Monte label.'  Do you see that?

22  "A.  I see that.

23  "Q.  Does that refresh your recollection as to whether the J.

24  Nichols products contained --

25  "A.  That's shows I had a better memory ten years ago than I do

C42FFRE2                        "Carbonell"

1    knew.

2    "Q.  I'm sure we all did, sir.  And you believe that to be

3    accurate, is that correct?

4    "A.  I believe so, yes.

5    "Q.  I'm going to go to the second document, which is DMFP1576.

6    We talked about this earlier.  This is under the heading Del

7    Monte fresh fruit operations.

8    "A.  526?

9    "Q.  1576.

10   "A.  1576.  Yes, sir.

11   "Q.  This was the J. Nichols fruit salad that we talked about

12   earlier under the heading Tropical Sun products.  And it says,

13   'Current production plans include the development of a fruit

14   salad to be packed in one gallon and quart plastic jars,

15   refrigerated, shipped and sold to the U.S. food service

16   industry and retail chain stores through J. Nichols.'  Do you

17   see that?

18   "A.  Yes, sir.

19   "Q.  Does that refresh your recollection as to whether the J.

20   Nichols products were to be sold in a refrigerated form?

21   "A.  It would appear to indicate that they were selling

22   refrigerated products, yes, sir.

23   "Q.  Let's mark the next exhibit.  Dr. Carbonell, focusing on

24   what I think is the first page of what you have with the number

25   on the bottom, DMFP1259, do you see that document?

C42FFRE2                    "Carbonell"

1   "A.  Yes.  I believe this is the offering document that Goldman

2   Sachs prepared when the entire Del Monte Foods was for sale.

3   "Q.  And what was the purpose of this document, if you recall?

4   "A.  The purpose of this document was to introduce the asset

5   that we were trying to sell to potential buyers.  We mailed

6   these to a number of companies on a worldwide basis and invited

7   them to participate in a closed auction bidding process for the

8   entire business, and this was how we introduced ourselves.  We

9   not only had sent the document to the companies, but those who

10  attended, we had a number of shows, if you like, where we made

11  a presentation of these materials and answered any questions

12  they had.  And we hopefully enticed them into participating in

13  the bidding process.

14  "Q.  And ultimately to buy the company?

15  "A.  Ultimately succeeded in the divestiture of the asset, if

16  you would, the brokered business.

17  "Q.  If you could then go to the beginning of the next part of

18  the document, which is marked DMPF1530?

19  "A.  With the separate bundle?

20  "Q.  Yes, sir.

21  "A.  Yes.

22  "Q.  Which also has the heading Del Monte fresh fruit

23  operations?

24  "A.  Correct.

25  "Q.  Have you seen this document before?

C42FFRE2                         "Carbonell"

1    "A.   Yes, sir.

2    "Q.   If you could turn to page DMFP1576?

3    "A.   12576?

4    "Q.   Yes, sir.

5    "A.   Yes, sir.

6    "Q.   Under the heading Tropical Sun Products SA, do you see

7    that?

8    "A.   Mm-hmm.

9    "Q.   And it reads 'In August 1998 DMTFC,' and DMTFC is a

10   reference to Del Monte Tropical Fruit company?

11   "A.   Mm-hmm.   Yes.

12   "Q.   'DMTFC acquired a 50 percent interest in a tropical fruit

13   salad operation in Costa Rica.'  Do you see that?

14   "A.   Yes.

15   "Q.   Is that a reference to J. Nichols, if you recall?

16   "A.   I believe it is, yes.

17   "Q.   It says, 'The acquisition was made primarily to facilitate

18   the production of tropical fruit salad from residual fruit

19   generated from the division's growing operation in Costa Rica.

20   This includes pineapple from Pindeco and melons from J.

21   Nichols' Inc. contract office.'  Do you see that?

22   "A.   Yes, sir.

23   "Q.   It continues:  'The current production plants include the

24   development of a fruit salad to be packed in one gallon and

25   quart plastic jars, refrigerated, shipped and sold to the U.S.

C42FFRE2                          "Carbonell"

1   food service industry to retail chain food stores through J.

2   Nichols.'  Do you see that?

3   "A.  I do.

4   "Q.  Is this a reference to the chemically treated fruit salad

5   product that we talked about a moment ago, do you recall?

6   "A.  I believe so, yes.

7   "Q.  Sir, based on this document, is it fair to say that

8   pineapples and melons were an important part of the Del Monte

9   tropical fruit business as of 1989?

10  "A.  I don't agree with that.  I don't think so.  They were a

11  minor part.

12  "Q.  But they were referenced in this document as a new product

13  that was going to be part of the tropical fruit business,

14  correct?

15  "A.  Yes, but it doesn't say that it's going to become a

16  significant part of it.

17  "Q.  Was it an important part of that business?

18  "A.  Melons.

19  "Q.  And pineapple -- yes, melons?

20  "A.  Pineapple for sure.  Melons, no.

21  "Q.  How about the fruit salad product?

22  "A.  As I think it says, I think they used the word 'residual.'

23  It was an outlet for residual fruit.

24  "Q.  And it was significant enough that it was included in

25  Goldman Sachs' analysis of the company that was designed to

C42FFRE2                         "Carbonell"

1   attract potential buyers, correct?

2   "A.  I don't think it is an assessment of significance in the

3   presentation.  It doesn't say it's anticipated to be a major

4   component of revenues or earnings.  I think it's just listed

5   among new product activity, which was an important thing to

6   catch the eye of the potential buyers.

7   "Q.  Okay.  I understand.

8   "A.  Del Monte classic had the same thing and it was far more

9   important to Del Monte process than J. Nichols' products were

10  to Del Monte tropical.

11  "Q.  Let's mark the next document.  Just so we're clear, this

12  is a document that bears the Bates range DMFP5520 through 5525

13  and it's a September 12, 1988 memo from D. Funk and A. Schurr.

14  Have you seen this memo before, Dr. Carbonell?

15  "A.  I don't recall so.

16  "Q.  Do you know who D. Funk is?

17  A.  Dan Funk.  I believe he was in the technical side of the

18  fresh fruit business, quality control and product develop sort

19  of assignment.

20  "Q.  And I see that Mr. Haycox is copied on this memo.  At the

21  time, September 1998, Mr. Haycox was working for Del Monte

22  tropical fruit division?

23  "A.  He was chief operating officer.

24  "Q.  We also have J. Nichols?

25  "A.  I presume it's the J. Nichols of J. Nichols Company.

C42FFRE2                          "Carbonell"

1   "Q.  This is an October 28, 1998 intercompany correspondence

2   from D. Funk.  Do you recall seeing this document before?

3   "A.  I don't believe I have.

4   "Q.  Under the distribution list there's someone by the name of

5   P. Bott.  Do you see that?

6   "A.  Paul Bott was at the time president and chief executive of

7   Del Monte tropical fruit.

8   "Q.  Directing your attention to page DMFP5533?

9   "A.  Yes, sir.

10  "Q.  Under the heading preserved fruit salad?

11  "A.  Mm-hmm.

12  "Q.  'objective:  Develop a formula for the preparation of a

13  preserved fruit salad in Costa Rica which utilizes

14  predominantly residual pineapple and melons.'  Do you see that?

15  "A.  Yes.

16  "Q.  Do you know whether this is a reference to the same

17  preserved fruit salad that's referenced in the Goldman Sachs

18  offering memo that we looked at earlier?

19  "A.  I don't know for a fact, but I believe.  It has a high

20  likelihood of being the same thing.

21  "Q.  As I think we also discussed, after it acquired RJR

22  Nabisco, KKR began efforts to sell Del Monte, correct?

23  "A.  I would express it a little differently.  KKR instructed

24  me to sell Del Monte.  I was at the time chairman and CEO of

25  Del Monte Corporation, which included the whole Del Monte

C42FFRE2                        "Carbonell"

1    business.

2    "Q.  And so you were tasked with the assignment of selling Del

3    Monte?

4    "A.  Correct.

5    "Q.  And at some point KKR agreed to sell the Del Monte

6    tropical fruit business to Polly Peck as we discussed, correct?

7    A.  Well, on Monday morning when we all went back to work from

8    the weekend we were told that we had sold them.

9    Q.  And at some point after that, Del Monte and Polly Peck

10   entered into a license agreement, correct?

11   "A.  Yes.  Some period of time after that.

12   "Q.  That was the license agreement that permitted Polly Peck

13   to use the Del Monte trademark on certain products in the

14   United States and elsewhere, correct?

15   "A.  Correct.

16   "Q.  Just so we're clear, at the time of the license agreement,

17   you were chairman and CEO of Del Monte, correct?

18   "A.  Del Monte Corp., yes."

19           MR. DREYER:  Your Honor, we have just a short read,

20   then back to the video.

21           THE COURT:  All right.  Just for the record, sir tell

22   us your name.

23           MR. FEIRMAN:  Jordan Feirman.

24           THE COURT:  Mr. Feirman is going to read the part of

25   Mr. Carbonell.

C42FFRE2                          "Carbonell"

1    "Q.  Let me hand you what we've premarked as Exhibit 1.

2           MR. DREYER:  If you could put that up.

3    "Q.  Do you recall this document?  It's titled the DMC Wafer

4    license.

5    "A.  Yes, sir.

6    "Q.  What is this, what is it?

7    "A.  It's an agreement between Del Monte Corporation and a

8    subsidiary of Polly Peck International, PLC.  It is a licensing

9    agreement that Del Monte grants certain use rights for its

10   trademark the Polly Peck subsidiary.

11   "Q.  What if any role did you have in the negotiation of any

12   aspects of this agreement?

13   "A.  I participated in the negotiation of certain aspects of

14   this agreement.

15   "Q.  When did you participate in those negotiations?

16   "A.  When in time?

17   "Q.  Yes.

18   "A.  I recall between September and December of 1989.  After

19   the, you know, Polly Peck surfaced and had a deal with KKR for

20   the purchase of Del Monte tropical fruit.

21   "Q.  Which were the portions that you recall you negotiated?

22   "A.  Negotiated is, may not characterize what went on.  At the

23   time we had Shearman & Sterling representing the acquiring

24   group for Del Monte which I was associated with and so I had

25   discussions with Shearman & Sterling.  I had discussions with

C42FFRE2                          "Carbonell"

1    Merrill Lynch with primarily Dennis Kelly was the

2    representative who was associated with this purchase and then,

3    of course, we will get feedback like we get drafts back from

4    Shearman & Sterling and we will react and discuss them.  But in

5    the classic sense of getting all down into the room as we are

6    here today, I don't recall that it might have happened only

7    once.

8    "Q.  Do you recall a specific time when it actually happened or

9    is this a--

10   "A.  Not in terms of the specific date.  It was around the

11   middle because I recall that Mark Ellis from, who represented

12   Polly Peck in the U.S., an employee of Polly Peck, came into

13   that meeting, but I don't recall the time, I mean, it's ten

14   years ago.

15   "Q.  Do you remember the specific discussions that ensued with

16   Mr. Ellis that you participated in or that you were present

17   for?

18   "A.  After the initial agreement with KKR, Polly Peck felt that

19   they had bought the brand for fresh fruit as opposed to

20   receiving a license and their main interest was to retain what

21   they thought they had, they were buying.  As I said earlier, I

22   wasn't privy to the discussions between KKR and Polly Peck, so

23   I don't know what was represented or misrepresented, but when

24   we were back on the track to acquire the processed foods, KKR

25   acknowledged to us that they had intended to do that and we

C42FFRE2                          "Carbonell"

1    acknowledged to KKR that it was our intent to make sure that

2    the Del Monte Corporation retained the ownership of the brand

3    and that the license agreements offered Del Monte Corporation

4    the rights to control the quality levels of the products that

5    bore the Del Monte brand.

6              MR. DREYER:  I believe there's a little bit more.

7              MR. FEIRMAN:  I think I'm missing that page.  Sorry.

8              MR. DREYER:  It's page 38, line 8.

9    "A.  And lastly, we wanted to make sure that they were not

10   going to become a competitor of Del Monte, Del Monte

11   Corporation by entering product areas where they were not

12   present at the time of the sale and that was the plain subject

13   or the discussion of that meeting was to reassure Polly Peck

14   that that was our position, to clarify to Polly Peck that that

15   was our position and to reassure them that we had every intent

16   for them to do their business subject to the limitations that

17   were to be negotiated in the future prior to the existence of

18   this agreement.

19   "Q.  What if anything do you recall Mr. Ellis said?

20   "A.  On this occasion?

21   "Q.  Yes.

22   "A.  I think Mr. Ellis, if memory serves me right, besides this

23   agreement, there were other issues that we had to discuss, and

24   his participation was most active in these other areas which

25   related to Del Monte Philippines.

C42FFRE2                        "Carbonell"

1   "Q.  At this meeting did Mr. Ellis indicate that he understood

2   what Del Monte Corporation's position was as you said it was

3   stated and that this was acceptable to Mr. Ellis?

4              MR. DREYER:  Let's have the last piece of the video.

5   "Q.  Does that refresh your recollection whether you met with

6   Mr. Ellis on behalf of Polly Peck?

7   "A.  I think this refers to where I just related to you as the

8   only Polly Peck meeting that I recall.

9   "Q.  Right.  And that was with Mr. Ellis?

10  "A.  Well, he was present.  I mean it wasn't a one-on-one.

11  "Q.  Do you recall who else was present?

12  "A.  Lots of lawyers from both sides.  And I don't recall

13  anybody but lawyers, basically.

14  "Q.  Dr. Carbonell, at this time in 1989, the processed

15  division was not selling any of its products in the produce

16  section of the supermarkets, correct?

17  "A.  I believe that's correct.

18  "Q.  The parties were not competing in this area, were they?

19  "A.  I believe that's correct.

20  "Q.  So just so we're clear, let me ask you the question I

21  previously asked you.  During the drafting of Exhibit B prior

22  to the time of it being executed, are you aware of anyone on

23  behalf of Del Monte or RJR or KKR communicating to Polly Peck

24  the belief that Polly Peck would not be able to put the Del

25  Monte mark on products that were being sold by J. Nichols?

C42FFRE2                        "Carbonell"

1    A.  I don't have direct knowledge of that, sir."

2              MR. DREYER:  Your Honor, nothing further from the

3    witness.

4              THE COURT:  All right, thank you.

5              MR. GONZALEZ:  Your Honor, just for the record, the

6    reading of the Carbonell deposition was from October 13, 1998.

7              THE COURT:  Thank you, sir.

8              MR. DREYER:  Your Honor, we have Dr. Jacoby.  I'm not

9    sure if this is an appropriate time to call a break.

10             THE COURT:  Mr. Gonzalez, the reading did not take

11   place in 1998.  The reading of what was from 1998?

12             MR. GONZALEZ:  The part where we just did a mock --

13   that deposition that they were reading from took place on

14   October 13 of 1998?

15             THE COURT:  Oh, thank you.  All right, thank you.

16             MR. DREYER:  And the videotaped portion was from

17   September 2010, as you just saw.

18             THE COURT:  I understand.

19             We're going to bring back now the witness who was on

20   the stand the end of Thursday.  Call him, please.

21             All right, ladies and gentlemen, we're going to pick

22   up now with the witness who was on the stand on Thursday.  It

23   also is a Fresh Del Monte witness, because this is all part of

24   Fresh Del Monte's case.

25             Welcome again, Dr. Jacoby.  I remind you again that

C42FFRE2                          Jacoby – direct

1    you remain under oath.  You understand that, is that correct?

2              THE WITNESS:  Yes, I do.

3              THE COURT:  Please be seated.  Move your chair forward

4    and we'll continue where we left off on Thursday.  Mr. Plevan,

5    your witness, sir.

6              MR. PLEVAN:  Thank you, your Honor.

7    JACOB JACOBY,

8         called as a witness by the Plaintiff,

9         having been previously duly sworn, testified as follows:

10   DIRECT EXAMINATION (Cont'd)

11   BY MR. PLEVAN:

12   Q.  Dr. Jacoby, when we ended on Thursday afternoon, do you

13   recall that we were beginning to discuss your analysis of the

14   Hall & Partners data?

15   A.  Yes.

16   Q.  Before we go back to that Hall & Partners data let's go

17   back and tie up some loose ends on the data that you generated

18   in your survey.

19              MR. PLEVAN:  Could we have demonstrative 5?  Thank

20   you.

21   Q.  Dr. Jacoby, I know you went over this the other day but go

22   to the fifth column.  What does that data show?

23   A.  Where it says "preserved"?

24   Q.  Right.  The preserved.

25   A.  Remember, the respondents were asked regarding the fruit in

C42FFRE2                    Jacoby - direct

1    the container whether they thought it was fresh, preserved and
2    they could say don't know, so in the fourth column we have the
3    percent who said fresh.  In the fifth column we have the
4    percent who said preserved and in the sixth column we have the
5    percent who said don't know.
6    Q.  All right.  Now, at your deposition you were asked
7    questions about the responses among those who said that the cut
8    fruit was preserved, the fifth column.  Are those responses in
9    your view relevant to understanding why respondents believe
10   that the Del Monte Corp.'s cut fruit was fresh?
11   A.  No, they're not.  We know not everyone took away a fresh
12   meaning.  Some people thought the various items we showed them
13   were preserved and some said don't know.  The key consideration
14   that the study was directed towards was to find out what
15   percent thought these various items contained fresh fruit.
16   Q.  Is there any useful exercise in comparing various numbers
17   in that fifth column?
18   A.  No.
19   Q.  Now, if we could have Exhibit 129, page 8.  Dr. Jacoby, you
20   testified last week about removing the product from sight, do
21   you recall that, before question 2A was asked?
22   A.  Right.
23   Q.  Now, at your deposition you were asked whether you should
24   have left the product there while the questions that followed
25   were asked.  Do you recall that?

C42FFRE2                          Jacoby - direct

1   A.  Yes, I do.

2   Q.  Now, do you view that as a proper criticism of your survey?

3   A.  No, I do not.

4   Q.  Explain why, please?

5   A.  Well, there's, in this agreement across the courts

6   actually, there are circumstances under which you leave

7   something in view and under which you take it away.  Some

8   courts tell you if you leave it in view it's a reading test.

9   Some courts say if you take it away it's a memory test.  The

10  question is what's realistic.  In the real world the consumer

11  doesn't take the package away, it's not taken away.

12       However, in the real world you don't have people who know

13  they're sort of in a test situation, that they're going to be

14  asked questions about this.  In the real world you don't have

15  an interviewer there asking them questions and in the real

16  world you don't have a situation where when the questions are

17  asked when they don't have that information in their mind they

18  can go look at the package and read from the package as opposed

19  to tell you the impressions that they had from having looked at

20  the package before for as long as they wanted.

21       So there are tradeoffs, and in this circumstance, by far,

22  in my opinion, the appropriate approach was to remove the

23  product from view, as is done, I should say, most of the time.

24  Q.  Most of the time in consumer surveys?

25  A.  Of this sort, yes.

C42FFRE2                              Jacoby - direct

1    Q.  Now, is there research that shows how much time consumers

2    actually spend looking at a product before they buy it?

3    A.  Yes.  We have a considerable amount of research that shows,

4    A, for frequently purchased products like this, they paid

5    hardly any attention to the product.  They usually read three

6    to five items of information if that, and they usually spend

7    around four to six seconds making the decision.

8    Q.  Now, if we could look at question 2A, which I believe

9    follows on the next page, and you can blow up the top.  Thank

10   you.  Now, you testified this was the key question in the first

11   part of your survey, Dr. Jacoby?

12   A.  Yes.

13   Q.  Now, at your deposition you were asked a number of

14   questions about the fact that the terms "fresh" and "preserved"

15   that are used in this question were not defined.  Do you recall

16   that?

17   A.  Yes, I do.

18   Q.  And is that a valid criticism of your survey design?

19   A.  I don't believe so.

20   Q.  Why not?

21   A.  Well, for several reasons.  Fresh and preserved are

22   basically opposites in this context.  They define each other.

23   If it's fresh, it's not preserved.  If it's preserved, it's not

24   fresh.  It's either/or.  They're mutually exclusive.  If you

25   start running around defining every term for consumers, A, some

C42FFRE2                          Jacoby - direct

1  are going to get insulted.  I mean, if I were to go and define

2  here's what fresh fruit is, by the way, fresh is blah, blah,

3  blah, some consumers are going to be insulted and it's going to

4  extend the interview, make it in some respects more confusing.

5  It's just not done for simple terms that consumers use in their

6  daily lives and understand in their daily lives.

7  Q.  Well, Dr. Jacoby, can the word "fresh" in a different

8  context mean something else?

9  A.  Sure.  You can talk about that fresh young thing on

10 Broadway.  You can talk about my daughter, who isn't fresh,

11 she's eleven, but you could say she's fresh.  Context -- the

12 meaning's defined in the context.  The words have a context.

13 Q.  Dr. Jacoby, in your deposition you were asked if the word

14 "fresh" could mean not spoiled.  Now, in this context does that

15 make any sense that fresh would mean not spoiled?

16 A.  No.  Consumers -- well, let's say manufacturers don't sell

17 food that's not spoiled or spoiled.  There's not a category of

18 spoiled food and not spoiled food.

19 Q.  All right, now, if we could go back to page 129.  008.  I'm

20 sorry, Exhibit 129-008 and if you could focus on Q1F and G at

21 the bottom.  Dr. Jacoby, you were asked a lot of questions at

22 your deposition about the use or non-use of a filter in this

23 survey.  So first, could you explain to us what is a filter?

24 A.  A filter is the question asked before you ask another

25 question.  It's designed to pull out individuals who may not

C42FFRE2                        Jacoby - direct

1    have an opinion.  For example, in this case, the full filter

2    would be do you have an opinion as to whether or not the fruit

3    in this container is fresh or preserved?  And if the people say

4    no, I don't have an opinion, then you wouldn't ask them is it

5    fresh or preserved.  The problem with full filters, though, is

6    as pointed out in the Federal Judicial Center's Reference

7    Manual on Scientific Evidence is that it's an easy way for

8    people who know that they're going to be asked a question

9    afterwards to cut down on the number of questions they're being

10   asked to move the interview forward and get out quicker.  And

11   so even if they do have an opinion they are inclined to say no,

12   I don't know.

13   Q.  What did you do here to make sure that respondents wouldn't

14   give an answer that they didn't really know the answer to?

15   "A.  I used what's called a quasi filter, which is what is

16   recommended in the Federal Judicial Center's Reference Manual

17   on Scientific Evidence, both in the 2000 version and I have a

18   prepublication copy of what's coming out in a few months in the

19   2012 version.  It's even more emphasized there that full

20   filters are to be preferred over -- excuse me, that quasi

21   filters are to be preferred over full filters.

22   Q.  Go to the next page on the top, I guess.  Show us in this

23   language what is the filter, the quasi, you called quasi filter

24   you used.

25   A.  Right.  Remember, it comes immediately after them being

C42FFRE2                         Jacoby - direct

1    told they can say don't know to any question, don't guess.

2    Then it comes to this question --

3    Q.  One second.  So, Dr. Jacoby, if we go back, those are the

4    questions at the bottom of this page which is Exhibit 129, the

5    eighth page?  This is the instructions regarding don't guess?

6    A.  Exactly.  If you don't know or don't have an answer don't

7    guess, just say don't know and we'll go on.

8               THE COURT:  And you say this is a quasi filter.

9               THE WITNESS:  No, your Honor, the quasi filter comes

10   in on the very next question, 2A.  And the quasi question says

11   if you can tell.  It sort of tells them -- I don't ask them

12   does this cut fruit product contain fresh fruit or preserved

13   fruit there's no forced choice there.  It says, if you can

14   tell, does this cut fruit product contain fresh fruit or

15   preserved fruit?

16              THE COURT:  Can you give the jury an example of what a

17   complete filter is?

18              THE WITNESS:  Yes, I did.  Let me give it again.

19   Instead of 2A, if you take out the "if you can tell," maybe

20   I'll ask the question 2 before 2A and question 2 would be do

21   you have an opinion on whether this cut fruit product contains

22   fresh fruit or preserved fruit?  And if they say no, I don't

23   have an opinion, then I wouldn't ask them does it contain fresh

24   or preserved.

25              THE COURT:  All right.

C42FFRE2                        Jacoby - direct

1          THE WITNESS:  But here I've put them both into one

2     question.

3          THE COURT:  All right, I understand.  And you're

4     saying there's some manual that you say prefers this method?

5          THE WITNESS:  Yes.  It's the --

6          THE COURT:  All right.  Thank you.

7     Q.  Dr. Jacoby, let's move on now to the next page of your main

8     questionnaire, and there were two additional questions.

9     Highlight both of those together.  The first one is, "What in

10    particular makes you say that?"  Do you see that?

11    A.  Yes, I do.

12    Q.  And then the second question, "Can you tell me more about

13    that?"  Dr. Jacoby, explain to us -- these are why questions,

14    why you asked.  You put these questions in your survey?

15    A.  It's customary to include questions like this, but they're

16    used for different purposes.  The most frequent purpose is to

17    try to identify bizarre answers, to see if people are coming

18    out with things that don't make sense in this context.  "Why do

19    I say that?  Because my sister-in-law told me this product has

20    fresh fruit," or for somebody to say, "I don't know, I just

21    guessed."  It gives them an opportunity then to clean the data

22    out for answers like that.  We found no such answers like that.

23    Q.  So therefore no responses were eliminated, is that what

24    you're saying?

25    A.  No responses were eliminated and no matter what they said

C42FFRE2                    Jacoby - direct

1   here it wasn't then followed up with probes and specifically,
2   which is typical if you want to go further, closed-ended
3   questions.
4   Q.   Let me stop you there.  At your deposition you were asked
5   for a number of pages questions about the answers to the why
6   questions.  So what was the argument that was being made and
7   what's your response to it?
8   A.   The argument is I should have paid attention to what people
9   said here as opposed to what the experimental data showed.  By
10  experimental data, those were the different groups who then got
11  the question 2A, if you can tell is this fresh fruit or
12  preserved fruit.  Experimentation is the gold standard in
13  science for figuring out cause and effect, and there's
14  tremendous amount of literature in the social sciences, which
15  even Dr. Simonson, who is in the back of the court, has quoted
16  and has used in his doctoral seminars.
17  Q.   Dr. Jacoby, what were the answers that were given that you
18  were pointed to, the general nature of the answers in those
19  responses?
20  A.   The answers in particular, a lot of people said when asked
21  why do you think, what in particular makes you say that it's
22  fresh fruit, they said because it looks fresh, because I can
23  see the fruit.
24  Q.   So this was the appearance of the fruit?
25  A.   It's the appearance of the fruit, yes.

C42FFRE2                          Jacoby - direct

Q.  And again, why then did you not take that into account in

evaluating the results?

A.  Because we have the experimental data which trumped these

verbal reports.  The experimental data we have people randomly

assigned to these cells, they were all coming in the same pool,

customers of cut fruit products.  We know from their answers to

that question 2A what was influencing them even though --

there's tremendous literature on this -- people don't always

know the reasons why they're influenced, what causes them to

come to a particular judgment.

          THE COURT:  Let me ask this, sir, and, Mr. Plevan,

I've neglected to give the jury its mid-morning break, so

whenever you think is a logical time I'll do that now.

          MR. PLEVAN:  Well, your Honor, if you have a

question --

          THE COURT:  No, I'm going to ask it.

          MR. PLEVAN:  Ask your question.

          THE COURT:  Don't look for me to put words in your

mouth.  I'm just trying to understand, as I said I believe on

Thursday.  Go back to the slide before, please.  Yes, can you

tell me more about that.  Are you saying that you used, you

employ the answer to 2C only to the extent of weeding out the

outliers just seemed like a good answer, something like that,

and only for this purpose?

A.  Yes.  In this case, your Honor, because we have an

C42FFRE2                          Jacoby - direct

1    experiment and the experimental data by far trumps --

2              THE COURT:  I understand that.  But if somebody said

3    the fruit looks fresh in 2C, you would not include that in your

4    calculations?

5              THE WITNESS:  That's in the report, but I wouldn't pay

6    attention to that, because there's so much literature and I

7    have a bunch in my pocket I could pull out and read to you

8    verbatim, of the most regarded scientists in behavioral

9    science --

10             THE COURT:  That is the experimental data that is the

11   earlier questions is what you ought to be focusing on, is that

12   your point?

13             THE WITNESS:  No, that you can't rely on the data in

14   these questions because things operate on such a subconscious

15   level.  When you ask why do you say the fruit in this container

16   is fresh, people aren't thinking about the fact that, oh, it

17   was chilled and I saw it in the fresh produce section or it's

18   in a plastic see-through container.  That doesn't occur to

19   them.  When you ask them why is the fruit fresh they're saying,

20   oh, because it looks fresh.  They're focusing on the object of

21   the question and not realizing all these other influences that

22   have impacted on their response.  The experiment teases those

23   influences out.

24             THE COURT:  All right.  Thank you.  Let's take a

25   ten-minute break, ladies and gentlemen.

C42FFRE2                         Jacoby - direct

1            (Recess)

2                             o0o

3            (In open court; jury present)

4            THE COURT:  Please be seated.  You may continue.

5            MR. PLEVAN:  May I have demonstrative 5 back on the

6       screen?

7       Q.  Dr. Jacoby, was your understanding that looking at the two

8       products you have in front of you, I've given you back Exhibits

9       166 and I think the other one is 188, is that right?  Those are

10      the two that you used in the survey as well as the cans,

11      correct?

12      A.  Yes.

13      Q.  Looking at those two products, was your understanding that

14      the grapefruit is the same?

15      A.  My understanding is the grapefruit is the same in all three

16      products.

17      Q.  Now, you indicated that some of the data indicated that the

18      appearance of the fruit was not driving the results.  Can you

19      illustrate by pointing to the data you had reference to on the

20      demonstrative 5?

21      A.  Sure.  There are several things.

22      Q.  I can have -- Todd, if you can highlight --

23      A.  Here we go, Mr. Plevan.  First take a look at this.  You

24      have the fruit bowl and the fruit bowl chilled in the fresh

25      produce aisle versus the canned file.  It's the exact same

C42FFRE2                        Jacoby - direct

1    product, exact same fruit, etc., or type of fruit.  Here you

2    see a 20 percent difference.  Then you take a look at the fruit

3    bowl chilled versus the SunFresh chilled.  Again, it's the same

4    product.  This is in the plastic container but it's not a thin,

5    flexible container and it's not the shape that you usually find

6    in the Korean deli.

7        So again, you have here about a 12-1/2 percent difference.

8    The fruit isn't determining that.  The appearance of the fruit

9    isn't determining that.

10       You could also take a look at the -- again, the fruit bowl

11   in the chilled produce versus again this SunFresh when it's in

12   the canned aisle.  Over there you got a 14-1/2 percent

13   difference between 38 and 52.4.  These differences are

14   consistent.  You don't have them inverted.  You don't have more

15   people saying it's fresh when it's in this large container as

16   opposed to the fruit bowl.  The data fit, they have what we

17   call technically nomological validity.

18   Q.  But what is the point with respect to the appearance of the

19   fruit?

20   A.  The appearance is the same in all of these, where you can

21   see the fruit.  So if it's the appearance of the fruit if

22   that's what's going on it ought to be roughly the same in all

23   these different groups, but it's not.  What's driving these

24   differences are the nature of the packaging, the section of the

25   supermarket in which the package was found and whether it was

C42FFRE2                         Jacoby - direct

1    chilled or at room temperature.

2              THE COURT:  Sir, earlier you said "there" and you hit

3    the larger product.  What is it?  Look at the tab.

4              THE WITNESS:  Exhibit 188.

5              THE COURT:  And you contrasted that to what you called

6    the fruit bowl, which is exhibit --

7              THE WITNESS:  166, your Honor.

8              THE COURT:  Thank you.

9    Q.  Now, Dr. Jacoby, you referred to professional literature.

10   Is there a specific article that is a leading article in this

11   area?

12   A.  There are many articles.  The one that I mentioned,

13   Professor Simonson, I and virtually everyone uses is the one by

14   Nisbett and Wilson.  It's one of the most cited articles in all

15   the social sciences with over 3,600 citations as of a few days

16   ago.  There are articles by William McGuire of Yale University,

17   the National Science Foundation.  There are articles by leading

18   cognitive psychologists which all say the same thing.

19   Q.  And what is that same thing?

20   A.  That same thing is that we're not aware, all of us, human

21   beings are not aware of the subtle things and the unconscious

22   things that make us decide, come up with one decision or one

23   judgment versus another.  They're in uniform agreement in that

24   and the research is in uniform agreement on that.

25             THE COURT:  It is uniform, you said?

C42FFRE2                        Jacoby - direct

1           THE WITNESS:  It is uniform.

2    Q.  If you do want to evaluate the influence of contextual

3    clues, how do you go about doing that?

4    A.  The way I did it with an experiment, but if you want to ask

5    directly you can ask directly, which is part 2 of my study

6    where I asked them about a whole variety of contextual views.

7    Q.  Could we have demonstrative 6?  This is the part 2 you had

8    reference to?

9    A.  Yes.

10   Q.  And if we can go look at 7, demonstrative 7.  And these

11   were the responses you got?

12   A.  Correct.

13   Q.  At your deposition you were asked why you did not include

14   in your part 2 questions such as if the product has a label.

15   Now, why did you not include those?

16   A.  Well, number one, it didn't occur to me.  But number two,

17   it wouldn't have been relevant.  The question was why did they

18   think it's fresh.  What factors?  They had all, they being the

19   consumers, had all the time they wanted to look at the package.

20   They knew they were going to be questioned about it.  It has a

21   label on it.  They could have answered any way they wanted.

22        Over here I didn't have that as a question.  A, I didn't

23   think of it, and, B, even if I did, it's not relevant to

24   determining why they think it's fresh.

25   Q.  One final question about the arguments that the defendants

C42FFRE2                        Jacoby - direct

1  have raised about the appearance of the fruit.  At your

2  deposition you were asked a number of questions about why you

3  didn't show consumers the fruit without packaging, for example,

4  just in a bowl.

5  A.  Right.

6  Q.  What's your comment on that?

7  A.  Again, that's not the real world.  I mean, at one point

8  they're criticizing me for not being real world, then they're

9  asking me to do something that isn't real world.  Fresh fruit

10  is not sold in bowls or in dishes by itself.  It's sold in a

11  package.  I tested what's out in the real world, the packages,

12  where they appear in store in the various sections of the

13  supermarket.

14  Q.  Following up on that point, you have the big SunFresh which

15  is 188, correct?

16  A.  Yes.

17  Q.  What is your understanding as to where this is actually

18  sold at retail?

19  A.  This is sold in large stores, which might be characterized

20  as warehouse stores, such as Costco, I believe Wal-Mart, but

21  I'm not, as I sit here now, I haven't gone back and checked on

22  this recently.  It is not sold in regular supermarkets.  A

23  smaller version of this in a glass jar is sold in supermarkets.

24  Q.  And "this" being 188?

25  A.  Correct, 188, as you identified it.

C42FFRE2                          Jacoby - direct

1    Q.  Why, then, did you use the larger one that's sold in the

2    box stores or the warehouse stores?

3    A.  Because I wanted to make sure I had another plastic

4    container, number one, and number two, it is sold to consumers

5    in these large stores where they can buy them.  It's not a fake

6    product.  It's out there for consumer use.

7    Q.  All right, now, Dr. Jacoby, we're now --

8    A.  Excuse me, if I could just add to that answer.  In my

9    understanding, and I've lived 72 years now, is that things in

10   jars tend to be preserved, they're not fresh.  So had I put it

11   in a jar it would have been, my understanding is more consumers

12   would have thought it was preserved fruit than would have

13   thought it was fresh fruit.  The issue that I was testing is

14   plastic in a thin, see-through as opposed to much harder,

15   inflexible portion.

16   Q.  Okay, now we're back to Hall & Partners, which is where we

17   left off at the end of the day on Thursday.  For just a quick

18   review, if we could look at Exhibit 58, page 43, with the

19   three -- all right.  These were the print ads that were being

20   surveyed, correct?

21   A.  Yes.

22   Q.  And if we go to the next page, at the bottom we have the

23   question, you recall, what was the question, again, that the

24   participants were asked?

25   A.  Now, thinking about the advertising you have just seen,

C42FFRE2                          Jacoby - direct

1    what was the main message that the ad was trying to
2    communicate?  It also has what were your impressions of Del
3    Monte.
4    Q.  In communications research, what does "main message" mean?
5    A.  Well, most advertisements and most communications you can
6    expect more than one meaning from.  Now, they wanted to know
7    what was the single most important thing or the single most
8    frequent and common thing that consumers were getting out of
9    this communication, and so they asked, thinking about the
10   advertising, what was the main message that the ad was trying
11   to communicate to you, and --
12   Q.  How do you get the rest of the communications in addition
13   to main message?
14   A.  It's traditional communication research to follow this up
15   with what other message, what other messages, if any, was the
16   ad trying to communicate to you.
17   Q.  And was that followup question asked here?
18   A.  No.
19   Q.  Now, if you would look at the top of the page, this is
20   what -- is this what Hall & Partners reported to Del Monte was
21   the main message?
22   A.  Yes.
23   Q.  Can you read it from this?  If you can, if you can open
24   your book?
25   A.  I can read it, the highlighted portion.  Most respondents

C42FFRE2                          Jacoby - direct

1    were able to play back that the advertising was about -- that I

2    can't read, I'm sorry, it's a little blurry here.

3    Q.   We're at Exhibit 58, if you have a copy.  You should have a

4    copy of 58 with you.

5    A.   That is page --

6    Q.   43 of the report.

7    A.   I've got it.  Excuse me.  My arms don't reach that far.

8    Ah, that's better.

9         What Hall & Partners' caption at the top of the page is --

10   Q.   Put it in quotes so we know you're reading.

11   A.   Quote:  "Most respondents were able to play back that the

12   advertising was about 'fresh products' that are 'healthy' and

13   'ready to eat.'  The latter messages came out much stronger in

14   the grapefruit advertisement."

15   Q.   Okay.  Now, you also testified last time, if you could take

16   that down and go to the left column, where you referred to the

17   coding on the left page, same page with the left column.  You

18   told us last time about how you didn't accept that and you got

19   the codes, do you recall, and we had Exhibits 88-89?

20   A.   Right, because I couldn't make sense out of "fresh look of

21   the product."  I saw that as being different than "it is fresh"

22   as opposed to "looks fresh" and I wanted to see how many said

23   it was fresh.

24   Q.   All right.  And what, then, did you do and what were your

25   conclusions about what that data showed about the main message

C42FFRE2                          Jacoby - direct

1    when you looked at the verbatims?

2    A.   What I did was I requested the verbatims, these were the

3    answers that people gave to this question.  I got all the

4    answers and I looked at them and I set up my own codes.  I

5    counted people who said the fruit is fresh.  I counted people

6    who said the fruit is natural and I counted the people who said

7    the fruit didn't have preservatives or additives.  And when I

8    did that, I found that roughly 27 percent of the people, which

9    comes very close to what they had, including the other factors,

10   about 27 percent of the people came out with a meaning that the

11   fruit there was fresh.

12            MR. PLEVAN:  Could I have demonstrative 8, please?

13   Q.   Now, what is demonstrative 8 showing?  I know we can't read

14   it, but tell us what it says.

15   A.   These are the three ads at the top.  Sorry about that.  It

16   reads on the left mango, peach and grapefruit; peach being in

17   the center, grapefruit underneath and these are all the

18   respondent numbers that I found based on my analysis of the

19   Hall & Partners data said that the fruit in the ad was fresh,

20   contained no additives or preservatives or wasn't natural.

21   Q.   If we go to the numbers at the bottom.  Are these the

22   percentages that you found for each of the three different ads?

23   A.   Yes.  30, 24, 28.  When you average them out it's around 27

24   something.

25   Q.   All right, now, Dr. Jacoby because of Mr. Xander Shapiro's

C42FFRE2                          Jacoby - direct

1   testimony last week about what Hall & Partners counted or

2   didn't count, words such as "refreshing" and "looks fresh,"

3   just to be sure, did you count in your count of the confused

4   customers consumers who said in this, the women in this survey

5   who responded that the fruit looked fresh?

6   A.  No.

7   Q.  Did you count someone who may have said refreshing?

8   A.  No.

9   Q.  Did you count near fresh?

10  A.  No.  I only counted people who, as I said, said the fruit

11  is fresh.

12  Q.  You said you counted natural?

13  A.  Right.

14  Q.  Why natural?

15  A.  Well, natural means that there are no preservatives, no

16  additives.

17  Q.  Suppose in connection with the peach, the one in the

18  middle, if you would, which as I understand your testimony was

19  that there's additives but no preservatives, if you had not

20  counted natural there, what difference would it have made?

21  A.  Hardly any.  I found of all these people that I list here,

22  and I've forgotten how many there were, 40 or 50 roughly, who

23  sold a peach, only five would be counted just because they said

24  natural.

25  Q.  And the total number of individuals who you listed up

C42FFRE2                        Jacoby - direct

1   there, do you recall what that number is out of the total

2   survey?

3   A.  Offhand, I don't know.

4   Q.  Was it 134?

5   A.  It was 134 out of slightly under 500.

6   Q.  Now, if we could go to demonstrative 9A, and if you could

7   just perhaps the first column.

8   A.  Well, again, here are the answers that --

9   Q.  What does this illustrate?

10  A.  On the left-hand side you see the respondent numbers in the

11  Hall & Partners survey to respondent 65 said it was fresh

12  fruit, easy storage.  67, number 67 said that the fruit was

13  fresh.  84, it is fresh.  121, that it is all natural, nothing

14  is added.  160, fresh fruit in your grocers aisle.  164, fresh

15  fruit.  169, getting fresh fruit in a jar.  So these are

16  answers that illustrate people are saying this is fresh fruit.

17  Q.  And these are the ones you counted?

18  A.  Yes.

19  Q.  So 9A is just examples taken of the approximately 130

20  responses that you counted?

21  A.  Correct.

22  Q.  All right.  If you would go to table 9B.  Now, read some of

23  these and what does this illustrate?

24  A.  This illustrates when asked the main idea people are giving

25  you different things.  Some people come up with other main

C42FFRE2                          Jacoby - direct

1    ideas.  54 said the fruit is already peeled for me.  93, you

2    don't have to peel the fruit, it's already done for you.  282,

3    the fruit was packaged for convenience.  292, already peeled.

4    You can go on down that.  The basic thing is they talk about

5    how convenient this food is.

6    Q.  Now, did you count those as part of the people confused?

7    A.  No.

8    Q.  Now, do you know from this survey whether these people also

9    had a secondary meaning that the fruit was fresh?

10   A.  No.  They were never asked a second question about what

11   other meanings did you get from the ad, so these people who may

12   have said convenient may have also, some or all of them, some

13   proportion of them at the very least might have also said it

14   was fresh, but I couldn't get to count those in addition to the

15   people I already counted.

16   Q.  All right, if we would look at demonstrative 9C.  What are

17   these examples you picked out?

18   A.  I picked these out because it shows that people know the

19   difference between fresh and preserved.  I mean, when they say

20   nothing added like extra sugars, nothing added, just fruit, all

21   natural, nothing added, very fresh and natural, no

22   preservatives.  They know, they can compare whether it's fresh

23   or has preservatives.  Lay consumers, you and I, our spouses,

24   their adult kids, when they go into the supermarket they know

25   the difference between fresh and preserved.

C42FFRE2                    Jacoby - direct

1   Q.  All right, Dr. Jacoby, if you go back to Exhibit 58, page

2   43, we get the three print ads together.  I know it's difficult

3   to read, but rather going and focusing on each one, do these

4   ads specifically state in so many words that the products that

5   are being advertised are fresh?

6   A.  They do not.

7   Q.  What, then, does the consumer research do to help explore

8   the meaning that consumers get?

9   A.  Well, again, as a manufacturer, you want to know what the

10  consumer take-away is, what understandings they take away from

11  your advertising.  And if you are about to embark on a campaign

12  to use that as a benchmark to see if you can change their

13  understandings in a way that the advertising is designed to

14  change them.  That was the purpose of the study, to take a look

15  at what consumers understood by looking at these ads and they

16  were looked at one at a time and in my opinion it wasn't

17  thoroughly examined, it was just the main idea, but that was

18  the main idea for communication and we found just asking that,

19  that more than a quarter, almost a third came out thinking that

20  the fruit in these containers were fresh fruit.

21  Q.  Have you seen in the course of this case any analysis of

22  the data from Hall & Partners by somebody else, the report

23  itself by someone on behalf of defendants doing any reanalysis

24  or analysis of the data?

25  A.  I had not.  I had asked if there were any and I have not

C42FFRE2                         Jacoby - direct

1    seen any.

2    Q.  If we would go to page 045 of this exhibit?  Now, this is

3    the question, you have it in front of you, too, Dr.,

4    Dr. Jacoby.  It's the right page, page 42, this is the likes

5    and dislikes.

6    A.  Yes.

7    Q.  Mr. Xander Shapiro was asked about this data last week.

8    What is this question getting at?  Is it addressing the product

9    being advertised or something else?

10   A.  No, it was addressing the ad, their likes and dislikes

11   about the ad.  I've got the question here.  Quote, "What if

12   anything did you specifically like about the advertising,"

13   unquote.  So it's asking about the advertising and it's not

14   surprising that people are referring to, oh, I like the design,

15   the pictures, the graphics.

16   Q.  You better slow down, Dr. Jacoby.  You were talking a

17   little too fast.

18   A.  Sorry.  I'm a kid from Brooklyn.

19   Q.  Go ahead.  You can continue your answer.  I just was

20   concerned you were starting to talk too fast.

21   A.  Basically, the likes and dislikes referring to what the

22   people are saying in answer to the question what do you like

23   about the ad, what did you dislike about the ad.  It's not

24   about the product in the ad, it's not about the fruit, it's

25   about the ad itself what was called the ad execution in

C42FFRE2                              Jacoby - direct

1   advertising language.

2   Q.   Does this have anything to do with the analysis about the

3   minimum percent misled by the print ads?

4   A.   No, not at all.

5   Q.   If we go to the next page, page 45.   Mr. Shapiro was asked

6   questions about this as well.   And can you explain what's

7   happening here in terms of how these questions are being asked

8   of the women, approximately a little bit less than 500 women in

9   this survey?

10  A.   Well, the question they were asked -- there were nine

11  statements which are appearing down the left-hand side of the

12  page, and the question at the top of the page, which of these

13  statements describes the messages presented in the

14  advertisement.   And it gives them nine things to select from.

15  The products have been peeled, the products are refreshingly

16  cool, etc.

17  Q.   Does this in any way, the responses have anything to do

18  with the number who were misled?

19  A.   No, because there's nothing here, there's no questions

20  about the products in the ad or in the packages containing

21  fresh fruit.

22  Q.   Fresh fruit or preserved fruit?

23  A.   Exactly, or preserved fruit, they weren't asked either of

24  those questions.

25  Q.   Dr. Jacoby, you have in total discussed three separate sets

C42FFRE2                          Jacoby - direct

1   of data, is that right?

2   A.  Yes.

3   Q.  And, very briefly, what are the three sets?

4   A.  The first set is the experiment in my survey.  The question

5   2A, after having them view the video and go down the aisle, as

6   it were, and then ultimately take a look at products 166, 188

7   in the fresh produce aisle along with the fresh vegetables,

8   etc., fresh fruit or in the canned aisle, then asking them does

9   the product, what does it contain, fresh or preserved fruit.

10  That's the first part.

11  Q.  What's the second part?

12  A.  The second part were these nine -- I don't know if there

13  were nine, I think there were seven.  The rules of thumb, I was

14  asking them about those seven statements is, if it appears in a

15  can is it fresh fruit or preserved fruit.  If the fruit appears

16  in the fresh fruit section of the grocery aisle, is it fresh

17  fruit or preserved fruit, etc.

18  Q.  And what was the third?

19  A.  The third, the Hall & Partners data that I analyzed.

20  Q.  Now, what if any observations did you make regarding

21  comparing the results from these three different approaches?

22  A.  They're all converging.  They're all saying roughly the

23  same thing, that there's a confusion level between 25 and

24  30 percent.  I mean, one could have said it was 10 percent,

25  another could have said it was 90, but no.  They're all the

C42FFRE2                    Jacoby - direct

1   same.  What we call convergent validity.  This is exactly the

2   kind of thing that we use in the sciences and engineering.  If

3   you're putting up a house, you don't have these guys site along

4   one line to see where to put the corner, they site along the

5   second line and where they intercept, that's called

6   triangulation, where they triangulate is where you put your

7   post in to put a corner in.  All these studies, these three

8   things that we're talking about, converge.  They give you

9   roughly the same level of deception, of confusion.

10  Q.  Does that add to the credibility of the data?

11  A.  Certainly does.

12  Q.  Dr. Jacoby, do you understand that in this lawsuit the

13  plaintiff Fresh Del Monte is challenging lines and products

14  other than those you've tested?

15  A.  Yes.

16  Q.  Are the survey findings that you found limited to just the

17  products you or Hall & Partners tested, just those, or do they

18  apply to other products as well?

19  A.  They apply to other products as well.  Actually, between my

20  study, which looked at the SunFresh, 188 and the red grapefruit

21  bowl, 166, and Hall & Partners, which looked at these as well

22  as another one of the ads was for a third one of the lines, so

23  I think they're covering at least half of what Del Monte is

24  putting out.  But I think to answer your question directly --

25  Q.  Well, Dr. Jacoby, let me give you samples.

C42FFRE2                          Jacoby - direct

1   A.   Okay.

2   Q.   I'm going to be handing you Fruit Naturals 146 and two

3   SuperFruits, 162 and 165.

4            MR. PLEVAN:   Your Honor, at this time I'd offer into

5   evidence 162 and 165, which are samples of SuperFruits.

6            MR. ORR:   No objection, your Honor.

7            THE COURT:   Admitted, 162, 165.

8            (Plaintiff's Exhibit 162 and 165 received in evidence)

9   Q.   Well, if you can proceed with your answer, Dr. Jacoby, now

10  that you have examples.

11  A.   All right.   These are three others, one of which was tested

12  by Hall & Partners, I don't recall which one.   But this is

13  Fruit Natural, this is SuperFruit, sorry, 146 is Fruit Natural,

14  162 is SuperFruit, as is 165.

15       The point is, these are also in very flexible see-through

16  packaging.   They look like single servings of what's in the

17  fruit bowl.   To the extent that the products have the same

18  characteristics as were tested, that is, they're in flexible

19  see-through plastic packaging, they're found in the fresh

20  produce section of the supermarket, not on the canned shelf and

21  they're found in chilled fashion, then you can begin to

22  generalize what we found from those products as well, that's

23  done in science at times.   You can't possibly test everything

24  and the results of the three portions of, two portions of my

25  study and the Hall & Partners converging as they do, indicates,

C42FFRE2                              Jacoby - direct

1   suggests that you can generalize from our findings to these

2   products as well.  The more of the characteristics they have in

3   common with what we tested, the more the conclusions would hold

4   up.

5           MR. PLEVAN:  Could I have demonstrative 8 back up?

6   Q.  Just focus on the data at the bottom.  Is there data in

7   Hall & Partners' study that supports your position on the

8   generalization of this data to products not tested?

9   A.  Yes.  Again, these are.  Two of these three products I

10  believe were not tested, one of which did, or all three -- no,

11  I'd have to take a look.

12  Q.  But just focusing on --

13  A.  Well, those two and maybe all three that were not tested

14  you get the same level of confusion.

15  Q.  At the three columns, if you look at mango, each one of

16  these was a different fruit, correct?

17  A.  Correct.

18  Q.  And was each one of these; the mango, the peach and the

19  grapefruit, in a different package?

20  A.  Yes.  To give you an example --

21          MR. ORR:  Your Honor, at some point I have to

22  intervene.

23          THE COURT:  Sustained.

24  Q.  Dr. Jacoby, I have just one additional set of questions for

25  you.  Your Honor, I've asked Dr. Jacoby just to look at three

C42FFRE2                          Jacoby - direct

1    places in the transcript where I believe there was a

2    mistranscription of something that he said.  I'd like to point

3    those out on the record.

4        Dr. Jacoby, I put a tab on these.  For easier reference, if

5    you would look on page 73, line 22.

6    A.  I believe you mean --

7    Q.  Page 573.  Thank you.

8    A.  573, line 22 reads, "I received an endowed share at New

9    York University."  It should read, "I received an endowed

10   chair," c-h-a-i-r.

11   Q.  And the next one is at 609, line 14.

12            MR. ORR:  Your Honor, we could probably clear these up

13   without taking up the jury's time with this.

14            THE COURT:  Mr. Plevan, if they're ministerial, you

15   can go to something else.

16            MR. PLEVAN:  There's one more.  This is not

17   ministerial, your Honor.

18   Q.  Page 609.

19   A.  Yes.

20   Q.  At line 14.

21   A.  609.

22   Q.  Page 609.

23   A.  It says, "Doesn't make sense," d-o-e-s-n-'-t make sense.

24   It should be a separate sentence that reads, "Does it make

25   sense," question mark.

C42FFRE2                        Jacoby - cross

1   Q.  Where "does" and "it" are two separate words?

2   A.  Correct, "does it make sense?"

3            THE COURT:  So it's your testimony that your prior

4   testimony should read on line 13, "Let's take a look first at

5   the whole pattern of the data.  Does it make sense?"

6            Is that what you're now saying?

7            THE WITNESS:  Perfect, your Honor.  Yes.

8            MR. PLEVAN:  Nothing further, your Honor.

9            THE COURT:  Cross-examine.

10  CROSS-EXAMINATION

11  BY MR. ORR:

12  Q.  Good afternoon, Dr. Jacoby.  My name is Dennis Orr.  I

13  don't believe we've met.  I will be asking you questions on

14  behalf of Del Monte Corp.

15       Sir, your introduction to this case came about, did it not,

16  from Mr. Plevan, isn't that so?

17  A.  Mr. Plevan and his colleagues, correct, in a phone call.

18  Q.  Mr. Plevan called you in November or December of 2009 about

19  this case, correct, sir?

20  A.  Sitting here now, I don't remember the exact time.  If I

21  mentioned that in the deposition, that's about the time, yes.

22  Q.  And during that conversation he asked you to work on this

23  matter, isn't that so?

24  A.  Correct.

25  Q.  Now, sir, you have worked with Mr. Plevan in the past, have

C42FFRE2                          Jacoby - cross

1   you not?

2   A.  Yes, I have.

3   Q.  You and he have worked on many, many matters over the

4   course of the years that you've worked together, correct, sir?

5   A.  Not correct.  One "many" would be sufficient.  We have not

6   worked since 2000 -- for at least ten years before he called me

7   on this project.

8   Q.  Now, sir, you have told us on Thursday that you have

9   testified in I think you said a hundred matters in court.  Do

10  you recall that, sir?

11  A.  Yes, I do.

12  Q.  And you have been cross-examined many, many times, have you

13  not?

14  A.  I have.

15          THE COURT:  Two many's are okay there?

16          MR. ORR:  I'm sorry?

17          THE COURT:  I asked whether two many's were acceptable

18  to this witness.

19          THE WITNESS:  No, your Honor.  I rather enjoy it.

20          THE COURT:  Go ahead.

21  Q.  Now, you know, Dr. Jacoby, that I am entitled to ask you

22  questions that permit of a yes or no answer, correct, sir?

23  A.  Yes.

24  Q.  And I'm going to ask you to answer my questions "yes" or

25  "no" and if you can't, just let me know that.  Do you

C42FFRE2                          Jacoby - cross

1   understand that?

2   A.  I do.

3   Q.  Now, let's get back to where we were.  You have worked with

4   Mr. Plevan on many matters over the years, correct?

5   A.  Yes.

6   Q.  In fact, sir, I understand that you have known Mr. Plevan

7   since the early 1980's, isn't that so?

8   A.  Yes.

9   Q.  That's over 30 years, is it not, sir?

10  A.  No, that's 30, right on the head.

11  Q.  Right on the nose.  Oh, since 1982, okay.  Now, in addition

12  to the cases you have worked on together, you have appeared

13  with Mr. Plevan on panels and in seminars where you have both

14  presented to audiences, correct, sir?

15  A.  Yes.

16  Q.  Now, in that first call that you had with Mr. Plevan and

17  his colleagues, it is true, is it not, that Mr. Plevan referred

18  to the three factors that we've been talking about in this

19  case, correct?

20  A.  Yes.

21  Q.  He referred you to the thin, see-through, flexible

22  packaging, didn't he, sir?

23  A.  Yes.

24  Q.  He referred you to the produce section of the supermarket,

25  isn't that so?

C42FFRE2                    Jacoby - cross

1    A.  Yes.

2    Q.  And he referred you to the fact that the DMC product,

3    products that Mr. Plevan was concerned about, were chilled,

4    correct, sir?

5    A.  Yes.

6    Q.  Now, Mr. Plevan did not say to you that we want you to find

7    out if there's confusion and we want you to find out why, did

8    he?

9    A.  I can't answer that with a yes or no.  I can give you an

10   answer to it, but not with a yes or no.

11   Q.  What Mr. Plevan said to you was we think there is confusion

12   and here's why and he gave you the three factors, correct, sir?

13   A.  He asked me to find out -- I'm sorry, I can't answer that

14   in a yes or no.

15   Q.  Mr. Plevan did tell you that he thought there was

16   confusion, correct, sir?

17   A.  He told me he wanted to know if there was confusion, that

18   their hypothesis was that there was, but they needed it tested

19   to see if there was.

20   Q.  And he gave you the three factors that we talked about,

21   isn't that correct, sir?

22   A.  That's correct.

23   Q.  Now, let's talk briefly about your survey and what you did

24   not test and then we'll talk about the survey itself.  Sir, as

25   I understand it, you conducted a survey for Mr. Plevan's

C42FFRE2                              Jacoby – cross

1    client, you tested the two red grapefruit products that we've

2    been talking about, Exhibit 166 and 188, the fruit bowl product

3    and the SunFresh product, correct?

4    A.  Yes.

5    Q.  You did not test any other Del Monte products, isn't that

6    so?

7    A.  No.

8    Q.  Except for the two control products, you did not test any

9    other Del Monte products in your survey, correct, sir?

10   A.  Yes.

11   Q.  You did not test the labeling of any Del Monte products,

12   isn't that a fact?

13   A.  No.

14   Q.  You did not conduct in your survey any questioning with

15   regard to the labeling of any Del Monte products, isn't that

16   so, sir?

17   A.  I didn't ask questions.  The labeling was there, the

18   consumers read them.  All the labeling was intact.  If they

19   wanted to comment on labeling, if it had an effect, that would

20   have come out, but it didn't.

21   Q.  You did not conduct any questioning specifically addressing

22   the labeling, correct, sir, in your survey?

23   A.  Yes, I did.  When I asked them what made you say that, if

24   they wanted to talk about the label they could have talked

25   about the label.  That was question 2B and 2C.

C42FFRE2                          Jacoby - cross

1   Q.  Now, you did not test the advertising of any Del Monte

2   product, correct, sir?

3   A.  Correct.

4   Q.  And that includes the fruit undressed advertisements that

5   we've heard discussed in the course of this case, isn't that

6   so?

7   A.  Correct.

8   Q.  You did not test any products in glass jars, as I

9   understand it, isn't that correct, sir?

10  A.  Yes.

11  Q.  And finally, sir, you did not obtain any data to support

12  the proposition that consumers pay attention to the words "must

13  be refrigerated" on a label, correct?

14  A.  I did not study that, correct.

15  Q.  Now, sir, let's turn to your survey.  In that survey, if a

16  respondent said that he or she thought that Del Monte foods red

17  grapefruit product was fresh, you counted that respondent in

18  the 31 percent that you believed may be confused by these

19  products, correct, sir?  That's a yes or no question, sir.  If

20  the person said fresh, they were counted as confused, correct?

21  A.  Yes, but not in the 31 percent.  That's a derived figure

22  based upon subtracting out the control to get to the

23  31 percent.

24  Q.  You took the 51 percent and then you eliminated the

25  20 percent who said there was fresh product in cans, correct,

C42FFRE2                        Jacoby - cross

1    sir?

2    A.  Yes.

3    Q.  We'll get to that shortly.  Now, it did not matter what

4    reason the respondent gave for his or her opinion that the

5    product was fresh, correct?

6    A.  Correct.

7    Q.  They said fresh, mindful of the math, 51 percent minus 20,

8    31 percent, you counted them in the ultimate 31 percent,

9    correct, sir?

10   A.  Yes.

11   Q.  Now, sir, it's a fact, is it not, that 66 out of 202

12   respondents said that the fruit bowl was fresh because it

13   appeared that way.  Do you recall that?

14   A.  Yes.

15   Q.  Only 13 respondents out of 407 surveyed mentioned the

16   packaging as the reason he or she thought the product was

17   fresh.  Do you recall that, sir?

18   A.  I don't recall it, but I accept the representation.

19   Q.  Do you recall being asked about that at your deposition,

20   sir?  Do you recall recording it at page 28 of your report?

21   A.  I don't recall.  There are lots of numbers in that report,

22   thousands of them.  I don't recall all of them.  I do not think

23   you would be misrepresenting to me.  I accept what you're

24   saying, but if you ask me do I recall them, the answer is no, I

25   don't.

C42FFRE2                          Jacoby – cross

1    Q.  Now, the packaging, the thin, see-through, flexible

2    packaging was one of the reasons that your colleague,

3    Mr. Plevan, mentioned to you in that first call you had in this

4    case, correct, sir?

5    A.  Correct.

6    Q.  Recall on Thursday, Dr. Jacoby, you told us that the

7    31 percent was a humongous number.  Do you remember saying that

8    in your testimony on Thursday?

9    A.  I know it was large.  I don't know if I used the word

10   "humongous," but it is relative to my experience in other

11   matters.

12   Q.  13 respondents out of 407, sir, is 3 percent.  You agree

13   with that mathematics, do you not, sir?

14   A.  Roughly, yes.

15   Q.  3 percent is not a humongous percentage, is it, sir?

16   A.  Correct.

17   Q.  Now, sir, only 5, 5 respondents out of 407 mentioned

18   location of the product in the produce section of the store as

19   the reason he or she thought the product was fresh.  Do you

20   recall that?

21   A.  Roughly that number, yes.

22   Q.  Now, location is another reason your friend, Mr. Plevan,

23   offered to you in the first conversation you had in this case,

24   correct, sir?

25   A.  Yes.

C42FFRE2                        Jacoby - cross

1    Q.  Five out of 407, sir, is 1 percent, is it not?

2    A.  A little over.  1 point something, but let's not quibble.

3    Q.  You'll forgive me if I move it down to 1 percent, would you

4    not, Dr. Jacoby?

5    A.  You may round down.

6    Q.  And it's not a humongous percent, is it?

7    A.  Correct.

8    Q.  Now, 8 out of 407 of the respondents mentioned

9    refrigeration as the reason he or she thought the products were

10   fresh isn't that correct?

11   A.  I accept that representation.

12   Q.  And that's the third factor Mr. Plevan raised in the first

13   conversation that you had in this case, isn't that so?

14   A.  Yes.

15   Q.  Eight out of 407, sir, is 2 percent, is it not?

16   A.  Approximately.

17   Q.  Not a statistically significant number, is it sir?

18   A.  Correct.

19   Q.  And you told us today -- you told us at our deposition, and

20   just to clarify, I did not take your deposition?

21   A.  Correct.

22   Q.  But you told us today, sir, that the reasons that

23   respondents gave for why they thought the product was fresh

24   were irrelevant to you.  Do you recall that?

25   A.  Yes, they are irrelevant in the context of an experiment --

C42FFRE2                          Jacoby - cross

1    Q.  Sir, I ask you to answer "yes" or "no."

2    A.  Yes.

3    Q.  Do you recall saying that?

4    A.  I believe I did.  Sorry, that's not a yes.  Yes.

5    Q.  You disregarded the reasons that your respondents gave you

6    as to why they thought the product was fresh, correct, sir?

7    A.  Yes.

8    Q.  Now, sir, you agree that Thomas McCarthy's treatise,

9    McCarthy on Trademarks and Unfair Competition is a reliable

10   authority in the field of trademarks and competition, correct,

11   sir?

12   A.  Tom's book is a reliable legal authority, not a science.

13               MR. ORR:  Your Honor, under 803.18 I am allowed to

14   publish portions of Mr. McCarthy's treatise to the jury.

15               MR. PLEVAN:  Objection, your Honor.

16               MR. ORR:  It is considered evidence, but it's not

17   given an exhibit number.  That's Federal Rule of evidence

18   803.18, your Honor.

19               THE COURT:  Sidebar.

20               (Continued on next page)

21

22

23

24

25

C42FFRE2                           Jacoby - cross

1              (At the side bar)

2              THE COURT:  What's the objection?

3              MR. PLEVAN:  Your Honor, Professor McCarthy's book is

4    a treatise on law and what cases say.

5              THE COURT:  What were you going to ask him about from

6    McCarthy?

7              MR. ORR:  I'll show you the portions, your Honor.  I

8    have excerpts that actually I should have brought up.

9              THE COURT:  Why don't you do that?

10             MR. ORR:  I can show you mine.  I'm sorry, Judge, but

11   the first reading would be from there.  Actually, I have copies

12   for you.

13             THE COURT:  "Sometimes the most probative and

14   illuminating parts of the survey are not the numbers and

15   percentages generated by the responses but the verbatim

16   accounts of the responses.  The respondents' verbatim responses

17   to why questions may provide a window into consumer thought

18   processes in a way that mere statistical data cannot."

19             MR. PLEVAN:  It may be yes, may be no, but this is

20   just simply a lawyer writing a book about what courts have

21   said.  There are certain cases where judges have said that, in

22   other cases judges have not.  Your Honor is the only person who

23   can give them law on this case.

24             THE COURT:  Are you presenting this as something a

25   court has said?

C42FFRE2                         Jacoby - cross

1          MR. ORR:  No.

2          THE COURT:  You're presenting it as something that's

3    contained in a learned treatise?

4          MR. ORR:  Absolutely, judge.

5          THE COURT:  Is that your statement of it or is that

6    the treatise you just showed?

7          MR. ORR:  That is the treatise itself, your Honor.

8    Your Honor, might I add that Dr. Jacoby refers to

9    Mr. McCarthy's treatise in his CV, which is in evidence.

10         THE COURT:  He's already said, I think he said --

11         MR. ORR:  I think so, too.

12         THE COURT:  -- that it's a reliable source.  I believe

13   he said that.

14         MR. PLEVAN:  Judge, it's simply what some courts have

15   said on some circumstances which we will not know.  This is not

16   a treatise by an expert in this field.  This is a lawyer.  He's

17   writing a treatise.  We all use McCarthy to look up the law.

18         THE COURT:  Let's see that again.  I don't believe

19   it's presented as a statement of a Court.

20         MR. ORR:  It is not.

21         MR. PLEVAN:  What is it now?

22         MR. ORR:  Section 32.178 of McCarthy's treatise, your

23   Honor, verbatim.

24         THE COURT:  Do you have the earlier page?

25         MR. ORR:  Yes, sir.

C42FFRE2                         Jacoby – cross

1           THE COURT:  This is the treatise you're showing me?

2           MR. ORR:  This is the treatise.

3           THE COURT:  No, I'm going to allow that.  This is not

4    what the Court has said.  This is the author's opinion.  This

5    is what somebody who he said, I believe, is a reliable source

6    in the field.  I'm going to allow it.  All right, let's move

7    on.

8           (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C42Wfre3                          Jacoby - cross

1              (In open court)

2              MR. ORR:  Your Honor, I'd like to publish to the jury

3      McCarthy's treatise Section 32:178.

4              THE COURT:  Do it in the context of calling his

5      attention to it, sir.

6              MR. ORR:  I certainly will, your Honor.

7      Q.  Dr. Jacoby, I think you've indicated to us that you're

8      familiar with Mr. McCarthy's treatise on trademarks and unfair

9      competition, are you not?

10     A.  I am.

11     Q.  Let me ask you to look at Section 32:178 of that treatise,

12     which is on the board, on the screen before us, and I'm going

13     to direct your attention specifically, sir, to the next page,

14     where it says "author's opinion."

15             MR. ORR:  Can everyone see that I know we've been

16     reading to the jury things that the jury can read for itself,

17     but this might be easier for me to also read.  "Sometimes, the

18     most illuminating and probative parts of the survey are not the

19     numbers and percentages generated by the responses but the

20     verbatim accounts of the responses."

21     Q.  Do you see that, sir?

22     A.  I do.

23     Q.  Now, sir, you've told us that you did not consider the

24     verbatim responses of the respondents to your survey to be

25     relevant, did you?  You disregarded them, correct?

C42Wfre3                          Jacoby - cross

1    A.  After examining them to look for outliers, yes, I

2    disregarded them because there is --

3             MR. ORR:  Your Honor.

4    A.  -- cost instead of --

5             THE COURT:  Just a moment.  Sir, when Mr. Orr asks you

6    a question, you should answer it yes or no, if you can.  But if

7    you can't answer it yes or no without being misleading, you

8    should tell him that and he then will have the option of asking

9    the question or of going on.  Can you answer that question yes

10   or no?

11            THE WITNESS:  Not without being misleading, your

12   Honor.

13            THE COURT:  All right.  Sir.

14   BY MR. ORR:

15   Q.  All right.  Sir, have you considered the reasons given by

16   the respondents to your survey to be irrelevant, correct, sir?

17   Yes or no?

18   A.  To that question, the answer was no for reasons I mentioned

19   in court.  And just mentioned again.

20            THE WITNESS:  Your Honor, I took an oath to tell the

21   whole truth, nothing but the truth.  This is not the whole

22   truth.

23            MR. ORR:  Your Honor --

24            THE COURT:  Just answer the questions.

25            The jury will disregard the statement of the witness

C42Wfre3                          Jacoby - cross

1   because there was no question that it was attached to.

2   BY MR. ORR:

3   Q.  Do you recall telling the examiner at your deposition, sir,

4   at page 101, that you considered the reasons given by the

5   respondents to your survey to be irrelevant?

6   A.  Yes.  After examining them for the outliers, the aberrant

7   responses, as I mentioned.

8   Q.  Now, sir, in response to your survey, far more respondents

9   mentioned the appearance of the products, did they not, than

10  those that mentioned the reasons given to you by your friend,

11  Mr. Plevan, in your first conversation in this case, correct?

12  A.  For the reasons I indicated, the answer is correct.  And

13  when I say --

14  Q.  Now, let me turn your attention, sir, to another portion of

15  Mr. McCarthy's treatise.

16          MR. ORR:  I hope everybody can see that, but I'm

17  interested in the last sentence.

18          MR. PLEVAN:  Objection, your Honor.

19          THE COURT:  Yes.  The jury will disregard --

20          Is it to the question that's coming or to the

21  statement on the screen?

22          MR. PLEVAN:  To this going up on the board with the

23  footnotes.

24          THE COURT:  Take it down.

25          MR. ORR:  I'll read it to the witness, your Honor.

C42Wfre3                    Jacoby - cross

1              MR. PLEVAN:  Objection.

2              MR. ORR:  If I may.

3              THE COURT:  Let me take a look at it.

4              (Discussion off the record; at the side bar)

5              THE COURT:  You may ask the question.

6    BY MR. ORR:

7    Q.  Dr. Jacoby, you're aware that Mr. McCarthy, in his

8    treatise, states, "Like any scientific method related to

9    statistics in the social science, every survey, no matter how

10   carefully constructed and conducted, has some potential flaws

11   somewhere."  You recall Mr. McCarthy saying that in his

12   treatise, do you not, sir?

13   A.  Yes.

14   Q.  And you agree with that statement, do you not, sir?

15   A.  I, yes.

16   Q.  Now, mindful that every survey has potential flaws, it is a

17   fact, is it not, sir, that all the decisions about who to

18   include in this survey, how many men versus women, the age of

19   the respondents, were your personal choices, correct, sir?

20   A.  Based upon informed data, yes.

21   Q.  Well, you did not conduct any scientific testing to

22   determine who to include as respondents in the survey; you just

23   made some choices, correct, sir?

24   A.  As I said during my direct --

25   Q.  Yes or no, sir?  You made some choices, correct?

C42Wfre3                          Jacoby - cross

1   A.  Yes, I chose men and women.  I chose --

2              MR. ORR:  Your Honor.

3              THE COURT:  The answer is yes.

4              THE WITNESS:  Yes.

5   BY MR. ORR:

6   Q.  Now, sir, we talked about the 64-ounce Sunfresh product

7   that you tested, Exhibit 188 before you.  You tested that

8   product, sir, as if it sold in supermarkets, did you not?

9   A.  Yes, I put it on a shelf in the supermarket.

10             MR. ORR:  Your Honor --

11  Q.  The answer's yes, sir?

12  A.  Yes, I put it on a shelf in the supermarket.

13  Q.  You showed, in fact, respondents of a video of a

14  supermarket, correct?

15  A.  Correct.

16  Q.  Now, you eventually came to understand after you conducted

17  the survey that the Sunfresh 64-ounce product is not sold in

18  supermarkets, is it?

19  A.  No.  Incorrect.  I knew that before I did that.

20  Q.  You didn't tell us that at your deposition, do you recall

21  that, sir?

22  A.  I don't recall what you asked, but I knew that this was not

23  being sold in supermarkets at the time I designed my survey.

24  Q.  So even though the 64-ounce Sunfresh product is not sold in

25  supermarkets, you tested it in the supermarket, correct, sir?

C42Wfre3                    Jacoby - cross

1    A.  Sold to consumers, yes.

2    Q.  Yes or no, sir?

3    A.  Yes.

4    Q.  That product is sold at giant discount stores like Costco

5    and Wal-Mart, correct?

6    A.  I said that 20 minutes ago.  Correct.

7    Q.  And those giant discount stores, sir, are a very different

8    environment, are they not, than the local supermarket or bodega

9    or small grocery store?  Correct?

10   A.  Every supermarket is different from each other.

11   Q.  Yes or no, sir?

12   A.  Sure, yes.

13   Q.  Is that a different environment?

14   A.  Yes.

15   Q.  By the way, sir, on the videos that we saw on Thursday,

16   those products weren't, you didn't walk into a supermarket just

17   randomly and take a video; you actually set up the products on

18   the shelf that we saw in the video, correct, sir?

19   A.  Yes.

20   Q.  Now, sir, again, mindful that every survey has flaws --

21   A.  Potential flaws.

22   Q.  Potential flaws.

23   -- potential flaws, you agree, sir, that it is important, do

24   you not, to be precise in the framing of a question to a

25   respondent in one of your survey, correct?

C42Wfre3                          Jacoby - cross

1    A.   Correct.

2    Q.   You also agree that different consumers can have different

3    understandings of the meaning of the same word, isn't that

4    correct?

5    A.   Correct.

6    Q.   In fact, sir, you have been criticized by one of Judge

7    Stein's colleagues in this court on another case for having

8    failed to define a significant term in one of your survey, have

9    you not?

10            MR. PLEVAN:  Objection, your Honor.

11            MR. ORR:  It's cross-examination, your Honor.

12            THE COURT:  Just a moment.  Were you criticized in

13   another case by the judge for having failed to define a

14   significant term in whatever survey was involved in that other

15   action?

16            THE WITNESS:  I have no idea what the cross-examiner

17   is referring to.

18            THE COURT:  All right.  So the answer is I don't know

19   what you're referring to.

20            MR. ORR:  Your Honor, may I approach with a booklet of

21   materials.

22            THE COURT:  You can show him whatever you want.

23            MR. ORR:  Your Honor, may I approach.  I have one for

24   your Honor as well.

25            THE COURT:  Yes.

C42Wfre3                         Jacoby - cross

1              MR. PLEVAN:  Judge, I'll object to this line using

2    other cases that have different kinds of surveys.

3              MR. ORR:  I find that ironic.

4              THE COURT:  Gentlemen, this is cross-examination.  Go

5    ahead.

6              I'm sorry.  It's redirect.  What tab do you want him

7    to look at?

8              MR. ORR:  I would like you to look at tab one, please,

9    sir.

10             THE COURT:  Just take a look at that to yourself, sir.

11   Does that refresh your recollection in regard to whether or not

12   you were criticized in another case for failing to define is

13   significant term in some other survey?

14             THE WITNESS:  It does, your Honor.  It was the word

15   "version."

16             THE COURT:  It does or does not?

17             THE WITNESS:  It does.

18             THE COURT:  What is your refreshed recollection?

19             THE WITNESS:  It was with regard to the word

20   "version."

21             THE COURT:  All right.

22   BY MR. ORR:

23   Q.  And the judge in that case was Judge Sand, correct?

24   A.  Correct.

25   Q.  And Judge Sand indicated on page ten of his opinion, "But

C42Wfre3                    Jacoby - cross

1    the Jacoby survey never defined the word version or elicited

2    the word version from the survey respondents."  Do you see

3    that, sir?

4    A.  I haven't gotten there yet, but.

5    Q.  Turn to page ten.

6    A.  Yes, I see it.

7    Q.  First full paragraph.

8    A.  I see it.

9    Q.  Judge Sand indicated that you never defined the word

10   "version"?

11              MR. ORR:  At the end of that paragraph.

12              MR. DREYER:  If he could read the whole sentence.

13              THE COURT:  Let's just questions and have the answers.

14   BY MR. ORR:

15   Q.  But the Jacoby survey never defined the word "version" or

16   elicited the word "version" from the survey respondents, do you

17   see where Judge Sand said that?

18   A.  I do.

19   Q.  At the bottom of that paragraph, Judge Sand continued,

20   "Because of the ambiguity of the version question, the court

21   assigns significantly reduced weight to the Jacoby survey's

22   results."  Do you see that, sir?

23   A.  I do.

24   Q.  Now, sir, the word "fresh" was used in your survey in this

25   case, correct?

C42Wfre3                          Jacoby - cross

1    A.  Yes.

2    Q.  It is an important word in this case, is it not?

3    A.  It is.

4    Q.  I think we've heard you say earlier, but let's just

5    confirm, you did not define the word "fresh" in your survey,

6    correct, sir?

7    A.  Correct.

8    Q.  Now, you felt, and I think you told us this this morning,

9    you felt the word "fresh" and the word "preserved" defined each

10   other, correct?

11   A.  In context, correct.

12   Q.  So if the respondent did not think the product was

13   preserved, the respondent would think the product was fresh,

14   correct?

15   A.  Correct.  Or --

16   Q.  And vice versa?  If the respondent thought that the product

17   contained preservatives, the respondent would consider the

18   product not fresh, correct?

19            THE WITNESS:  Your Honor, I can't answer that without

20   explaining.

21            THE COURT:  All right.  Now Mr. Orr will have that

22   choice.

23   BY MR. ORR:

24   Q.  You certainly understand, sir, that the word "fresh" can

25   have different meanings, do you not?

C42Wfre3                          Jacoby - cross

1    A.  Yes, I do.

2    Q.  A check, sir, of dictionary.com showed 17 meanings to the

3    word "fresh".  Does that come as a surprise to you?

4    A.  No.

5            THE COURT:  The witness has set forth in direct

6    testimony a couple of the different meanings fresh had.  I

7    think he referred to his 11-year-old daughter who was not

8    fresh, is that correct?

9            THE WITNESS:  That's correct, your Honor.

10           MR. ORR:  We're going to keep that out of this.

11   Q.  Newly made or obtained, would that be a meaning you've

12   heard used for the word "fresh"?

13   A.  Could be, yes.

14   Q.  Recently arrived?

15   A.  Sure.

16   Q.  Fresh troops?

17   A.  Yes.

18   Q.  And I think we talked, you talked about this earlier on

19   direct examination, retaining the original properties

20   unimpaired, not stale or spoiled.  You're certainly familiar

21   with that definition, are you not, sir?

22   A.  Yes.

23   Q.  And I think this is the meaning you intended in your

24   survey, but correct me if I am wrong, not preserved by

25   freezing, canning, pickling, salting, drying, etc.?

C42Wfre3                          Jacoby - cross

1    A.  Correct.

2    Q.  You've heard that?

3    A.  That's the opposite, correct.

4    Q.  Now, you do agree that the word "fresh" can simply mean

5    unspoiled, not stale, correct?

6    A.  Correct.

7    Q.  Indeed, sir, it is a fact, isn't it, that many of the

8    respondents seemed to have that meaning in mind when they

9    answered the questions in your survey, isn't that correct?

10   A.  I don't think so.

11   Q.  Well, sir, do you have your report handy?

12   A.  Yes, I do.

13   Q.  Turn to page 294.  Respondent 1826 said I say fresh fruit

14   because the fruit doesn't look old or not tasty.  Do you see

15   that, sir?

16   A.  I do.

17   Q.  Turn to page 302 -- all right, at page 302, respondent

18   10633 said, The fruit looks fresh because it's in good shape

19   and not aging or withered.  Do you see that, sir?

20   A.  No, I don't.  I don't have a 10633 here.

21            MR. PLEVAN:  Neither do I.

22   A.  Page 302 you said?

23   Q.  302.  I don't have -- what is that number again?

24            MR. PLEVAN:  What was the number again?

25            MR. ORR:  302.

1           MR. PLEVAN:  No, no.  The number of the respondent.

2     BY MR. ORR:

3     Q.  Page 302 of your report, sir, respondent 10633, in the

4     right-hand column?

5     A.  I have no 10633 on this page.

6           MR. PLEVAN:  Neither do I.

7           MR. ORR:  I do.

8           THE COURT:  Why don't we take a break.  It's 1:00.

9     Mr. Orr, is this a logical time to straighten it out?

10          MR. ORR:  Perfect time.

11          THE COURT:  Ladies and gentlemen, we'll take a lunch

12    break.  See you back here at ten after two.  Thank you.

13          (Jury excused)

14          THE COURT:  Please be seated.  You may step down,

15    Dr. Jacoby.

16          (Witness excused)

17          THE COURT:  So the record is complete, when we had the

18    side bar earlier without the reporter present, Mr. Plevan made

19    the same objection to the McCarthy treatise and my ruling is

20    the same.  I overrule the objection.  I leave it to you

21    gentlemen to straighten out where that reference can be found.

22    But what exhibit number is the McCarthy report?  I have the

23    appendices here as in 119.  What number is the report itself?

24          MR. ORR:  I don't believe the report was entered into

25    evidence, your Honor, which has been a little bit of, unless

C42Wfre3                        Jacoby - cross

1    somebody moved it when I wasn't here.

2            THE COURT:  Do we have somewhere in these materials

3    the McCarthy report?

4            MR. ORR:  You mean the Jacoby report?

5            THE COURT:  I'm sorry.  The Jacoby report.

6            MR. DREYER:  I think we agreed the reports could --

7            THE COURT:  I'd be very surprised if it was in

8    evidence.  I really was asking if this had been given to me in

9    any of these books.

10           MR. DREYER:  I don't believe either side has.

11           THE COURT:  Fine.  Let me ask, sir.

12           MR. ORR:  For the record, your Honor, I was referring

13   to appendix H which is marked for identification as Exhibit

14   133, and that's page 302 and I believe that's where they'll

15   find the information I was just referring to.  If counsel has

16   any problem with that, we can chat.

17           THE COURT:  Just walk over to Dr. Jacoby's friend

18   Mr. Plevan and ask him.

19           MR. PLEVAN:  Three times, so far, my good friend, my

20   best friend.  I'm expecting Dr. Jacoby to take me out for

21   drinks.

22           THE COURT:  Are you all on the same page?

23           How much longer do you think, as an estimate, sir?

24           MR. ORR:  Half hour, Judge.

25           THE COURT:  All right.  I have two questions that I

C42Wfre3                          Jacoby - cross

1    just need some assistance on in terms of the charge, two very

2    brief questions.  I don't know who is going to be doing the

3    charge issues, but if you have those in front of you, the

4    proposed Fresh charge -- you both had it actually.  On enhanced

5    damages for the Lanham Act, you both seem to say the jury can

6    treble.  That I don't understand in light of the Getty

7    decision, which says whereas here the recovery is based on

8    plaintiff's damages, the Court, not the jury may enhance the

9    award up to three times the amount of actual damages.

10           So what am I missing here?  You both seem to put

11   trebling in the jury's hands.  I don't understand that.

12           MR. PLEVAN:  Your Honor, you're absolutely right that

13   that's what the Second Circuit law is.  The question is whether

14   or not, and we cited this in one of the lengthy footnotes --

15           THE COURT:  You're talking about the copyright case by

16   the Supreme Court?

17           MR. PLEVAN:  Yes, sir.

18           THE COURT:  What in the world does that have to do

19   with the Getty case?

20           MR. PLEVAN:  Because the Supreme Court said the

21   statutory damages, contrary to prior case law, was triable to

22   the jury.

23           THE COURT:  In the copyright decision.

24           MR. PLEVAN:  Yes, absolutely, your Honor.  So the

25   suggestion we're making is would the Second Circuit come out

C42Wfre3                    Jacoby - cross

1    the same way in light of that Supreme Court's case which I

2    believe was a little bit of a surprise that statutory damages

3    was triable to the jury.  But your Honor is absolutely right

4    about the current state of the Second Circuit law.

5           THE COURT:  What you're asking me to do is to give a

6    charge that's flatly inconsistent with the stated Second

7    Circuit law in Getty, in light of a later Supreme Court case on

8    a different statute that may or may not be applicable.

9           MR. PLEVAN:  Absolutely right, your Honor.

10          THE COURT:  DMC, you want the same charge?

11          MS. DeARCY:  No, your Honor.  And particularly in

12   light of what you've just identified.

13          THE COURT:  I'm raising the question.  I didn't

14   understand why both parties, I thought in your charge you were

15   saying it.

16          MS. DeARCY:  Your Honor, again, particularly in light

17   of the inconsistencies you've identified.

18          THE COURT:  In light of?

19          MS. DeARCY:  The inconsistencies taken with respect to

20   the Second Circuit, the defendants would withdraw that

21   instruction from the enhanced damaged.

22          MR. PLEVAN:  Your Honor, we were merely flagging this

23   issue because sometimes judges say take an issue that there may

24   be some question, give it to the jury, it could always be

25   redecided by the judge later, then you have a verdict.  We were

C42Wfre3                          Jacoby - cross

1   certainly not trying to mislead because I think we made it

2   clear that the current law is exactly what your Honor said.

3          THE COURT:  If there is a serious question, I could

4   always do that and then take it away from the jury.  DMC.

5          MS. DeARCY:  I think actually that would create a

6   greater confusion.  I think as Fresh has identified the law in

7   the Second Circuit, it's inconsistent with the instruction that

8   the best and most prudent way to proceed, your Honor, would be

9   to remove that language from the instruction altogether.

10         THE COURT:  Let me think about it.  When I give you

11  the charge, we can talk about this at the charging conference.

12         The second area of question that I have is where

13  Fresh, and I don't have the specific part in front of me,

14  Fresh's charge on damages, Fresh is separating out the damages,

15  I mean, telling the jury to separate them out and not to double

16  count, correct?  You're trying to prevent double counting by

17  the jury of damages?

18         MR. DREYER:  That is correct, your Honor.

19         THE COURT:  My question to DMC is I don't think that's

20  really what the current cases say, but isn't that a better way

21  to go about it -- that is, if there's agreement -- to go about

22  it because then we're guaranteed not to have double counting,

23  which I may have to take account of later on if I use DMC's

24  charge on damages?

25         MS. DeARCY:  Your Honor, our problem with the way in

C42Wfre3                       Jacoby - cross

1   which they articulated this double counting issue is they

2   suggest to the jury in their instruction that if there is a

3   problem with double counting that the Court will correct that

4   later.  We certainly don't want to tell the jury that they

5   don't have to pay attention to the damages in a careful way

6   because you're going to correct them.

7           THE COURT:  That's a good point.  But if that part of

8   it is taken out, then you don't have a problem, in general, and

9   again, I'll give you the charge which everybody can nitpick;

10  I'm just trying to get a sense of where we're going.  You

11  wouldn't have an objection if I take account of your concern?

12          MS. DeARCY:  Your Honor, we wouldn't have a concern

13  with the Court identifying the issue of double counting.  I'm

14  not certain if your question is whether we have any other

15  objections to their damages instruct.

16          THE COURT:  No.  I think you do.  That helps.

17          When does Fresh, given the estimate by Mr. Orr, when

18  does Fresh think it's going to close?

19          MR. DREYER:  Rest?

20          THE COURT:  Rest.

21          MR. DREYER:  Our next and last witness is Mr. Phillips

22  who will be available first thing in the morning given the

23  calculation issue, and I think we had agreed to have Del Monte

24  call one of their witnesses out of turn, Mr. Lazopoulos, who

25  was here last week, and he'll be available.

C42Wfre3                        Jacoby - cross

1           THE COURT:  I think we'll have both sides resting

2    today or tomorrow, Mr. Gonzalez?

3           MR. GONZALEZ:  Yes, your Honor.

4           THE COURT:  We'll be aiming for a charging conference

5    at the end of the day tomorrow, I think that makes sense.

6           MR. GONZALEZ:  Your Honor, I don't think this will be

7    a problem, Lazopoulos will be here today is fine, but I'm told

8    he may not be able to be here past today.  I don't know how

9    long they're going to take on redirect of Mr. Jacoby.

10          MR. PLEVAN:  Ten, 15 minutes, Judge.

11          THE COURT:  Ten after two, take a lunch break.

12          (Luncheon recess)

13

14                       AFTERNOON SESSION

15                          2:10 p.m.

16          (In open court; jury not present)

17          THE COURT:  I'll get the charge to the parties as soon

18   as I can.  We'll e-mail it to whoever you tell us to e-mail it

19   to.  Make sure my deputy has e-mails.  I hope to have it out to

20   you by six or seven p.m.  And assuming we end up everybody

21   closing tomorrow, we'll have the charging conference after

22   everybody has closed or at the end of the day.  If we haven't

23   closed, we'll have it by five p.m.

24          Mr. Plevan, you look a little quizzical.

25          MR. PLEVAN:  Rested, not closed, Judge.

C42Wfre3                          Jacoby - cross

1            THE COURT:  Thank you.  Rested, not closed.

2            (Continued on next page)

C42Wfre3                          Jacoby - cross

1               (In open court; jury present)

2               THE COURT:  Be seated.

3               You may continue with the cross-examination of

4     Dr. Jacoby, Mr. Orr.

5               MR. ORR:  Thank you, your Honor.

6     BY MR. ORR:

7     Q.  Doctor Jacoby, before lunch we were talking about the

8     meaning of fresh, do you recall that.

9     A.  Yes.

10    Q.  We were talking about the particular meaning not stale, do

11    you recall that?

12    A.  Yes.

13    Q.  We were then talking about some of the verbatim responses

14    that were generated by respondents to your survey, do you

15    recall that again, sir?

16    A.  Yes.

17              MR. ORR:  Your Honor, we offer into evidence Exhibit

18    133, which is appendix H to Dr. Jacoby's report, which is the

19    verbatim responses.

20              THE COURT:  Any objection?

21              MR. PLEVAN:  No objection, your Honor.

22              THE COURT:  Admitted without objection.

23              (Defendants' Exhibit 133 received in evidence)

24    BY MR. ORR:

25    Q.  Now, the proposition I put before you, Dr. Jacoby, to start

C42Wfre3                      Jacoby - cross

this was that many of the respondents seemed to have the

meaning in mind of the word "fresh" as not stale when they

responded to questions in your survey, isn't that so?

A.  It is so that that's what you proposed.  It is not so that

I agree.

Q.  I know you don't agree.  That was the proposition I put to

you.

A.  Yes.

Q.  All right.  Let's turn to appendix H, Exhibit 133 in

evidence.  Let's look at page 294 and let's look at the

response of respondent 1826.  Respondent 1826 certainly seemed

to interpret the word "fresh" to mean not stale, isn't that so,

Doctor?

A.  Correct.

Q.  Let's turn to appendix H, sir, 133 in evidence, at page

302, and let's look at respondent 10633.

A.  There is no 10633 as I told you before when you got to this

point.

Q.  Up on the screen, sir, unless I'm misstating it, isn't that

10633?

A.  That is on the screen, but it's not on page 302.  I don't

know where you are.

Q.  Well, I have appendix --

        THE COURT:  Why don't you go to what he has in front

of him and show him where you are.

C42Wfre3                          Jacoby - cross

1        MR. ORR:  I don't know.

2    Q.  This is your report, sir?

3    A.  It is.

4        MR. ORR:  May I ask questions from here, your Honor.

5        THE COURT:  Yes, of course.

6    BY MR. ORR:

7    Q.  This is the report you brought with you today, is that

8    correct?

9    A.  Correct.

10   Q.  This document is appendix H which the parties have put

11   together?

12   A.  That's appendix H that you're looking at in the report.

13   That's what it says.

14       THE COURT:  Why don't counsel just talk to each other

15   and see if you can straighten it out, gentlemen.

16   BY MR. ORR:

17   Q.  It's on 301 on the one you have, sir.

18   A.  I don't have it.

19   Q.  Which you don't have because I have it.

20   A.  Correct.

21   Q.  And I'm returning it to you.  I knew we'd find it

22   eventually.

23       MR. ORR:  Thank you, Mr. Plevan.

24   Q.  Now, sir, on 301, before you, for some reason it's 302 on

25   the screen before the jury, we finally at long last see

C42Wfre3                         Jacoby - cross

1    respondent 10633's response, don't we?

2    A.  Yes.

3            MR. ORR:  And if we could show the response in the

4    other column, Andrew, please.  Can everyone see that?

5            Can you see it, your Honor?

6            THE COURT:  Yes.

7    BY MR. ORR:

8    Q.  Respondent 10633 apparently interpreted the word "fresh" to

9    mean not stale, correct, Dr. Jacoby?

10   A.  That's a meaning, yes.

11           MR. ORR:  Let's look at, I do this with great

12   trepidation, your Honor, page 289, and let's look at respondent

13   6106.  And I'm breathing a heavy sigh of relief here, your

14   Honor.

15   Q.  Once again, we see another respondent who seemed to

16   interpret the word "fresh" to mean not stale, correct, sir?

17   A.  You're referring to 6106.

18   Q.  Yes, sir.

19   A.  Looking at the texture, looking at it, it looks fresh, you

20   can tell it wasn't falling apart and it was firm.

21   Q.  Once again, this is a respondent who seems to be

22   interpreting the word "fresh" to mean not stale, correct, sir?

23   A.  You could interpret it that way.

24   Q.  Let's look at page 294, respondent 4941.  This respondent,

25   Dr. Jacoby, interpreted fresh and preserved in responding to

C42Wfre3                         Jacoby – cross

1   your survey, correct, sir?

2   A.   In response to question 2A, they said fresh.

3   Q.   And in their verbatim response, they said it looked fresh

4   but could be considered preserved, correct, sir?

5   A.   Correct.

6   Q.   Let's look at page 286 of the verbatims in Exhibit 133.

7            MR. ORR:   I'm having trouble reading that myself.

8   Q.   Once again here, sir, we have another respondent who

9   appears to be interpreting the word "fresh" to mean not stale,

10  correct?

11  A.   No, I don't see that here.

12  Q.   Let's turn back to the last one, page 294, 4941.  This

13  person used the terms "fresh" and "preserved" in the same

14  verbatim answer, correct, sir?

15  A.   Yes.

16  Q.   And it is a fact, is it not, that you did not review the

17  verbatims to determine if respondents were defining the term

18  "fresh" to mean not stale, correct?

19  A.   Not correct.

20  Q.   You did not in your report at any time anywhere, sir, that

21  you reviewed the verbatims to determine if respondents were

22  using the term "fresh" to mean not stale, isn't that so?

23  A.   I didn't state that in the report, that is correct.

24  Q.   In fact, sir, 42 respondents in your survey, when they were

25  shown a can of fruit, indicated that they thought the fruit

C42Wfre3                         Jacoby - cross

1    inside was fresh, correct?

2    A.   Correct.

3    Q.   Now, that's 20.7 percent of the people surveyed about the

4    can, correct, sir?

5    A.   Correct.

6    Q.   Now, in fact, the products that you tested are preserved,

7    are they not?

8    A.   All of the products are, yes.

9    Q.   And they say so on their labels, don't they?

10   A.   I don't know if they do or not.

11   Q.   Well, Exhibits 166 and 186 are the Red Grapefruit Bowl and

12   the Sunfresh bowl.  The labels say they each contain

13   preservatives, do they not, sir?

14   A.   If you give me an opportunity to read them, I'll answer

15   your question.

16   Q.   Let's move along.  The jury has those in front of them.

17   They can make their determination.

18        You talked in your direct examination about the Hall &

19   Partners study.  Do you recall that?

20   A.   Yes.

21   Q.   And that study was done in October of 2008, was it not,

22   sir?

23   A.   I think so.

24   Q.   And as I understand it, sir, it was a 25-minute online

25   survey, correct?

C42Wfre3                        Jacoby - cross

1   A.  Approximately, that's my understanding.

2   Q.  And what happened was respondents would respond to a spam

3   request out over the Internet, and if they wished, they could

4   participate in this survey, correct, sir?

5   A.  I don't recall that part.  It may be so, but I don't recall

6   it.

7   Q.  Now, sir, in that study, the Hall & Partners folks who

8   conducted it did not define the word "fresh" any better than

9   you did, did they?

10  A.  They did not define fresh.

11  Q.  Now, sir, in your survey, the product that was being tested

12  was taken away from the respondents before they answered the

13  questions that you posed to them, correct, sir?

14  A.  Correct.

15  Q.  And you believed that it was more realistic for a

16  respondent to have the product taken away before they decided

17  answers to your questions than it would be if they held the

18  product in their hands while they responded, correct?

19  A.  Correct, with the interviewer there.  Correct.

20  Q.  And, of course, in a supermarket or a bodega or a Costco or

21  anywhere else, they would have the product in their hands,

22  correct, sir?

23  A.  And they wouldn't have an interviewer, correct.

24  Q.  Now, sir, at your deposition, you testified that you have

25  been criticized by a court for allowing respondents in the

C42Wfre3                        Jacoby - cross

1    survey done in that case to have in hand the Yellow Page

2    advertising that was at issue in that case.  Do you recall

3    giving that testimony, sir?

4    A.  Yes.

5    Q.  And you referred to the Quality Inn's International case

6    versus McDonald's?

7    A.  Correct.

8    Q.  The fact is that Court did not criticize you for that

9    reason, isn't that correct, so?

10   A.  That's, what, 15, 20 years ago, I would have to go back and

11   review it, but I believe I was criticized for leaving it there

12   while asking the questions.

13   Q.  Let's turn to tab two of the booklet I gave you earlier.

14   Do you recall, sir, that the Quality Inns v. McDonald's case

15   occurred in Maryland, Baltimore, Maryland?

16   A.  Yes, I can see here it did 24 years ago.

17   Q.  All right.  Let's turn, sir, to page 17 in tab two of the

18   booklet I provided to you.  And on page 17, at the bottom of

19   the first column, you'll see the judge says as follows:

20   "Dr. Jacoby conducted his own survey using as stimuli an

21   airline travel magazine advertisement for Quality

22   International, a mock-up Yellow Pages advertisement, and an

23   artist's rendering showing McSleep Inn with a clarifying sign

24   underneath it which reads 'by Quality International.'"  Do you

25   see where I'm referring, sir?

C42Wfre3                    Jacoby - cross

1   A.  I do.

2   Q.  And the court goes on to say, in the second paragraph

3   following, "The court accepts that data, however, with some

4   reservations in view of the inclusion of the sign by Quality

5   International prominently added under McSleep in logo."  Do you

6   see that, sir?

7   A.  I do.

8   Q.  So the court didn't criticize you for allowing the

9   respondents to have it in hand; the court criticized you for

10  changing the trademark that was being tested, correct, sir?

11  A.  Incorrect.  There were three studies.  The court is

12  commenting on one of the three studies with one of the three

13  stimuli.  It was in regard to the Yellow Pages stimulus that

14  the court criticized me for leaving it in front of the

15  respondents.

16  Q.  There is no written reference to that in this opinion, sir.

17  If you wish to take some time to review it, go right ahead.

18          MR. PLEVAN:  Bottom of the page, Dr. Jacoby, page 17,

19  where he talks about "the most troubling aspect was the fact

20  that 70 percent of respondents correctly associated," go on,

21  "did so because they were reading the qualifying language."

22          MR. ORR:  First of all, I object to counsel reading

23  that, but that's fine.  I'll proceed.

24  Q.  Dr. Jacoby, the court's concern was not that the

25  advertisement was left in people's hands.  The court's concern

C42Wfre3                       Jacoby - cross

1    was you added the language by Quality International, correct,

2    sir?

3    A.   No.   The court's concern is that they could read that, and

4    that's not the Yellow Pages.   This is 24 years old.   I have not

5    seen this in 24 years.   If you want to give me an opportunity

6    to read through it, I think I can locate, I hope I can locate

7    where the court criticized me in the Yellow Pages study for

8    leaving the Yellow Pages ad in front of the respondent because

9    I remember writing about that and saying, wait a minute, that's

10   the way people use Yellow Page ads, unlike regular

11   advertisements.

12   Q.   You do recall, sir, bringing this case up in your

13   deposition, do you not?

14   A.   I do.

15   Q.   And you do recall adding the words "by Quality

16   International" to the trademark being tested in that case,

17   correct?

18   A.   That was the way in which it was being shown to the public,

19   and that is the way I tested it.

20   Q.   Now, sir, another of Judge Stein's colleagues in this

21   Court, the Southern District of New York, Judge Keenan, has

22   criticized one of your surveys more recently in 2007 for the

23   failure to reflect what happens in the real world.   Do you

24   recall that, sir?

25   A.   Yes, that was the Cargo case, correct.

C42Wfre3                     Jacoby - cross

1   Q.  And you turned to tab three in the booklet that I provided

2   to you, have you not, sir?

3   A.  Correct.

4   Q.  Let's turn to page six.  In the Cargo case, and in the

5   second column, first full paragraph, we see Judge Keenan says,

6   "The Jacoby survey is so flawed that its probative value is

7   substantially outweighed by its potential for unfair prejudice

8   and the likelihood that it will confuse or mislead the jury.

9   Two major defects strip the Jacoby survey of probative value.

10  Specifically, the survey, one, employed a format that failed to

11  approximate real world conditions and was impermissibly

12  leading, and, two, used improper stimuli.  The Jacoby survey's

13  failure to approximate real world conditions severely limits

14  its probative value."

15      You see where I'm referring to there, do you not, sir?

16  A.  I do.

17  Q.  And Del Monte Corp. here has the same criticism, that you

18  did not replicate real world conditions in your survey,

19  correct?

20  A.  That's their criticism.  But it's not analogous to what

21  happened in this study, in this case.

22  Q.  Now, sir, other courts have criticized you for not

23  replicating, repeating, what happens in the real world in your

24  surveys, correct?  Do you recall that?

25  A.  No survey can replicate the real world.  It's not the real

C42Wfre3                              Jacoby - cross

1   world.  Yes, courts have issued such criticisms, not only of me

2   but of other experts.

3   Q.  Let's look at tab four in the booklet before you.  There we

4   see the District Court's views of your survey in the Smith v.

5   Wal-Mart Stores case, in Georgia.  Do you recall that case,

6   sir?

7   A.  I do.

8   Q.  Let's turn to page 22.  On page 22 in the third full

9   paragraph, the judge in the Northern District of Georgia says,

10  "Even with regard to the tested concepts, the court finds that

11  the survey was so flawed that it does not create a genuine

12  issue of material fact."  Moving past the citation, the court

13  continues, "Jacoby surveyed an overbroad universe, failed to

14  adequately replicate the shopping experience, and asked leading

15  questions."  See where I'm referring there, sir?

16  A.  I do.

17  Q.  And Del Monte Corp. here has the same criticisms of your

18  report; you didn't replicate real life and you asked leading

19  questions.  Correct, sir?

20  A.  That's their complaint, yeah.  That's their allegations.

21  Q.  Now, this is not the first time, sir, that you have

22  submitted a survey in this court, the Southern District of New

23  York, isn't that so?

24  A.  Correct.

25  Q.  By my count, sir, from your resume, which is in evidence,

C42Wfre3                    Jacoby - cross

1    119, you list cases in your resume, do you not, sir, where

2    you've appeared and testified?

3    A.  I list the last four cases in the rules -- last four years'

4    worth of cases.  I don't know what happened to 119, but --

5    Q.  By my count, sir, from your resume and from the public

6    opinions I've been able to locate, you've offered seven surveys

7    for consideration by colleagues of Judge Stein in the Southern

8    District of New York.  Does that sound about right to you, sir?

9    A.  I think there have been appreciably more, but let's take

10   seven.

11   Q.  Now, sir, in three of those surveys, and if you look in

12   tabs five, six, and seven, and I will give you the case names,

13   in three of those surveys, the court considered the survey

14   without criticism.  Do you recall that, sir?

15   A.  No.  I'd have to go back and look at these.

16   Q.  All right.

17   A.  Well, no.  No.  If you're looking at six, Juicy Couture,

18   the court did more than not criticize.  The court lauded my

19   survey.

20   Q.  Just for the record, sir, tab five has the court's opinion

21   in the Gillette Company v. Wilkinson Sword case, and take my

22   word for it, sir, the court did not criticize your survey?

23   A.  No.  She accepted it and based judgments on it and thought

24   it was reliable.

25   Q.  You're talking about the Juicy Couture case?

C42Wfre3                          Jacoby – cross

1    A.  No.  I'm also talking about the Gillette case.

2    Q.  All right.  So in Gillette not only was there no criticism,

3    it was received?

4    A.  It was received with favor.

5    Q.  All right.

6    A.  As was the case in Juicy Couture.

7    Q.  Okay.  And the next tab, sir?

8    A.  I don't remember the Braun case.

9    Q.  Take my word for it there again, sir, the court received

10   your survey without criticism.  So you recall those three cases

11   receiving your survey and, in fact, lauding your survey in

12   those cases, correct, sir?

13   A.  That's correct.

14   Q.  Now, in four other cases before this court, your surveys

15   have been criticized quite severely, have they not?

16   A.  Well, you were talking about the first one with tab one.

17   Q.  All right.

18   A.  If you --

19   Q.  Simon & Shuster?

20   A.  Simon & Shuster.

21   Q.  You recall Judge Sand --

22   A.  Criticized the word "version" and then went on to say

23   everything else was very good about the survey.  The court had

24   very positive things to say about me and the survey.

25   Q.  But he criticized --

C42Wfre3                    Jacoby - cross

1   A.  As did the court, as did the Cargo court who had very nice

2   things to say about me, but the court didn't like, and

3   correctly so, the nonreal world juxtaposition of two ads when

4   it likely wouldn't have happened in the real world.  Totally

5   different situation than is occurring here.

6   Q.  When you say that the courts said nice things about you,

7   sir, they certainly did not criticize your credentials in those

8   cases, correct?

9   A.  Certainly the truth.

10  Q.  And Del Monte Corp. is not criticizing your credentials in

11  this case, true?

12  A.  That is correct.

13  Q.  In Simon & Shuster, Judge Sand criticized your failure to

14  define version; we've been through that?

15  A.  Yes.

16  Q.  And Cargo Global, Judge Keenan criticized your survey and

17  did not receive it, correct, sir?

18  A.  Correct.

19  Q.  Now, let's turn to tab eight, and there we see the opinion

20  in Weight Watchers International v. The Stouffer Corporation,

21  do you recall that case, sir?

22  A.  Yes, I do.

23  Q.  Let's turn to page 12 of that case.  And on page 12, sir,

24  if we turn to the first full paragraph in the second column, we

25  see Judge Mukasey -- by the way, Judge Mukasey was the judge in

C42Wfre3                        Jacoby - cross

1   that case, correct, sir?

2   A.  Correct.

3   Q.  Judge Mukasey states, first full paragraph, on page 12,

4   "The market study conducted for defendants in this case has

5   even less probative value.  It is obvious that Dr. Jacob

6   Jacoby, a veteran of the trademark litigation arena, and the

7   creator of the Stouffer's survey, constructed the study

8   specifically to disprove consumer confusion regardless of

9   participants' reactions to the advertisements."  Do you see

10  that, sir?

11  A.  I do.

12  Q.  So what Judge Mukasey criticized in that case is you

13  disregarded what the respondents were saying in response to

14  your survey, correct, sir?

15  A.  No.  He was criticizing something else with which, part of

16  which I agree with and part of which I disagree with.  That's

17  my recollection.  Again, this is also over 20 years old.

18  Q.  Dr. Jacoby, you do recall Judge Mukasey indicating that the

19  study specifically attempted to disprove consumer confusion

20  regardless of the participants' reactions to the advertisements

21  being tested in that case?  Do you recall that, sir?

22  A.  I don't recall that, and if I did, I would disagree with

23  it.  Obviously the court's entitled to its opinion, and I'm

24  entitled to mine.

25  Q.  Certainly Judge Mukasey didn't receive your survey in that

C42Wfre3                    Jacoby - cross

1   case with open arms, did he, sir?

2   A.  He did not, for all kinds of reasons, I guess.

3   Q.  Let's turn to tab nine in the booklet I provided to you,

4   and there, we see the Louis Vuitton v. Dooney & Bourke case,

5   and that case was decided in 2007, was it not, sir?

6   A.  Yes, it was.

7   Q.  And that was a case in which Judge Stein's colleague, Judge

8   Scheindlin, sat and reviewed your work, isn't that so?

9   A.  That is so.

10  Q.  And Judge Scheindlin had no regard whatsoever, did she, for

11  your report?

12  A.  For any of the surveys conducted by any side, either side.

13  Q.  She wrote two opinions in that case, both of which

14  criticized your survey, isn't that so?

15  A.  I believe she wrote one and special masters wrote a second.

16  Q.  Let's look at this opinion, sir.  And you'll see, if you

17  take a moment, this is Judge Scheindlin's opinion adopting the

18  views of the special master, isn't that so?

19  A.  I don't know which one this is.  If you represent that's

20  the one, correct.

21  Q.  Well, indeed, the special master's opinion is attached to

22  this decision, is it not, sir?

23  A.  Thumbing through this, I cannot see --

24            THE COURT:  What page is it?  Direct him to a

25  particular page.

C42Wfre3                    Jacoby - cross

1    BY MR. ORR:

2    Q.  If you turn to page 12, 13 of Judge Scheindlin's opinion,

3    sir, the next page contains the special master's opinion

4    criticizing your work, isn't that so?

5    A.  Yes.  Yup, I see it.

6    Q.  Let's turn to page eight of Judge Scheindlin's opinion, and

7    you see on page eight there's a section entitled Dr. Jacob

8    Jacoby, do you see that, sir?

9    A.  I do.

10   Q.  And on page eight, second column, first full paragraph, in

11   the second sentence, Judge Scheindlin says, "In considering the

12   cumulative effect of the numerous flaws identified by the

13   special masters, it is clear that Dr. Jacoby's report and

14   testimony on the issues of both trademark confusion and

15   dilution are unreliable."  Do you see that, sir?

16   A.  I do.

17   Q.  Now, Judge Scheindlin wrote another opinion in the Louis

18   Vuitton case, do you recall that?

19   A.  I think an earlier one, yes.

20   Q.  And in that opinion, she was also critical of your work?

21   A.  On the same subject.

22   Q.  Let's turn to tab ten, and there we see the earlier

23   decision by Judge Scheindlin in the Louis Vuitton v. Dooney &

24   Bourke case, do we not?

25   A.  We do.

C42Wfre3                    Jacoby - cross

1    Q.  Now, in this opinion, Judge Scheindlin was troubled by the

2    fact that your survey had changed during the course of the

3    conduct of the survey, isn't that so?

4    A.  Yes.

5    Q.  And I think you explained to Judge Scheindlin that that was

6    a mistake in that case, correct, sir?

7    A.  No.  I explained that when the first bunch of respondents'

8    data came in, we saw that there were ambiguities, and so the

9    study was broken apart.  And each of the two component, namely,

10   the likely confusion and the dilution, were then tested in

11   separate ways.

12   Q.  Let's turn to page 26 of Judge Scheindlin's earlier opinion

13   in the Louis Vuitton case, tab ten of the binder that I have

14   provided to you.  And in the second column under the heading

15   survey methodology and execution, we see Judge Scheindlin says,

16   "Dooney & Bourke argues that the survey is irremediably flawed

17   in part because it was not conducted in the manner described in

18   Dr. Jacoby's expert report but was conducted in two separate

19   rounds with the design modified halfway through to increase the

20   number of confusion responses."  Do you see where I'm referring

21   there, sir?

22   A.  I see where that's written, yes.

23   Q.  And, Dr. Jacoby, further down in that paragraph, Judge

24   Scheindlin points out, "Dr. Jacoby explained that although

25   phase two of the study should have been run with two bags, the

C42Wfre3                          Jacoby - cross

1   white and black wrist lets, due to a mistake on the part of

2   Dr. Kaplan, who was responsible for the interview process, only

3   the white wristlet was used."  Do you see that, sir?

4   A.  I do.

5   Q.  And Judge Scheindlin was concerned about that in that case,

6   the change in the methodology of the study midstream, correct?

7   A.  That's a different thing.  Dr. Kaplan and I have a letter

8   from Dr. Kaplan saying it was totally his responsibility --

9             MR. ORR:  Your Honor, I move to strike.

10            THE COURT:  Yes.  Can you answer?

11            THE WITNESS:  Yes.

12  A.  You're conflating two things, you're mixing up two things.

13  If you give me an opportunity to explain, I will, but it's your

14  choice.

15  Q.  I'm asking you what the judge said, sir, and the judge very

16  plainly just said what I just read to you, correct?

17  A.  The judge wrote that, but you are combining, you're taking

18  two things and you're making them as if they're one, but, no,

19  you're not correct.  This is not a correct interpretation.  You

20  can read these facts, but taking them out of context, you're

21  giving them a wrong, false meaning.

22  Q.  Let's try --

23  A.  You may do that.

24  Q.  Let's try the next page.  Turn to page 27 and see what

25  Judge Scheindlin has to say about you there.  On page 27, in

C42Wfre3                      Jacoby - cross

1   footnote 161, at the bottom of the first column, left-hand

2   side, Judge Scheindlin says, "The court may have been more

3   sympathetic had Jacoby himself not formulated the same survey

4   question, rejected in Novonordisk and had that court not

5   suggested to him what would have been acceptable.  However,

6   Jacoby apparently has not learned from his mistakes, which,

7   contrary to plaintiff's assertions that Jacoby's surveys have

8   been universally relied upon and have never been rejected by a

9   court seem to be numerous."  Do you see that, sir?

10  A.  I do.

11  Q.  Judge Scheindlin thought you make a lot of mistakes, don't

12  you, Dr. Jacoby?

13  A.  That's not Judge Scheindlin.  She's quoting from a

14  different judge, and that judge took things out of context,

15  took things off, like the sentence have been universally relied

16  upon in sports NFL studies, took that qualifier off, made it

17  sound as if the attorney was claiming I had never been

18  criticized when he was claiming in about a half dozen NFL

19  studies I'd never been criticized.  What do you do when the

20  court here is criticizing other there are 30 other courts

21  including the Second Circuit of New York has accepted and

22  changed the law based upon that very question, but the District

23  Court wasn't aware of that.  What do you do when the courts

24  disagree?

25  Q.  My question to you, sir, was:  Judge Scheindlin recorded

C42Wfre3                        Jacoby – cross

1    this language in her opinion, correct?

2    A.  Correct.  That's not her language.

3    Q.  And she was quoting another judge?

4    A.  That's true.

5    Q.  Out in Wisconsin, correct?

6    A.  That's true.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C42FFRE4                         Jacoby - cross

1   Q.  So two federal judges were of the view that you make a lot

2   of mistakes and you don't learn from it, correct, sir?

3   A.  That's --

4   Q.  Yes or no, sir?

5   A.  That's their view.

6   Q.  Two federal judges --

7             THE COURT:  You have the answer, sir.  You asked the

8   question, you have the answer.

9             MR. ORR:  Thank you, your Honor.

10             THE COURT:  Move on.

11   Q.  And you are of the view, are you not, Dr. Jacoby, that you

12   don't need a Court to tell you what is proper science, correct?

13   A.  I don't need a Court to tell me one of the most honored

14   science -- one of the most awarded scientists in my field, in

15   fact, somebody whom the Bar Association came to and invited me

16   to write the book on science.  I don't need a Court to tell me

17   what proper science is, when the research shows many Courts do

18   not understand science.

19             MR. ORR:  Let me ask if we could put up on the board,

20   Andrew, Dr. Jacoby's deposition at page 100.

21   Q.  And let's just look at the language right in the middle of

22   the page, starting on line 15.  Do you recall giving this

23   testimony at your deposition, do you not, sir?

24   A.  I certainly do.  And look at the sentence before.  If you

25   talk to authorities and scientists, they'll tell you what I'm

C42FFRE4                          Jacoby - cross

1   saying is right.

2   Q.  All right, let's, sir, let's keep it Q and A here, okay?

3   You don't need a Court to tell you what you think is proper

4   science, correct?

5   A.  That is correct.

6   Q.  You don't need any lawyers to tell you, correct?

7   A.  If they have doctorates --

8   Q.  Yes or no, you don't need --

9   A.  That's correct.  I don't need a lawyer to tell me what is

10  or isn't proper science.

11  Q.  Let's turn to page 103 of Dr. Jacoby's deposition.  And

12  we'll start on page 8.  I'm sorry, line 8.  Once again, this

13  expresses your attitude, does it not, sir?

14  A.  It certainly does.  A hundred percent.

15  Q.  Now, sir, we were conducting a survey of your surveys in

16  the Southern District of New York and we saw three that were

17  received without criticism, indeed lauded by the judges,

18  correct, sir?

19  A.  As I said, I think there are more than seven, but of those

20  seven, yes.

21  Q.  And four that we've just gone through, were severely

22  criticized, correct?

23  A.  Were criticized, yes.

24  Q.  Now, four out of seven, sir, that's 57 percent, is it not?

25  A.  If you take a look at the hundred or so cases in which I've

C42FFRE4                          Jacoby - cross

1   testified --
2   Q.  Sir --
3   A.  You'll find 90 percent of the time the courts will accept
4   what I say.
5        THE COURT:  Sir, the question is what percentage is
6   four over seven.  Do you happen to know?
7   Q.  It's 57 percent, is it not, sir?
8   A.  You're right, it's 57 percent.
9   Q.  Now, you understand that in this case Del Monte Corp. has
10  not asked his Honor to comment on your report one way or the
11  other, that is for the jury to decide, correct?
12       MR. PLEVAN:  Objection.
13       THE COURT:  Sustained.
14  Q.  Now, sir, we have seen, have we not, and you've told us
15  right this moment that you don't care what lawyers say,
16  correct?
17       MR. PLEVAN:  Objection.
18  A.  Incorrect.  I said about science.
19  Q.  About science.  You don't care what judges say about
20  science, correct?
21  A.  I have to care, but I don't necessarily have to agree and
22  when they're wrong and I know from my science that I'm right
23  and that most scientists agree with me, then I know I'm right.
24  Q.  All right.  You disregarded what the respondents in your
25  survey said, correct, sir?

C42FFRE4                        Jacoby - cross

1    A.  Because according to the authorities in my science, the

2    experimental research will trump what they say because the

3    scientists understand from study after study that we as human

4    beings cannot tell what is causing our responses in situations

5    like these.

6    Q.  Well, let's just get this straight.  You disregarded the

7    verbatims in your survey but you regarded the verbatims in the

8    Hall & Partners study, correct, sir?

9    A.  They didn't do the statement.  That's the only thing I had

10   to go on.  There was nothing to trump what they said there.  I

11   would venture to say Del Monte Corp. relied on Hall & Partners.

12   Q.  Well, they're not relying on it for the same purposes that

13   you're attempting to, are they, sir?

14   A.  Well --

15   Q.  Yes or no, sir?

16   A.  Yes.

17   Q.  Now, we agreed earlier, sir, that every survey has

18   potential flaws, correct?

19   A.  Correct.

20   Q.  And that principle certainly applied to the surveys that

21   Judge Stein's colleagues in this court criticized that we've

22   been talking about here today, correct?

23   A.  Every survey, including my surveys has potential flaws.

24            MR. ORR:  I have no further questions, your Honor.

25            THE COURT:  All right.  Thank you.  Is there any

C42FFRE4                         Jacoby - redirect

1   cross-examination?

2           MR. PLEVAN:  Redirect.

3           THE COURT:  I'm sorry.  Any redirect, you're quite

4   correct.

5           MR. PLEVAN:  Thank you, Judge.

6   REDIRECT EXAMINATION

7   BY MR. PLEVAN:

8   Q.  Dr. Jacoby, I'll ask you a few questions then I'll go back

9   and get my materials.  But you testified on direct that you

10  have testified in federal court about a hundred times.

11  A.  That's correct.

12  Q.  And have you testified and been hired for federal court

13  cases in the last year?

14  A.  Yes, many.

15  Q.  And the year before that?

16  A.  Yes.

17  Q.  And the year before that?

18  A.  Yes.

19  Q.  So one wonders if you've been criticized on I think it's

20  four or five cases that have been pointed out, how is it that

21  lawyers keep hiring you?

22          MR. ORR:  Objection.

23          THE COURT:  Sustained.

24  Q.  Dr. Jacoby, this line of questioning that you had today

25  about some of these cases where you've been criticized before,

C42FFRE4                           Jacoby - redirect

1   have you had that line of questions put to you before?

2               MR. ORR:  Same objection.

3               THE COURT:  I'll allow that.

4   A.  Yes, I have.

5   Q.  On many occasions?

6   A.  Yes.

7   Q.  And lawyers keep coming back to you and hiring you?

8               MR. ORR:  Same objection, your Honor.

9               THE COURT:  Have you been -- you did say you've been

10  recently hired, correct, by lawyers?

11              THE WITNESS:  Yes.

12              THE COURT:  All right, next question.

13  Q.  And in those cases the purpose of that was to put you in a

14  federal court to testify, was that the purpose?

15              MR. ORR:  Objection.  Leading.

16              THE COURT:  Sustained.

17  Q.  What was the purpose when you were hired in those cases by

18  those lawyers?

19  A.  The purpose was to do research.  If the research supported

20  what they, their position, and as I said earlier, on Thursday,

21  it doesn't always support, but if it does support, then they

22  have me come in, and I might mention, Morrison & Foerster --

23              MR. ORR:  Objection.

24  Q.  Dr. Jacoby --

25              THE COURT:  Sir, don't volunteer.  Just answer the

C42FFRE4                        Jacoby - redirect

1    question as narrowly as possible.

2                THE WITNESS:  Yes, sir.

3                THE COURT:  So, too, if they can be answered "yes" or

4    "no" do so in response to Mr. Plevan's questions.  Proceed,

5    Mr. Plevan.

6    Q.  Now, Dr. Jacoby, have there also been situations where you

7    didn't actually testify in federal court but perhaps your

8    deposition or an affidavit was used?

9    A.  Yes.

10   Q.  And this might end up in a reported decision?

11   A.  Correct.

12   Q.  Every time you have testified, do you know whether or not

13   if a judge accepted your findings you were, your name was

14   mentioned in the opinion?

15   A.  I know in many instances it's not.

16   Q.  So that if counsel for the defendants for Morrison &

17   Foerster did research and said they've located all --

18               THE COURT:  Sustained as phrased.

19               MR. PLEVAN:  Pardon?

20               THE COURT:  Sustained as phrased.

21               MR. PLEVAN:  Yes.

22               THE COURT:  The record will show the DMC lawyer

23   standing to object.

24   Q.  If someone were to just research names, would that show all

25   the cases in which you have been, you testified and your survey

C42FFRE4                        Jacoby - redirect

1    was accepted by the Court?

2    A.   It would not.

3    Q.   Let me give you an example, for example.  As an example.

4    Do you remember a case in front of Judge Cederbaum called

5    Tambrands v. Warner Lambert?

6    A.   Yes, I do.

7    Q.   Do you recall approximately how long that was?

8    A.   28, 30 years ago.

9    Q.   Say 25?

10   A.   25.

11   Q.   Who was the lawyer that hired you in that case?

12   A.   The lawyer that cross-examined me for this case.  You were

13   the opposing attorney.

14   Q.   All right, let's slow down.

15        MR. ORR:  Objection, your Honor.

16   Q.   So who was the lawyer -- we'll get do that.

17        THE COURT:  No, no.  I'll allow the answer.  Go ahead.

18   Q.   By name, who was the lawyer that hired you in this --

19   A.   Bruce Keller of Debevoise Plimpton.

20   Q.   Bruce Keller of Debevoise & Plimpton.  Is he in the

21   courtroom?

22   A.   No, he's not.

23   Q.   Did he take your deposition in this case?

24   A.   Yes, he did.

25   Q.   And has Mr. Keller hired you and his firm hired you from

1   time to time over the years?

2   A.  Yes, he has.

3   Q.  Recently?

4   A.  No, I think recently I've opposed his firm on another

5   matter.

6   Q.  And so when Mr. Orr asked you he said we never met before,

7   that's because he took your deposition in this case?

8   A.  That's correct.

9   Q.  And Mr. Keller was in this Tambrands case?

10  A.  That's correct.

11  Q.  He was the lawyer that hired you?

12  A.  Correct.

13  Q.  And who was on the other side?

14  A.  You were.

15  Q.  Okay.  Now, you testified that there was about ten years in

16  which you and I did not work together?

17  A.  Correct.

18  Q.  During that period of time, were you hired by a law firm

19  called Morrison & Foerster?

20  A.  Yes, I was.

21  Q.  And is that the law firm Mr. Orr is with?

22  A.  Yes.

23  Q.  On how many occasions during that ten-year period when you

24  weren't working with me were you hired by Morrison & Foerster

25  to conduct surveys?

C42FFRE4                        Jacoby - redirect

1   A.   Three.

2   Q.   How many offices of Morrison & Foerster was involved in

3   those retentions?

4            MR. ORR:   That I object to, your Honor.

5            THE COURT:   I'll sustain the objection on the grounds

6   of relevance.

7   Q.   In what kind of cases were you hired by Morrison &

8   Foerster?

9   A.   One or actually two, probably.  Different surveys, the

10  Federal Trade Commission was coming out with regulations on how

11  the TV manufacturers were to describe the diagonal size of

12  their televisions and I did studies.  Morrison & Foerster was

13  one of a number of firms, but they were the lead firm

14  representing Samsung and Sony and half dozen of the major TV

15  manufacturers were the clients in that case.

16  Q.   Were there other cases in which Morrison & Foerster hired

17  you --

18  A.   Yes.

19           MR. ORR:   Your Honor, I think we've beaten this horse

20  to death.  Objection.

21           THE COURT:   I'll overrule the objection.  The question

22  has been answered.  Next question.

23  Q.   Were other cases for use in federal court case testimony?

24  A.   Yes.

25  Q.   Now, this Mr. Keller you referred to took your deposition

C42FFRE4                    Jacoby - redirect

1   in this case.  You also testified about doing a book, that you

2   did a book for the American Bar Association?

3   A.  I just finished it about a month ago.

4   Q.  And who did you call to ask if he would be your co-author

5   in that situation?

6   A.  At one point I asked Mr. Keller if he would like to

7   co-author it with me.

8   Q.  Is he also in the category of the people you'd refer to as

9   your good friend?

10          THE COURT:  Sustained.  Move on.  The record would

11   show the opposing attorney was not rising to object.

12   Q.  If we could look at these cases that Mr. Orr pointed out

13   that some of the judges commented favorably on your surveys,

14   correct?

15   A.  Yes.

16   Q.  So just looking at the ones Mr. Orr has brought to our

17   attention if you'd like at tab 5.  And if you look at page 8,

18   right above where it says "welcomes its criticisms," do you see

19   that?

20   A.  Yes.

21   Q.  Just read what Judge Wood said in this particular case, at

22   the paragraph that begins "the Court finds."

23   A.  "The Court finds that Dr. Jacoby made a good faith effort

24   to and did conduct fair unbiased consumer studies using

25   methodology consistent with both industry standards and the

C42FFRE4                        Jacoby - redirect

1    requirements set forth by Courts for evaluating what is

2    communicated to by advertisements."

3    Q.   If you would turn to tab 6, and this would be a decision by

4    Judge Cote, Denise Cote, as referred to before, Juicy Couture,

5    and if you would turn to page 22.  Do you see footnote 33 on

6    page 22?

7    A.   Yes, I do.

8    Q.   Could you read that into the record, please?

9    A.   Quote, "It is unnecessary to spend time addressing

10   Coutour's attacks on the Jacoby survey, since Couture has

11   failed to show any actual confusion and it carries the burden

12   to do so.  Suffice it to say that the attacks on Jacoby's

13   well-designed survey was strained and unpersuasive."

14   Q.   Dr. Jacoby, have other Courts made similar comments about

15   your surveys?

16   A.   Many of the Courts.

17   Q.   Have any judges actually heard all these kinds of

18   criticisms that Mr. Orr brought out, gone back and looked at

19   those cases and then expressed the Court's view about those

20   criticisms?

21            MR. ORR:   Objection.

22            THE COURT:   Sustained as phrased.

23   Q.   Dr. Jacoby, have Courts commented on when these issues have

24   been raised about criticisms of you personally?

25   A.   Yes.

C42FFRE4                          Jacoby - redirect

1    Q.  And do you have a specific case in mind, recent case?

2    A.  There was a case from nine years ago about, after many of

3    the criticisms, it was Wells Fargo, it was in U.S. District

4    Court of Detroit.  I've forgotten the judge's name, but she

5    went back and she read all of the cases and then came back and

6    had a very nice paragraph where she said she'd read the cases

7    where it was claimed that I had --

8              MR. ORR:  Your Honor, I object to --

9              THE COURT:  Yes, sustained.

10   Q.  What was the judge's conclusion?

11             MR. ORR:  Objection.

12             THE COURT:  Just a moment.  Sustained.

13             MR. PLEVAN:  I'll try one more time, Judge.

14   Q.  Did the judge in this particular case review the cases

15   where you had been previously criticized?

16   A.  Yes.

17   Q.  What did she rule with respect to your survey?

18             MR. ORR:  Same objection, your Honor.

19             THE COURT:  Sustained.

20   Q.  What was your understanding of what she ruled?

21             MR. ORR:  The same objection.  That doesn't help.

22             THE COURT:  Mr. Orr is correct.  The same ruling.  Is

23   it fair to say, sir, that of the numerous times that you have

24   presented surveys and testified in federal courts certain

25   judges have praised your surveys and methodologies and other

C42FFRE4                          Jacoby - redirect

1    judges have criticized your surveys and methodologies?

2              THE WITNESS:  It's fair to say, your Honor --

3              THE COURT:  All right.  Thank you.

4    Q.  Approximately what percent of the total times you've

5    testified in federal court --

6              MR. ORR:  Objection.

7    Q.  -- that you've been criticized?

8              THE COURT:  I'll allow that.

9    A.  About 10 percent of the time I've been criticized.  About

10   90 percent of the time the Courts have accepted and in most

11   cases lauded, praised my research.  Nobody's perfect and I'm

12   not.

13   Q.  Now, you were asked a number of questions on

14   cross-examination about fresh versus preserved, correct?

15   A.  Yes.

16   Q.  And you were actually read a number of the verbatims that

17   counsel suggested to you showed that people thought that the

18   word "fresh" meant not stale.  Do you recall that?

19             MR. ORR:  Object to form.

20             THE COURT:  I'll allow that.

21   Q.  Generally, do you recall that testimony?

22   A.  Yes, I do.

23   Q.  And if you would open up your binder to the tab, of your

24   report, appendix H --

25             MR. PLEVAN:  What exhibit number was that, counsel?

C42FFRE4                        Jacoby - redirect

1                   MR. ORR:  133.

2    Q.  I believe it's Exhibit 133, but you have appendix H in

3    your --

4    A.  Yes, I do.

5    Q.  And it begins in your report on page 283?  Appendix H.

6    A.  Yes, that's the cover page on 283.  It actually begins on

7    page 284.

8    Q.  Go to the last page.  What's the last page of this exhibit?

9    A.  312.

10   Q.  And if we could see one page, approximately, take an

11   estimate of, there's two columns --

12                  THE COURT:  Sir, sir.  Look at Exhibit 133.

13                  MR. PLEVAN:  I'm sorry, your Honor?

14                  THE COURT:  Do you have Exhibit 133 in front of you?

15                  MR. PLEVAN:  No, your Honor.  I have the exact same

16   thing in Dr. Jacoby's report.

17                  THE COURT:  Well, I just show a different last page.

18   That's all.  I don't mean to engender confusion here.

19                  MR. PLEVAN:  I think that was the problem we had

20   before.  I now have the exhibit and the first one I have here

21   is --

22                  THE COURT:  The last one.

23                  MR. PLEVAN:  Goes from page 284 and the last one in

24   the exhibit is 313.  So that's approximately 30 pages.

25                  THE WITNESS:  Nearly 30 pages, yes.

C42FFRE4                        Jacoby - redirect

1    Q.  And if you look at the first page -- if we could just go to

2    page 284 would be the first page.  Approximately how many

3    entries are there in each column on this page?

4    A.  Actually, there are 18 respondents.  Each column refers to

5    a single respondent.  In other words, if you read across.  So

6    there are nearly 20 respondents per page for nearly 30 pages

7    which gets up to the 600 or so people I spoke about.

8    Q.  And then, but how many different responses are you

9    recalling on that page?

10   A.  Twice for each respondent, so it works out to about 1200

11   responses and counsel only read about five, I think.

12   Q.  That's my recollection as well.

13            MR. ORR:  Your Honor, object --

14            THE COURT:  Yes, the jury, remember, what lawyers say,

15   even with all this by-play, ladies and gentlemen, it's the

16   answers that are evidence, not what lawyers say.  Not the

17   questions, just the answers.

18   Q.  Dr. Jacoby, on cross-examination were you asked any

19   questions about what you've described as convergence of the

20   data and what that means?

21   A.  I think I was, yes.

22   Q.  And what is your testimony on convergence of the data?

23            MR. ORR:  This is beyond the scope.

24            THE COURT:  Sustained as to form.

25   Q.  You were asked a number of questions as to whether or not

C42FFRE4                    Jacoby - redirect

1    you should have defined the terms "fresh" and "preserved."  Do
2    you recall that?
3    A.  Yes.
4    Q.  Now, what is your view as to when shoppers go in, what is
5    your view as to whether they know what those terms mean?
6              MR. ORR:  Your Honor, we've been over this on direct.
7              THE COURT:  And that's why he's -- and you went over
8    it on cross and that's why he's entitled to do it on redirect.
9    A.  My view is the vast majority of consumers understand what
10   "fresh" means in this context and they understand what
11   "preserved" means in this context, and the evidence for that
12   comes out in various ways.
13   Q.  All right.  Without going back over this evidence, if they
14   know what the words mean, what, then, does your survey show
15   with respect to when they confront one of the products you
16   tested?
17   A.  It shows approximately a third of the people are confused
18   or deceived or misled into believing that the fruit in those
19   products is fresh fruit.
20   Q.  Even though in your view they understand what the words
21   mean?
22   A.  They understand what it means and they're using it properly
23   and they're answering the question properly.
24   Q.  Now, you were asked questions about an excerpt from
25   Professor McCarthy's treatise.  Do you recall that?

C42FFRE4                          Jacoby - redirect

1   A.  Yes, I do.

2           MR. PLEVAN:  Can I have the first page of that

3   section?  Could we highlight the section where it begins "it is

4   notoriously easy," and blow that up?

5   Q.  Do you see this?  Dr. Jacoby, I'm going to read it to you

6   and ask you if you agree with this:  "It is notoriously easy

7   for one survey expert to appear to tear apart the methodology

8   of the survey taken by another."  Do you see that?

9   A.  Yes, I do.

10  Q.  Do you agree with that comment by Professor McCarthy?

11  A.  I do.

12  Q.  And what if anything, if you compare tearing apart someone

13  else's survey or doing your own, which is easier and which is

14  harder?

15  A.  It's a heck of a lot easier to tear someone's survey apart

16  than to design one that will stand up under cross-examination

17  in court.

18  Q.  You were asked questions about, or you offered answers

19  related to the difference between an experiment and being asked

20  questions that was not part of an experiment.  Could you

21  elucidate that?

22  A.  Yeah.  The social scientists have a whole variety of

23  techniques for examining human behavior and what leads to it.

24  One is simple observation.  The next rung is surveys, where you

25  ask questions, but surveys can be, depending upon what you ask,

C42FFRE4                    Jacoby – redirect

1  notoriously unreliable.

2      The next level would be experiments, which are considered

3  to be the gold standard across all the sciences for determining

4  cause/effect.

5      The first part of my study was an experiment which got at

6  cause/effect and overcame the limitations that many people,

7  that many people in the social sciences subscribe to and know

8  and have known about for years.  Surveys offer in many ways

9  unequivocal evidence, whereas simple verbal statements do not.

10  I could go on at length, but I really don't want to take the

11  time.

12  Q.  If we go back to Exhibit 129, page 8, just look at the 2A

13  question that you asked.  I think you were asked on cross or it

14  was suggested to you that this was leading the responses to one

15  answer or the other.  Is it leading?  Was it leading,

16  Dr. Jacoby?

17          MR. ORR:  Beyond the scope.  I never talked about

18  this, your Honor.

19          MR. PLEVAN:  Specifically said, your Honor, that one

20  of the criticisms was that Dr. Jacoby --

21          THE COURT:  I will allow the question.  It is not

22  beyond the scope.

23  A.  It's not leading.  Again, bear in mind we emphasize right

24  before this that they could tell us don't know and we emphasize

25  don't guess.  And then we didn't say does this cut fruit

C42FFRE4                        Jacoby - redirect

product contain fresh fruit or preserved fruit, it began if you

can tell, right up front.  It didn't force them to choose fresh

or preserved and as we saw from the data that I showed you,

many people said "don't know" and many people said "preserved."

Q.  Now, is this the experiment part of what you were talking

about?

A.  Yes.  That comes right after they've seen the different

videos and held the different products, and these people were

in separate groups.  Nobody in one group knew about the other

group, who were looking at the other products.

Q.  Comparing this, then, to Hall & Partners was Hall &

Partners an experiment?

A.  It was not.

Q.  Is that why you have to look at what the consumer said?

A.  That's all we said.  Correct, that's why I had to look at

that.

Q.  Is it still reliable what you looked at in Hall & Partners?

A.  It's not as strong evidence as an experiment, but it is

evidence that I know, quote, the other side can't criticize

that I slanted something.  I mean, they commissioned it.  It's

their research and here's what their research showed at the

very beginning that large numbers of people were taking away

the meaning the fruit was fresh.

Q.  Dr. Jacoby, having heard all the criticisms, would you

design the survey differently?

C42FFRE4                        Jacoby - redirect

1   A.   Not a whit, no way.

2   Q.   Do you believe it was done properly and in accordance with

3   the standards of your profession?

4   A.   I do.   I mean, there are always tradeoffs.   Surveys and

5   research are not the real world.   They try to approximate it,

6   and sometimes you have to approximate it one way and you have

7   to relinquish approximating it in another way.   True, people

8   aren't -- people are allowed to hold the product in the real

9   world, but in the real world they don't go into it knowing that

10  they're going to be asked questions about it immediately

11  thereafter.   They don't go into it with an interviewer there

12  who says here's my question, is it fresh or preserved and the

13  respondent can immediately say, oh, wait a minute, give me a

14  chance, let me read the package and see what it says about

15  that.   If they didn't pay attention to that up front and they

16  were asked to look at these things as they do in the real world

17  and they knew they were going to be asked questions about it

18  and they had as much time as they wanted to read it, and you

19  still get these dramatic differences, that's what counts.

20            MR. PLEVAN:   May I have a minute, your Honor?

21            THE COURT:   Yes.

22            (Pause)

23            MR. PLEVAN:   Nothing further, Judge.

24            THE COURT:   Thank you.   Is there any recross?

25            MR. ORR:   Very briefly, your Honor.

C42FFRE4                          Jacoby – recross

1          THE COURT:  Sure.

2          MR. ORR:  Which are, of course, famous last words.

3   RECROSS EXAMINATION

4   BY MR. ORR:

5   Q.  Dr. Jacoby, on redirect examination you were asked if I

6   only pointed out to you five excerpts from Appendix H, Exhibit

7   133.  Do you recall that, sir?

8   A.  I don't think I was asked that.  I think I offered that.  I

9   said my recollection was approximately five.

10  Q.  We could spend the rest of the afternoon on appendix H,

11  sir, but let's look at one more excerpt.  It's in evidence, the

12  jury can consider it for all of the items that are in there.

13        Let's turn to page 286 and look at the respondent 11621's

14  response.  11621 said:  "I think it's fresh because it's

15  preserved in the container."  Did he or she not, Dr. Jacoby?

16  A.  That was one that we looked at, yes.

17  Q.  No, we did not look at that one, sir.  That was on 294.

18  And as I said you have not looked at appendix H to see how

19  people were using the term "fresh" in preparation for your

20  testimony today, correct?

21  A.  That is correct I did not look before coming today.  I

22  looked when I did the study two years ago.

23  Q.  So we have a second person who used the terms "fresh" and

24  "preserved" in the verbatim response, correct?

25  A.  Correct.

C42FFRE4                        Jacoby - recross

1    Q.  We'll scan up to the top of this page.  Let's look at the

2    first item.  Do you see "it looked fresh"?

3    A.  Right.

4    Q.  If we scan down, you see "the appearance is fresh," "the

5    way it's packaged looks fresh."

6    A.  Right.

7    Q.  You see all those responses, do you not, sir?

8    A.  I do.

9    Q.  A lot more than five, aren't there, doctor?

10            MR. PLEVAN:  Objection.

11   A.  No, that supports what I'm saying.

12            THE COURT:  I'll allow it.  What's your answer?

13   A.  That supports what I'm saying.  Remember, this is the

14   answers to 2B which is to explain their answer why they thought

15   it was fresh.  It's because of the way it's packaged, looks

16   fresh, the appearance is fresh, the juice it's in looks fresh.

17   So they're explaining why they think, why they answered it's

18   fresh.

19            THE COURT:  Sir?

20   BY MR. ORR:

21   Q.  Yes, and the point I was making, sir, and I'm happy for you

22   to look at the juice it's in looks fresh, you referred to that

23   one previously, correct, sir?

24   A.  Just now, yes.

25   Q.  And in fact this goes back to the point that far more

C42FFRE4                      Jacoby – redirect

1   people talked about the appearance than talked about the three

2   reasons that Fresh Del Monte has offered here, correct, sir?

3   Yes or no, sir?  Far more people chose the appearance rather

4   than the three factors that Mr. Plevan raised with you in the

5   first conversation that you had in this case, correct?

6   A.  That is correct.

7          MR. ORR:  No further questions, your Honor.

8          THE COURT:  Mr. Plevan?

9   REDIRECT EXAMINATION

10  BY MR. PLEVAN:

11  Q.  Dr. Jacoby, the five we were talking about was how many

12  people said that fresh means spoiled.

13         MR. ORR:  Leading.

14         THE COURT:  I don't have a question.  Why don't you

15  ask a question?

16  Q.  What were the five that you and I were talking about just a

17  minute ago?

18  A.  I believe they referred to the fruit being spoiled.

19  Q.  And that was all?

20  A.  And that was it.

21  Q.  Did you see any more on this page that talked about the

22  fruit being spoiled?

23  A.  No, I did not.

24  Q.  And as far as those who talked about the appearance of

25  fresh, have you already pointed out the reasons based on the

C42FFRE4                        Jacoby - redirect

1  literature and other reasons why you didn't count that?

2  A.  I would love to point out more and just read into the

3  record --

4          THE COURT:  No.

5          MR. ORR:  Objection.

6          THE COURT:  Have you, sir?

7          THE WITNESS:  Yes, I have.  I'm sorry.

8          THE COURT:  Thank you.

9  Q.  And what was the leading article that you talked about?

10         MR. ORR:  Beyond the scope.

11         THE COURT:  Just a moment.  The leading article he

12  talked about when?

13         MR. PLEVAN:  On direct testimony that related to this

14  very issue that these appearance issues --

15         THE COURT:  Objection sustained.

16         MR. PLEVAN:  Nothing further, Judge.

17         THE COURT:  All right.  Thank you.  You may step down,

18  sir.  You are excused.

19         (Witness excused)

20         THE COURT:  All right, counsel, if you'll take all

21  these documents.  Plaintiff, next witness.

22         (Pause)

23         THE COURT:  Next witness?

24         MS. AGUIAR:  Your Honor, due to various witnesses'

25  availability, we've agreed that Mr. Lazopoulos would be the

C42FFRE4                         Lazopoulos – direct

1    next witness to testify.

2              THE COURT:  That's witness for the defense?

3              MS. AGUIAR:  The defense wanted to call him, yes.

4              THE COURT:  Ladies and gentlemen, again, because of

5    scheduling matters, the availability of witnesses, what the

6    parties have agreed is rather than have the next plaintiff's

7    witness, we're going to have a defense witness, all right?  So

8    this witness is being called by Del Monte Corporation, one of

9    the defendants.  Mr. Gonzalez, call your witness.

10             MR. GONZALEZ:  Your Honor, call Mr. Lazopoulos.

11    EMANUEL JOHN LAZOPOULOS,

12         called as a witness by the Defendant,

13         having been duly sworn, testified as follows:

14             THE COURT:  Welcome, sir.  Please pull your chair

15    forward and speak loudly, clearly and slowly into the

16    microphone.  Mr. Gonzalez, your witness, sir.

17             MR. GONZALEZ:  Thank you, your Honor.

18    DIRECT EXAMINATION

19    BY MR. GONZALEZ:

20    Q.  Sir, you are the senior vice president of sales, product

21    marketing and management for Fresh Del Monte?

22    A.  Yes.

23    Q.  And you began working for them in June 2003?

24    A.  Yes.

25    Q.  You were here last week to testify in this case?

C42FFRE4                      Lazopoulos - direct

1    A.  Yes, I was.

2    Q.  And a decision was made by the plaintiff not to call you,

3    is that right?

4              MS. AGUIAR:  Objection, your Honor.

5              THE COURT:  Sustained.  You were here last week and

6    you're here today, correct?

7              THE WITNESS:  Yes.

8              THE COURT:  Next.

9    Q.  When did you begin working in Fresh Del Monte?

10   A.  I began working in Fresh Del Monte in June 2003.

11   Q.  What was your position when you began?

12   A.  My position was vice president of fresh cut sales and

13   operations.

14   Q.  And you became senior vice president when?

15   A.  June 2005.

16   Q.  Sir, you would agree that of the brands that you deal with

17   in your capacity as senior vice president, the most valuable

18   brand that you have is the Del Monte label, correct?

19   A.  Yes, it is.

20   Q.  And you would agree that it's extremely available to your

21   company, correct?

22   A.  It is valuable, yes.

23   Q.  For example, if you were to learn that tomorrow some other

24   companies put Del Monte stickers on fruit, putting them in the

25   stores without your permission, you'd be all over that,

C42FFRE4                          Lazopoulos - direct

1    wouldn't you?

2    A.  Yes, we would be.

3    Q.  You wouldn't tolerate that for a minute, would you?

4    A.  No, I would not want to tolerate that.

5    Q.  Now, sir, you received weekly reports as part of your job

6    duties, is that right?

7    A.  Yes, I do.

8    Q.  And how long have you been receiving those weekly reports?

9    A.  Actually, probably since June of 2005.

10   Q.  And if someone were to say in one of those weekly reports

11   hey, we just saw a store in Kansas with our Del Monte stickers

12   on fresh fruit and it's not our fruit, you would immediately

13   take action to stop that, wouldn't you?

14   A.  Yes, probably so, yes.

15   Q.  You're not going to let people sell fruit that's not yours

16   with Del Monte stickers, are you?

17   A.  We're not going to let people sell fruit with Del Monte

18   stickers that's not ours, that's correct.  You're talking whole

19   fruit.

20   Q.  Yes, sir, whole fresh fruit right off the tree.

21   A.  Right.

22   Q.  Now, sir, in the course of your work at Del Monte, you have

23   lots of meetings with senior management folks, correct?

24   A.  Yes, I would say we do meet often.

25   Q.  And one of the things that you talk about is what is being

C42FFRE4                    Lazopoulos - direct

1    sold out in the market that you're in, in the refrigerated
2    section of the fresh fruit of the stores, correct?
3    A.  I wouldn't say I would characterize it as talking about
4    what's being sold at the markets.  They're usually about what
5    we sell and what we do, the performance, they're a very high
6    level and such.
7    Q.  Don't you also talk about what your competitors are up to?
8    A.  In a general sense, sometimes yes, but we focus on what we
9    do and we want to do it well.
10   Q.  Understood, but if you get reports back from the people out
11   in the field that your competitors are putting new products in
12   the refrigerated section of the produce department, that is
13   something you'll want to discuss with your other senior
14   management folks, true?
15   A.  Yes, if it's in the refrigerated section, fresh cut
16   products.  Is that what you're asking?
17   Q.  That's what I'm asking.
18   A.  Yes, we would probably venture to talk about it, but at
19   this point in time, though, my job as senior vice president
20   sales and product management and marketing is for the whole
21   products.
22   Q.  Understood, and that includes whatever's sold in the
23   refrigerated section of the produce department, correct?
24   A.  That does not include fresh cut products that are sold in
25   the refrigerated section.

C42FFRE4                         Lazopoulos - direct

1   Q.  So you're telling me that your current position has nothing
2   whatsoever to do with what is being sold in the refrigerated
3   part of the produce?
4   A.  Well, it does -- if it's classified as a whole fresh fruit
5   product, so if it's a tomato or an avocado or an apple or
6   grapes or such, yes, but if it's a fresh cut fruit product,
7   that doesn't come under my domain.
8   Q.  Whose domain would that be?
9   A.  Paul Rice.  He's the senior vice president of operations
10  for North America.
11  Q.  And when you have senior management meetings, Mr. Rice
12  attends these meetings as well, doesn't he?
13  A.  Yes.
14  Q.  In fact, let me give you a specific example that the jury
15  has seen.  Can we see Exhibit 509, please?  I'm going to take
16  you to page 872.  Andrew, would you show the cover page just to
17  remind the witness and the jury?  You remember this
18  presentation, don't you, the 2006 plan presentation that took
19  place on November 11, 2005?
20  A.  I was there, yes.  I don't remember the whole book, no.
21  Q.  Fair enough, but you were at the meeting.
22  A.  Yes, I was.
23  Q.  All right.  Now, Andrew, please turn to page 872.  That
24  would be you there?
25  A.  That is me.

C42FFRE4                          Lazopoulos - direct

1    Q.  And go back, Andrew, to the full.  So you were at the top

2    of this organizational chart for N.A. sales, N.A. meaning North

3    America, correct?

4    A.  Well, this is just the whole products, so if you look

5    closely you see it mentions bananas and pines and melons, the

6    citrus fruit and so on.  It does not mention fresh cut.  So

7    fresh cut does not come under my direction.

8    Q.  But everything else does?

9    A.  On the whole side, yes.

10   Q.  And because you were in charge of the entire whole fresh

11   operation as you put it, you had meetings where other senior

12   people are present where you discussed strategy for the

13   company, correct?

14   A.  Occasionally, yes.

15   Q.  And that is in fact what was going on at this meeting, were

16   you talking about strategy for the year 2006, right?

17   A.  That was part of it, yes.

18   Q.  And do you recall that there was discussion at this meeting

19   about the Del Monte label?

20   A.  I don't recall.

21   Q.  Now, you obviously used the Del Monte label on everything

22   that's sold under your jurisdiction, right?

23   A.  Almost everything, yes.

24   Q.  What don't you use it on?

25   A.  On any secondary product quality that doesn't make the

C42FFRE4                              Lazopoulos - direct

1    grade, so to speak.  So if it's not the best quality we

2    wouldn't put the Del Monte shield on it.

3              MR. GONZALEZ:  Could you go to page 608?

4    Q.  At the very top, sir, you see it says Del Monte primary

5    brand, which you and I have agreed to, correct?

6    A.  Yes.  I see that.

7    Q.  And then it says limited to fresh produce.  Do you see

8    that?

9    A.  I do see that.

10   Q.  In all of the years that you have been at Del Monte, that

11   is how you have been operating using the Del Monte brand only

12   with fresh produce, correct?

13   A.  The years that, what I know is that as long as I've been at

14   Del Monte since 2003 we've used the brand on fresh produce yes.

15   But what we can use it on, I don't know.  I can't go there.

16   Q.  I didn't ask you that, but I'm going to.  When you were the

17   vice president of sales when you started that position, you

18   were in that position for two years, right?

19   A.  That's correct.

20   Q.  And in those two years you were responsible for fresh cut,

21   correct?

22   A.  I was responsible for fresh cut, yes.

23   Q.  Now, during those two years, when you were responsible for

24   fresh cut sales, you knew then that it was very important to

25   protect the brand, right?

C42FFRE4                          Lazopoulos - direct

1    A.  Yes.

2    Q.  If anybody was, got a step on your turf then would you take

3    immediate steps to stop them, correct?

4    A.  It depends what you mean step on our turf and what steps I

5    could take.

6    Q.  Let me be more clear.  When you were vice president of

7    sales for the entire fresh cut operation of the company, if you

8    believed that a company was using the Del Monte brand

9    improperly, you would have said something, correct?

10   A.  I would have told my superior, yes.

11   Q.  You would have demanded that they take action to stop it,

12   true?

13   A.  I can't demand something of my superior.

14   Q.  Well, wouldn't you have told your superior that we need to

15   take steps to stop this, this is wrong?

16   A.  I would have discussed it with him but I don't remember

17   specific discussions.

18   Q.  So let's talk about Orchard Select.  When you joined the

19   company in June of 2003, you knew that my company was selling

20   Orchard Select pineapple in the refrigerated part of the

21   produce department, true?

22   A.  I have a recollection of that, yes.

23   Q.  Now, when you learned that, did you tell my client, Del

24   Monte, you can't do that, you can't sell pineapple in the

25   refrigerated part of the store with a Del Monte label?

C42FFRE4                    Lazopoulos - direct

1   A.  Well, I didn't say that, no.  I didn't tell your client

2   anything.

3   Q.  You didn't ask anybody to, did you?

4   A.  I didn't ask anybody specifically, but I'm sure I talked to

5   Paul Rice about it at the time who I reported to.

6   Q.  Do you understand, sir, that your employer is taking the

7   position in this case that my client cannot sell any pineapple

8   in the refrigerated part of the store.  Do you understand that?

9   A.  Yes.

10   Q.  You not only knew that we were selling Orchard Select, but

11   you knew that we were selling other lines of products when you

12   were vice president, true?

13   A.  Yes, I did.

14   Q.  And what are the products you knew that we sold in the

15   refrigerated part of the produce section?

16   A.  I knew you were selling the -- it wasn't in all the stores

17   but you were selling some Fruit Naturals, if I recall correctly

18   and some ready to eat Fruit Bowls, grapefruit and so forth, and

19   yes, there was a concern, because it was extremely confusing

20   for the consumer.  The consumer sees the same brand or shield

21   on the product and they don't know which is preserved or which

22   is fresh cut.  So it was an issue.

23          MR. GONZALEZ:  Your Honor, I'm going to move to strike

24   the part of the answer about what the consumers knew or what

25   their confusion was.  It's not what I had asked him.

C42FFRE4                        Lazopoulos - direct

1          THE COURT:  Was that your belief at the time that it

2     was extremely confusing to the consumer?

3          THE WITNESS:  Yes.

4          THE COURT:  I'll allow it in on that basis as opposed

5     to any particular knowledge.

6          MR. GONZALEZ:  Thank you, your Honor.

7     Q.  So you also knew that my client was selling, and this is

8     back when you were vice president of sales in June 2003 to

9     June 2005, you also knew that my client was selling SunFresh in

10    the refrigerated part of the store, true?

11    A.  Yes, I recall SunFresh.

12         THE COURT:  Did you know that Orchard Select contained

13    pineapple at that time?

14         THE WITNESS:  I actually don't remember it containing

15    pineapple.  I remember Orchard Select peaches or such.

16         THE COURT:  All right.

17    Q.  The Fruit Naturals that you recall in the refrigerated

18    section, you do recall that some of those included pineapple

19    and some of those included papaya?

20    A.  I do recall some of them included pineapple.  I don't

21    recall papaya at all.

22    Q.  And the SunFresh products that you were selling in the

23    refrigerated part of the produce department, you knew that some

24    of those included pineapple and/or papaya, true?

25    A.  I knew some of them contained pineapple.  I don't remember

C42FFRE4                         Lazopoulos - direct

1   papaya specifically.

2   Q.  And so even though you knew that we were selling pineapple

3   in the refrigerated part of the store, you didn't do anything

4   to try to stop my client from selling it, didn't you?

5   A.  Well, it wouldn't have been my job to do that.  I informed

6   my superior Paul Rice of the issue.

7   Q.  Did you ever tell anyone that they should stop us from

8   selling pineapple in the refrigerated part of the store because

9   we didn't have a right to do that?

10  A.  I don't think I told anyone -- I don't recall what I told

11  them, actually.  I mean, I don't remember.  That was a long

12  time ago.

13  Q.  Let's get this straight.  What exactly do you recall saying

14  to Mr. Rice about the fact that my client was selling multiple

15  products with pineapple in the refrigerated part of the store

16  while you were vice president?

17  A.  The specific verbatim, I don't recall the language.

18          THE COURT:  In general.  Words or substance.  I take

19  it, sir, you can't recall the words.

20          THE WITNESS:  Right.

21          THE COURT:  In general.  In substance.

22  A.  In substance, the issue, the discussion was my concern that

23  the products that Del Monte Corporation was bringing into the

24  produce department was having an issue with our products.  It

25  was taking shelf space and there's limited shelf space in the

C42FFRE4                    Lazopoulos - direct

1    refrigerated case, so with that in mind and the issue, quite

2    frankly, is that it was confusing the consumer and eating into

3    our sales, so to speak.

4    Q.  All right.

5    A.  And I'm sure the conversation was about that.

6    Q.  Okay.  You just said two things.  Number one, confusion to

7    consumers and number two, we're cutting into your shelf space.

8    That's what you talked to your boss about, right?

9    A.  I talked to my boss about probably, yes, both those things.

10   Q.  You did not say to your boss, hey, they don't have the

11   right to sell that stuff there.  You did not say that, did you?

12   A.  I did not sell that because I don't know what rights they

13   have.

14   Q.  And when you talked to your boss, your boss didn't say that

15   to you either, did he?

16   A.  He didn't -- I don't recall what he said at the time.

17   Q.  You don't recall anybody saying at any of these senior

18   management meetings that you were having back in 2003 to 2005

19   when you're talking about our products are taking your space,

20   you don't recall anybody in your company saying hey, wait, they

21   can't sell pineapple there?  You don't recall anybody saying

22   that, do you?

23   A.  I don't think I said it in that context.  I don't recall

24   specific conversations.  I mean, that was seven years ago, and

25   so --

C42FFRE4                        Lazopoulos - direct

 1   Q.  You -- I'm sorry, are you finished?

 2           THE COURT:  Do you recall any specific conversations

 3   at or about that time concerning the sale of cut pineapple by

 4   Del Monte Corporation?

 5           THE WITNESS:  I remember, as I said, talking to Paul

 6   Rice about my concern about pineapple from Del Monte

 7   Corporation making inroads into the produce department.

 8           THE COURT:  In terms of shelf space?

 9           THE WITNESS:  In terms of shelf space, yes.

10   Q.  But nobody ever said, as you're having this discussion with

11   this person -- I assume you discussed this concern with others

12   too, true, within the plaintiffs -- between your employer?

13   A.  I think I probably talked to a few people about it.  Maybe

14   a general manager or Kirk Teske or such.

15   Q.  And what was Kirk Teske's position?  He was -- do you

16   remember?

17   A.  During the time when I was VP of sales for fresh cut?

18   Q.  Yes.

19   A.  He was general manager for Kankakee.

20   Q.  And Mr. Teske was the person who was here in court?

21   A.  That's correct.

22           THE COURT:  He's in the first row, right?

23           THE WITNESS:  Yes, he is in the first row.

24   Q.  So what concerns did you express to Mr. Teske about our

25   products being refrigerated?  Was it the same thing, that we're

 1   taking shelf space?

 2   A.  I'm not trying to be rude, sincerely.  I just don't

 3   remember exactly what the conversations were.  But again, in a

 4   general term, I remember having conversations and being

 5   concerned about it.

 6   Q.  About shelf space being taken, true?

 7   A.  About the whole context of Del Monte Corporation's

 8   preserved product being in the refrigerated case.

 9   Q.  You never told Mr. Teske that you thought our products

10   being there was in violation of the contract, you never said

11   that, did you?

12   A.  I never said that, because I'm not familiar with the

13   contract.

14   Q.  And when you had the conversation with Mr. Teske, he never

15   said to you, well, wait a minute, they can't sell pineapple in

16   the refrigerated part of the produce section, he didn't say

17   that to you, did he?

18   A.  He didn't say that to me, no.

19   Q.  And when you're having this meeting in November of 2005,

20   who is it that's talking about the Del Monte brand limited to

21   fresh produce?  Who is making the presentation?

22   A.  I think John Lockridge made this part of the presentation,

23   but I'm not sure.

24   Q.  I'm sorry, what's John's last name?

25   A.  Lockridge.

C42FFRE4                    Lazopoulos - direct

1    Q.  Does he still work for you?

2    A.  No, he doesn't.

3    Q.  And when Mr. Lockridge made this presentation that included

4    an assertion that Del Monte's brand is limited to fresh

5    produce, you don't recall anybody standing up and objecting to

6    that, do you?

7    A.  I don't recall this particular slide, let alone that.

8    Q.  You don't recall there being any discussion at this meeting

9    about the fact that my client could not sell pineapple in the

10   refrigerated part of the produce section, you don't recall that

11   being discussed at all, do you?

12   A.  I don't recall anything being discussed about this area.

13   Q.  And let me just focus on my question for a minute.  I

14   appreciate your recollection is not great about the meeting,

15   you've told us that.  Do you have any recollection of anyone at

16   the meeting at any time, whether it's this slide or some other

17   slide, do you have any recollection of anybody saying, wait a

18   minute, Del Monte can't sell pineapple in the refrigerated part

19   of the store?  Did anybody say that?

20   A.  Not that I'm aware of.

21   Q.  When did you hear for the first time that your client is

22   asserting that my client cannot sell pineapple in the

23   refrigerated part of the store?

24   A.  Sometime in, think it was sometime in 2008.

25   Q.  Sometime in 2008.

C42FFRE4                          Lazopoulos - direct

1    A.  Yes.

2    Q.  That's when this lawsuit was filed, do you know that?

3    A.  Yes.

4    Q.  And how did it come to you?

5          MS. AGUIAR:  Object just to the extent that it might

6    call for a privileged communication.

7          THE COURT:  Don't discuss anything lawyers said to

8    you.

9    A.  Our in-house counsel came to me with it.

10   Q.  Was this after this lawsuit was filed?

11   A.  I don't recall.

12         THE COURT:  What date was the lawsuit filed?

13         MR. GONZALEZ:  I believe it was October of 2008.

14         THE COURT:  Sir, do you know whether it was before or

15   after October of 2008 that an attorney came to you?  You may

16   not know.

17         THE WITNESS:  I don't recall.

18         THE COURT:  All right.

19   Q.  Sir, when you were vice president of fresh cut sales, one

20   of your responsibilities was to determine whether there were

21   new products that you could sell, true?

22   A.  No.

23   Q.  That isn't something that you participated in, deciding

24   what new products you might want to put on the market?

25   A.  No, it wasn't.  I came on in 2003 and specifically for the

C42FFRE4                    Lazopoulos – direct

1    sales function of the existing products we had.  Del Monte just

2    got finished building out eight facilities and these facilities

3    were not being utilized totally.  The sales were lackluster and

4    my specific job for those two years was really to focus on the

5    products that we had and promote them with retailers and

6    promote the product line.  And that was really my focus.  I

7    wasn't involved really on the operational side and new product

8    development really didn't come into play.

9    Q.  When you had meetings with other senior executives at Fresh

10   Del Monte, didn't you talk about new products?  Maybe not you

11   personally.  Wasn't there discussion about new products that we

12   might want to put on the market?

13   A.  I don't recall specifically about new products being put on

14   the market.

15   Q.  In all of the years that you've been at Fresh Del Monte,

16   every single product that you sell, meaning the company, with

17   the Del Monte logo, is a fresh product, true?

18   A.  To the best of my knowledge, the years that I've been there

19   all the products that we sell are fresh products.

20   Q.  What you told us in deposition is that during the years

21   you've been there you haven't even considered using the Del

22   Monte shield on something that's not fresh, correct?

23   A.  Well, it didn't come under me because new product

24   development wasn't under me.

25   Q.  And is that why you didn't consider it?

C42FFRE4                      Lazopoulos - direct

1   A.  I'm not -- am I speaking for the corporation?  I can't

2   speak specifically for the people in charge of new product

3   development.

4   Q.  Do you recall telling me at deposition, telling us at

5   deposition that the reason why you didn't consider it was

6   because you couldn't under the contract use the Del Monte label

7   on products that were not fresh?  Do you recall saying that?

8            MS. AGUIAR:  Objection, your Honor.  This goes to the

9   voir dire we had the other day.

10            MR. GONZALEZ:  At this point it's impeachment.

11            THE COURT:  Just a moment.

12            (Pause)

13            THE COURT:  I'll allow it.  Do you recall saying it,

14   yes or no?

15            THE WITNESS:  I'm sorry, can you repeat the question?

16   Q.  Yes.  When we asked you why you've only used the Del Monte

17   shield on fresh product as opposed to processed or preserved,

18   do you remember telling us in deposition that you didn't use

19   it, didn't even consider using it on preserved product because

20   you couldn't under the agreement?

21   A.  I don't recall.

22            MR. GONZALEZ:  Your Honor, I'd like to read from 132,

23   line 13 through 133, line 3.

24            MS. AGUIAR:  Just give me a moment to look at it.

25            (Pause)

1  Q.  Sir, I'm going to read --

2           THE COURT:  Do you recall being asked this question

3  and giving this answer at a deposition, sir?

4           THE WITNESS:  Starting with?

5           THE COURT:  Well, Mr. Gonzalez will read it.

6  Q.  I'll read it, sir, and just for the record, sir, the

7  deposition was taken on March 25, 2010.  I'm beginning at page

8  132, line 13.

9  "Q.  In the past has fresh Del Monte considered selling

10 processed and preserved cut fruit items like the types of

11 processed and preserved cut fruit items like Del Monte

12 Corporation sells?

13 "A.  In North America?

14 "Q.  In North America.

15 "A.  The only one I'm aware of in the past is the Rosy slightly

16 processed product line -- I'm sorry, product that I mentioned

17 earlier.

18 "Q.  Has fresh Del Monte in the past considered selling any of

19 these types of processed and preserved cut food items in North

20 America under the Del Monte brand?

21 "A.  No.

22 "Q.  Why not?

23 "A.  Because of the license agreement."

24      Do you see that?

25 A.  Yes, I do.

C42FFRE4                              Lazopoulos – direct

1    Q.  Did I read it correctly?

2    A.  Yes.

3    Q.  Did you have an opportunity to review your testimony?

4    A.  I had an opportunity to review it and I did so, and I was

5    under the understanding there were typos and so forth.  I

6    didn't think I could change the testimony.

7    Q.  Well, you made a number of changes to your testimony to

8    correct the testimony, is that right?

9    A.  They were all grammar and typos and such.

10   Q.  You didn't change this?

11   A.  I didn't change this for the content.

12          THE COURT:  In other words, was it your understanding

13   that the review was for purposes of typos and grammar and not

14   for purposes of substance?

15          THE WITNESS:  That's what my understanding was.

16          THE COURT:  All right.

17   Q.  Are you telling me now this is a mistake, the court

18   reporter made a mistake?

19   A.  I'm not saying the court reporter made a mistake.

20   Q.  You knew this was an important deposition, didn't you?

21   A.  Yes, I knew it was an important deposition.

22   Q.  And when you sat for it you sat as senior vice president

23   for your company correct?

24   A.  That was my position, yes.

25   Q.  And you knew it was important to tell the truth?

C42FFRE4                          Lazopoulos - direct

1    A.   Absolutely.

2    Q.   And you knew it was important not to guess or speculate,

3    right?

4    A.   Well, I was speaking under the context of my knowledge, and

5    I mentioned the license agreement, but I've never read the

6    license agreement, so I was under the assumption at that time

7    that, that this was the reason.  But again, I never read the

8    license agreement, so I didn't really know.

9    Q.   Well, you didn't just take a wild old guess in your

10   deposition, did you?

11   A.   Well, what I did is, I speculated, obviously, that we

12   didn't, we didn't do it and the reason is, is what I stated,

13   but again, I don't understand -- I don't -- I've never read the

14   license agreement to understand it.

15   Q.   But you've sat in a number of important management meetings

16   at your company where everybody talked about the fact that you

17   could only use the Del Monte label on fresh produce, isn't that

18   right?

19   A.   No, that's not right.

20   Q.   Well, did you see the document I just put up there where

21   the entire management was talking about strategy and it says

22   limited to fresh produce?  Did you see that?

23   A.   The document you put up there was well over 200, 300 pages.

24   I'm not sure.  It was a meeting that lasted for nine to ten

25   hours and it was one of six, five or six days of meetings that

C42FFRE4                    Lazopoulos - direct

1   occurred.  So I don't recall what was said, but to say that, I
2   don't think we can say that.
3   Q.  All right.  Let's get a couple of things clear.  When you
4   say at deposition under oath that you've never even considered
5   selling preserved product using my client's brand, that it was
6   because of the license agreement, the license agreement is the
7   contract that we're here for, true?
8   A.  That's part of the reason, yes.
9   Q.  What did you base that answer on?  If you hadn't read the
10  contract, isn't it true that you based that answer on the
11  course of conduct of your company since you began working there
12  in 2003?
13  A.  No, not at all.  Because what I based that answer on was
14  what I've done and what I did to that time -- in that time
15  frame.  So as I said earlier, my focus when I joined the
16  company was in the fresh cut products that we had and
17  subsequent to that on the whole fresh products, so that's what
18  it was all based on.
19  Q.  You're familiar with the Rosy brand?
20  A.  Yes.
21  Q.  You would agree with me hands down that the Del Monte label
22  is far more valuable than this Rosy label?
23  A.  Yes, I would.
24  Q.  You would agree that if this bucket had the Del Monte
25  brand, you'd be able to sell a lot more of this stuff?

C42FFRE4                          Lazopoulos - direct

1    A.   If that bucket had the Del Monte brand?

2    Q.   Yes.

3    A.   Yes, we probably would be able to sell a lot --

4              THE COURT:   What exhibit number do you have?

5              MR. GONZALEZ:   Thank you, your Honor.   255.

6    Q.   Tell us, by the way, who is the person who decided that

7    we're going to call this Rosy instead of Del Monte?

8    A.   I don't know that.

9    Q.   And why is it that it's called Rosy and not Del Monte?

10   A.   I don't know why it was decided to call it Rosy instead of

11   Del Monte.   I wasn't involved in the product development of

12   that product.

13   Q.   Do you recall telling us something different at deposition?

14   A.   I recall saying something different at deposition, but I

15   don't remember specifically what it was.

16             MS. AGUIAR:   Your Honor, can we --

17             MR. GONZALEZ:   It's impeachment again, your Honor.

18   Q.   Do you recall telling us at deposition the reason that it

19   says Rosy and not Del Monte is because the contract doesn't let

20   you say Del Monte because it's preserved?

21             THE COURT:   I'll allow it.

22   A.   I'm sorry, could you repeat that?

23   Q.   When you were asked at deposition why is this called Rosy

24   and not Del Monte, you didn't say, "I don't know."   What you

25   said was is that under the contract we can't call it Del Monte

C42FFRE4                          Lazopoulos - direct

1   because it's preserved.  Isn't that what you told us?

2   A.  I said something to that extent, but I don't remember

3   specifically.

4           THE COURT:  Had you read the contract at that time?

5           THE WITNESS:  No.  I have not -- I still haven't read

6   the contract.  I don't have a copy of it and I haven't read it.

7   Q.  So, tell me, if it is your employer's position that you can

8   sell pineapple even if it's processed or preserved using Del

9   Monte's brand, if that is in fact true, then why haven't you

10  done it in 23 years?

11  A.  I can't answer that.

12  Q.  Why haven't you done it since you started there?

13  A.  Because that hasn't been my focus, as I said.

14          MR. GONZALEZ:  Your Honor, for impeachment purposes,

15  I'd like to read from page 120, line 17 to 22.  One question,

16  one answer.

17          THE COURT:  Is there an objection?

18          (Pause)

19          MR. GONZALEZ:  Your Honor, I'm going to read the

20  question and answer that I'd like to read and one more question

21  and answer that counsel has asked me to read.  Andrew, could

22  you please put up page 120, lines 17 to 22?

23  "Q.  Can you explain why fresh Del Monte sells these products

24  under the Rosy brand instead of the Del Monte brand?

25  "A.  In North America we are not allowed to use the Del Monte

C42FFRE4                        Lazopoulos - direct

1   brand label on any type of preserved product."

2        Do you see that?

3   A.  Yes, I do.

4   Q.  You didn't change or correct that answer when you read your

5   transcript, did you?

6   A.  I did not.

7   Q.  That was your belief at the time, correct?

8   A.  That was my personal belief, yes.

9   Q.  And that belief was based at least in part on the many

10  conversations you've had with people at Fresh Del Monte,

11  correct?

12  A.  Not at all.

13  Q.  So what was it based on?

14  A.  It was based on the fact that when I joined the company we

15  were just doing fresh products, as I said.  And there was -- my

16  total focus was selling the products that we had and when this

17  preserved product came into play, I wasn't involved in the

18  product development of it, the development.  My focus was on

19  the fresh, fresh products only, and I didn't know that the, I

20  didn't know about the contract other than that there was one.

21  Specifically about the contract.

22  Q.  Sir, isn't it true that the reason you never took any steps

23  to stop my client from selling pineapple in the refrigerated

24  part of the produce section is because you always understood

25  that we could do that?

C42FFRE4                        Lazopoulos - direct

1    A.  No, that's not true.

2    Q.  Then why didn't you take steps to stop us?

3         THE COURT:  Sustained.

4         MS. AGUIAR:  And also, I didn't want to interrupt your

5    flow, but you said you'd read the other question and answer.

6         MR. GONZALEZ:  Andrew, can we display page 121, lines

7    1 and 2 and line 23?

8    "Q.  Is there someone that knows more about the Rosy brand than

9    you do?

10   "A.  Tom Young and Kirk Teske."

11   Q.  And again, Mr. Teske is the gentleman in the court who

12   already testified?

13   A.  Yes.

14   Q.  Does Tom Young still work for you?

15   A.  Yes, he does.

16   Q.  So if you had to find out more about the Rosy brand, he's

17   the guy you would talk to?

18   A.  Yes.

19        MR. GONZALEZ:  Andrew, can we go back to Exhibit 509

20   briefly and go to page 5600.

21   Q.  This is the same strategy meeting that I showed you about

22   earlier what it says, this one says, this page, page 600, using

23   the Bates number says under weaknesses, brand license

24   limitations.  Do you see that?

25   A.  Yes, I do.

C42FFRE4                          Lazopoulos - direct

1  Q.  That is a reference to what you referred to earlier, that

2  you could only use the Del Monte brand with fresh products,

3  correct?

4  A.  Could you repeat that?

5  Q.  Yes.  When this says weaknesses, brand license

6  limitations --

7            THE COURT:  Do you know what that was referring to?

8            THE WITNESS:  No, I don't.  I don't recall this

9  particular slide, either.  I'm not sure what they were

10  referring to.

11  Q.  Well, at that time, what brand license limitations were you

12  aware of with respect to the Del Monte shield?

13  A.  I wasn't aware of our limitations at all.  I didn't know

14  what our limitations were.

15  Q.  Well --

16            THE COURT:  But you knew, you were putting out, Fresh

17  was putting out some products with the Del Monte shield, right?

18            THE WITNESS:  On the whole side, sir?

19            THE COURT:  Yes.

20            THE WITNESS:  Yes.

21            THE COURT:  And were you putting out fresh cut produce

22  under the Del Monte shield at that time?

23            THE WITNESS:  Yes, we were.

24            THE COURT:  And you knew there was another company,

25  Del Monte Corporation, that was putting out cut product under

C42FFRE4                         Lazopoulos - direct

1   its, under the Del Monte shield, correct?

2              THE WITNESS:  That's correct.

3              THE COURT:  Did you have an understanding as to what

4   they could do versus what you could do?

5              THE WITNESS:  I had an understanding in my own mind.

6   As I said earlier, that we were fresh and they were preserved,

7   and that was the basis of my understanding.

8              THE COURT:  All right.

9   Q.  And at the time that I took your deposition you had that

10  same understanding then, didn't you?

11  A.  At the time of my deposition, I had that basis of

12  understanding then.  But I did not know at the time how far we

13  could go with our brand.

14  Q.  But when you were shown these words, these highlighted

15  words in deposition, "brand license limitations" in deposition,

16  you had an understanding then as to what the words meant, isn't

17  that right?

18  A.  I don't recall, actually.

19  Q.  Well, do you recall telling us at deposition that you

20  understood those words to mean that you couldn't use the Del

21  Monte shield if the product were processed or preserved?

22  A.  I don't recall.  That was a few years ago.

23             MR. GONZALEZ:  Your Honor, may I just show him to

24  refresh his recollection?

25             THE COURT:  Yes, show him.  Just because there are

C42FFRE4                    Lazopoulos - direct

1    certain words that you're going to read to yourself now doesn't
2    mean that it refreshes your recollection, but it may.
3    Q.  Sir, I'm going to ask you to read to yourself one question,
4    one answer from page 130, lines 6 through 10 of the deposition
5    before I ask you a question.
6              MS. AGUIAR:  You'll need to read from line 1 to fully
7    understand the question and answer.
8              MR. GONZALEZ:  Not a problem.
9    Q.  Why don't you read from line 1 to 10?
10             THE COURT:  To yourself.
11             (Pause)
12   A.  Just to line 10?
13   Q.  You can stop at line 10.  You're welcome to read more, but
14   that's all I need you to read.
15        Sir, having read this, does it refresh your recollection
16   that at the time of the deposition you had an understanding
17   that the words that are highlighted, "brand license
18   limitations" referred to the fact that Fresh could not put the
19   Del Monte logo on any processed or preserved products?
20   Correct?
21   A.  That's what I said.  But before that I prefaced it with the
22   fact that I didn't know.  I didn't recall that and I did not
23   know.
24   Q.  What you said --
25   A.  What was discussed at the meeting.

C42FFRE4                          Lazopoulos - direct

1   Q.  What you said before that was that you couldn't remember

2   specifically what was said about those words, right?

3   A.  That's correct.

4   Q.  But then when you were asked at deposition what is your

5   understanding as to what those words mean, that's when you gave

6   the answer that it was your understanding that it meant --

7           MS. AGUIAR:  Your Honor.  Objection.  May we approach,

8   because he's totally mischaracterizing --

9           THE COURT:  Yes, sidebar.  Sidebar.  Counsel, counsel.

10          I've forgotten the mid-afternoon break.  Ladies and

11  gentlemen, ten take minutes.  I apologize.

12          (Jury excused)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

C42FFRE4                         Lazopoulos - direct

1           (In open court; jury not present)

2           THE COURT:  What's the issue?

3           MS. AGUIAR:  My objection is that he asks --

4           THE COURT:  If you would step outside, sir, you can

5     take a break, too.

6           THE WITNESS:  Okay.

7           THE COURT:  Does somebody have an extra copy of that

8     page for me?

9           MR. GONZALEZ:  Your Honor, we put it up on the screen

10    as well, if it's easier.

11          THE COURT:  Okay.

12          MS. AGUIAR:  So he's asked what that refers to and he

13    says I don't know what his point was and he doesn't know what

14    he went into.

15          THE COURT:  You're talking about, is the reference

16    before to brand license limitations on the slide?

17          MS. AGUIAR:  It is, yes.

18          THE COURT:  Which he has no recollection of the

19    conversation of.

20          MS. AGUIAR:  Right and he says do you know what that

21    refers to.  I don't know what his point was.  And he's trying

22    to --

23          THE COURT:  Wait, I don't know what his point was,

24    that is, whoever was talking about brand license limitations in

25    the conversation he has no recollection of, is that correct?

C42FFRE4                      Lazopoulos - direct

1                 MS. AGUIAR:  Yes.

2                 THE COURT:  All right.  "When he talked about that,

3      but we have license limitations on our brand.  How far he went

4      into that, I don't know, in the context of this planning

5      document."  All right, now what is -- Mr. Gonzalez, what did

6      you --

7                 MR. GONZALEZ:  Your Honor, I don't even remember where

8      I got cut off.

9                 THE COURT:  What is your question going to be?

10                MR. GONZALEZ:  I don't even know that there's a

11     question pending.  I think counsel got up and objected and I

12     said to her off the record when I went by, she complained that

13     I was mischaracterizing what he said, so my view is, look, if

14     they want to read it then they can read it, then there's no

15     question about my mischaracterizing it.

16                The whole reason why I approached him is so I'm

17     avoiding the argument that I'm mischaracterizing in any way.

18     What happened here, your Honor, is the witness' answers have

19     changed dramatically between his deposition and his trial

20     testimony.

21                THE COURT:  But as I understand it, he has a

22     consistent response for it.  That is, he has no specific

23     recollection of the discussion if any and he was off the

24     reservation in the sense that he -- I never read the license

25     agreement.  That statement here is a consistent statement.

C42FFRE4                        Lazopoulos - direct

1              MR. GONZALEZ:  But the jury is entitled to disbelieve

2         what he's saying.

3              THE COURT:  Absolutely.

4              MR. GONZALEZ:  He's in all these meetings and saying

5         all these things.

6              THE COURT:  I understand, that's the nature of

7         impeachment, but what is the issue we have before us at this

8         moment that calls for a judicial decision?

9              MR. GONZALEZ:  I have no issue.

10             THE COURT:  Ms. Aguiar?

11             MS. AGUIAR:  I believe he was saying to the witness

12        and there was a question pending -- I'm sorry I'm trying to

13        scroll up, so I'm sorry --

14             THE COURT:  Take a moment, do the scrolling.  Take a

15        moment, do the scroll up.  Let me do the same.

16             MS. AGUIAR:  It says -- he asked him and this is right

17        when I objected so absolutely, this is when you asked the

18        question, so I put in an objection --

19             THE COURT:  What page?  What line?

20             MS. AGUIAR:  I can give you the time.

21             THE COURT:  You don't have pagination on the left?

22             MS. AGUIAR:  No.

23             THE COURT:  Go ahead.

24             MS. AGUIAR:  Question:  "But when you were asked at

25        deposition what is your understanding as to what those words

C42FFRE4                      Lazopoulos - direct

mean that was your, that is when you said it was your

understanding that it meant" -- that's when I objected because

I think he was trying to suggest to the witness that the

witness knew what those words in this presentation meant and

his testimony has been consistent, your Honor, which is that,

and this was the whole voir dire the other day and your words

were, look, the guy didn't have a basis for it.  It was in the

air, he didn't read the agreement, he said that.

          You told Mr. Gonzalez that he could ask all his course

of conduct questions.  Now we've gone well beyond that.  I

appreciate your ruling.  I made my objection based on your

prior ruling.

          THE COURT:  Given the answers I thought it was

appropriate impeachment, and it's come out now as is

appropriate that he had never read the license agreement.  So

what can I do for you now?  You have, it seems to me that

Mr. Gonzalez on the record now has appropriate impeachment

based on his answers on direct here that he said what he said

at the deposition, and you have his consistent response here

that he had never read the license agreement.  He doesn't know

what it said.

          MS. AGUIAR:  I understand that.

          THE COURT:  So you each have your arguments.

          MS. AGUIAR:  I understand that, and I believe that the

issue that I'm raising is twofold, that the question was

C42FFRE4                        Lazopoulos - direct

1    objectionable for the reasons I just described and that I don't

2    believe that this is coming up again as proper impeachment,

3    because he has said, look, I didn't read the agreement, I don't

4    know, and so I just think -- that's the nature of my objection

5    is twofold and -- I was just being whispered to.  I'm sorry.

6            THE COURT:  No, of course, talk to each other.

7            MS. AGUIAR:  And of course Mr. Kennedy is making a

8    perfectly valid point about 403.  I think he's trying to paint

9    this witness as someone who needs to be impeached again and

10   again and again on the same point.  And you raised the point,

11   look, it doesn't help the jury to hear, first off, that it was

12   just in the air and the guy doesn't really know, he hasn't read

13   the agreement, so the jury heard fine, it was in the air, he

14   thought it --

15           THE COURT:  You've been able to establish, well, you

16   haven't established but it's been established from this witness

17   that he's never read the agreement and he hasn't responded

18   directly to Mr. Gonzalez.  As a matter of fact, he's fought Mr.

19   Gonzalez on the issue of, well, in your conversations with

20   other high-level management didn't this come up and essentially

21   he said no, I focus on selling my product.  I don't worry about

22   what the other guys are doing and I never read the license

23   agreement.  I repeat, what is it at this point that you want?

24           MR. GONZALEZ:  For the record --

25           MS. AGUIAR:  Mr. Gonzalez has told me he will withdraw

C42FFRE4                        Lazopoulos - direct

1    the question, so that takes care of my first issue.

2              THE COURT:  Fine.  Okay.

3              MS. AGUIAR:  And my second issue is I think at some

4    point it is prejudicial.

5              THE COURT:  I think Mr. Gonzalez is done with this.

6              MS. AGUIAR:  So if he does anything more with that --

7              THE COURT:  I agree.

8              MR. GONZALEZ:  So do I.  That was my last question.

9    She objected.  I told her I'll withdraw it.  I'm going on to

10   another topic.

11             MS. AGUIAR:  So I can be clear, there's probably at

12   least one other point in that same section of the deposition

13   where it's the same issue, just different words where he says

14   again --

15             THE COURT:  Mr. Gonzalez, you're going to go to

16   another section here that does exactly what Ms. Aguiar says?

17             MR. GONZALEZ:  Your Honor, I feel I made the point I

18   need to make.  I'm going on to another topic.  He said this two

19   other times in the deposition, but I feel like I made my point,

20   so I'm not going to go there.  However, depending on what

21   they're going to do, if he comes back, I may have to --

22             THE COURT:  Well, let's see, I think you exhausted the

23   area given my prior rulings, but I think with respect to his

24   answers it was appropriate impeachment.  You both have your

25   arguments.  All right, take a break.

C42FFRE4                          Lazopoulos – direct

1            (Recess)

2            THE COURT:  I've been looking at the feed, I don't

3    show a question that's been asked.

4            MR. GONZALEZ:  There was a question and counsel

5    stopped me in the middle of a question.

6            THE COURT:  Right.  There's no question that's been

7    asked.  We're going to, I think it's probably moot in light of

8    the fact that you're going to go on to another area.

9            MR. GONZALEZ:  Yes.

10            THE COURT:  But so that the record is complete, I'm

11    going to, given the question, given my in limine ruling, I

12    think it has been proper impeachment, but by the same token,

13    it's quite more than enough and I'm directing you to go on

14    under Rule 611 to another topic.

15            All right, let's bring the jury in.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

C42FFRE4                         Lazopoulos - direct

1                    (In open court; jury present)

2                    THE COURT:  You may continue with the direct

3     examination of Mr. Lazopoulos.

4                    MR. GONZALEZ:  Thank you.

5     BY MR. GONZALEZ:

6     Q.  Sir, I had these two other quick areas to cover with you.

7     Number one, since you began working at Fresh Del Monte, one of

8     the things you do is you attend industry trade shows, correct?

9     A.  Yes, that's correct.

10    Q.  You've attended trade shows for the PMA, United Fresh

11    Produce Association and the New England Produce Council?

12    A.  Yes.

13    Q.  And also the Southeast Produce Council?

14    A.  Occasionally.

15    Q.  And, sir, you've told us at deposition that you think one

16    way that consumers can tell whether or not a product is fresh

17    is by the best by date on the product?

18    A.  Yes.

19    Q.  In general, the best by --

20    A.  If -- I'm sorry.  If they read it.

21    Q.  In general, the best by date for your products is less than

22    14 days from the date that it comes off the production line, is

23    that right?

24    A.  It all depends on the product.

25    Q.  How about the, take pineapple, fresh pineapple coming off

C42FFRE4                          Laopoulos - cross

1    the production line, what's the best by date?

2    A.  I don't recall right now, but it's somewhere around 12 days

3    or 14 days.

4    Q.  And you testified that in your opinion your typical

5    consumer understands that if the best by date is more than 18

6    days then they know it's not a fresh product, correct?

7    A.  I'm sorry, could you repeat that?

8    Q.  Yes.  You've told us at deposition that in your view if the

9    best by date is more than 18 days the consumer understands it's

10   not a fresh product, correct?

11   A.  I recall saying something like that, yes.

12   Q.  You understand that our products in this case all have a

13   best by date that's many months after it arrives at the store,

14   right?

15   A.  The ones that I'm familiar with, yes.

16   Q.  And so it's your understanding that if a consumer reads the

17   best by date they'll understand it's not fresh if it's many

18   months out, correct?

19   A.  If they read it.

20            MR. GONZALEZ:  Thank you, your Honor.  That's all I

21   have.

22            THE COURT:  All right, thank you.  Any cross?

23            MS. AGUIAR:  Briefly, your Honor.

24   CROSS-EXAMINATION

25   BY MS. AGUIAR:

C42FFRE4                          Laopoulos - cross

1   Q.  Mr. Lazopoulos, could you explain what your job duties and

2   responsibilities have been since the middle of 2005 through the

3   present?

4   A.  My specific job duties are, again, sales, product

5   management, which is managing the products that we have on the

6   whole side.  Again, the whole is bananas, pineapples.  When you

7   go to the grocery store in the produce department it's all the

8   whole products you'll see, the tomatoes, the avocados and so

9   forth.

10       In addition to that, I took on marketing in 2006 or 2007.

11  But again, the marketing function as well as all my sales

12  functions and so forth were specifically on the whole side.

13  The fresh cut sales and operations side reports to Paul Rice,

14  the senior vice president of operations for North America.

15  Q.  Are you familiar with the specific terms of the license

16  agreement in place between Fresh Del Monte and Del Monte

17  Corporation?

18  A.  No, I'm not familiar with it.

19  Q.  Do you actually know what the legal rights are of each

20  party under that license agreement?

21  A.  No, I do not.

22  Q.  Are you one of the people at Fresh Del Monte who is

23  knowledgeable about the company's rights to use the Del Monte

24  trademark?

25  A.  No, I'm not.  That would be our counsel.

C42FFRE4                    Laopoulos - cross

1    Q.   So as a business person at the company, if you want to know

2    what the company's rights are in that regard, to whom would you

3    go?

4    A.   I would go to Philip Brazlavsky or Bruce Jordan, probably,

5    which is our in-house counsel.

6    Q.   Both Phil and Bruce are in-house counsel for Fresh Del

7    Monte?

8    A.   That's correct.

9         MS. AGUIAR:  Thank you.  Nothing further.

10        MR. GONZALEZ:  Nothing further.

11        THE COURT:  So now we go back to the plaintiff.  You

12   may call your next witness.

13        MR. DREYER:  I think we're done for today, your Honor.

14   We have Mr. Phillips, who will be our first witness tomorrow.

15        THE COURT:  Why don't we end -- it's 4:40.  Let's end

16   now and we'll pick it up again tomorrow.  And though it may or

17   may not seem like it, the testimony is actually going forward

18   as scheduled and everybody's plan is still that you will have

19   this for your consideration this week.  Enjoy the evening.

20   Remember to keep an open mind.  You haven't heard all the

21   testimony.  Thank you again for being here timely.  I'll see

22   you again at 9:30 in the morning.

23        (Jury excused)

24        (Continued on next page)

25        THE COURT:  Make sure Ms. Blakely has the e-mails

C42FFRE4                        Laopoulos - cross

1    where you want us to send the proposed charge.  We'll have the

2    charging conference tomorrow at the end of the testimony and

3    we'll try to get that to you within, say, two hours.

4                All right, thank you.

5                MR. DREYER:  Your Honor, one quick housekeeping

6    issue --

7                MS. AGUIAR:  Two.  One for him, one for me.

8                MR. DREYER:  One with respect to the fruit exhibits.

9    Our fresh cut fruit exhibits are now past their expiration

10   dates.  We had marked both the demonstrative the actual bowl

11   itself and took a photograph of that as well.  What we propose

12   doing if both parties might want to use those in summation is

13   to discard the fresh, no longer good-looking fruit -- if the

14   Court would like, we could keep the packaging and sticker it

15   and we would add, for example, if 122 is a bowl of melon, we

16   would have 122A which is a new bowl of melon and have the

17   photograph as well.  So the original bowl --

18               THE COURT:  But they'll look identical, correct?

19   They'll look identical?  In other words, 122 and 122A will look

20   identical except for the fruit in 122 will look a little sorry,

21   is that correct?  All right.  Is there any objection to simply

22   making 122 now a new identical bowl?

23               MR. GONZALEZ:  So, your Honor, yes.  If they want to

24   add a new bowl --

25               THE COURT:  Yes, there's an objection?

C42FFRE4                        Laopoulos - cross

1           MR. GONZALEZ:  Yes, there's an objection.  I'm holding

2     so you can see the fresh fruit.  There's no reason why we

3     should replace this exhibit.  If they want to bring a new one

4     in, they can.  The fact that it doesn't look great is precisely

5     our point.  It doesn't last very long and that's why a lot of

6     consumers don't buy it, so it's actually relevant that it maybe

7     doesn't look great.  There there's been testimony about the

8     best by dates on them, so you can't get rid of them.  There's

9     no reason to throw the fruit away.  If you want to throw the

10    food away after the jury --

11          THE COURT:  We're not talking about throwing the food

12    away.  We're talking about what exhibit is going to be before

13    the jury so there's an objection to my suggestion.  Go ahead,

14    sir?

15          MR. DREYER:  Your Honor, if this is some experiment to

16    show what fruit is supposed to look like after two or three

17    weeks, they could have done this.  This stuff has been sitting

18    out on counsel table all day for two or three days last week.

19    It's not fair to say look at this terrible looking fruit.  If

20    they wanted to do that, they could have done it in the proffer.

21          MR. GONZALEZ:  You can look at the fruit.  It's not

22    terrible looking fruit.  If it makes my point, I'll open it up

23    and eat a piece, which I would.  Do you want me to hand it to

24    you?

25          THE COURT:  It will probably make the witness'

C42FFRE4                          Laopoulos - cross

1  testimony go faster.

2           MR. GONZALEZ:  It's not like it's disintegrating.

3           THE COURT:  But you want to make the point to them,

4  apparently, that their fruit doesn't look so good after a very

5  short period of time.

6           MR. GONZALEZ:  No, your Honor.  My point is that the

7  fruit looks okay.  I was responding to what they were telling

8  your Honor.  If what they're telling your Honor is that the

9  fruit has completely disintegrated, which it hasn't, then that

10  would be relevant in my view.  I don't like the idea of

11  tampering with evidence at middle of a trial.

12          THE COURT:  I understand that.  Changing evidence.

13  Are you going to make any argument to the jury about the state

14  of this fruit?

15          MR. GONZALEZ:  I don't expect to, your Honor, but if

16  we substitute it --

17          THE COURT:  I understand.  I understand.

18          MR. GONZALEZ:  I don't expect to.

19          THE COURT:  All right.  Fresh?

20          MR. DREYER:  Your Honor --

21          THE COURT:  He doesn't intend to make an argument on

22  what the fruit looks like.

23          MR. DREYER:  Well, he doesn't expect to.

24          THE COURT:  Yes.

25          MR. GONZALEZ:  Right.

1              MR. DREYER:  But the issue is for summation we would

2     like to use new fruit.  Summation is probably going to be in

3     two days on Wednesday morning.  We have stuff expired on 3/31

4     that even under normal conditions is probably not what we want

5     to show people as representative of our product.

6              THE COURT:  Sir, do you have any objection to their

7     showing the jury, they'll show them 122 and show them a brand

8     new exhibit that has, is also cantaloupe chunks and we'll give

9     it another number.

10             MR. GONZALEZ:  Your Honor, what I told them on the

11    weekend, what I'll tell the Court now, if you want to bring in

12    a fresh bowl a fresh fruit to make it 155A, I'm fine with that.

13             THE COURT:  There's your answer.  There's no objection

14    to putting in a cantaloupe chunk as 555A, a cantaloupe chunk

15    bowl that looks fresh on summation.  All right?

16             MR. DREYER:  And, your Honor, in terms of the fruit

17    that's expired and now literally leaking, what should we do

18    with that other than keep it in the refrigerator?

19             THE COURT:  You can keep it in the refrigerator.  The

20    ruling is the same.  You can show them, put in a new one, an A

21    and show it to them.  And if you want I will explain to the

22    jury what's going on, that is it's beyond the expiration date

23    so you're giving them fresh fruit, if you want me to.

24             MR. DREYER:  We'll let the Court know if that's okay.

25             THE COURT:  All right, fine.  Anything else?

C42FFRE4                          Laopoulos - cross

1            MS. AGUIAR:  The second issue, your Honor, was

2     something from several days ago.  It was the prejudicial

3     Exhibit 508 that we put up.  It was about rights in Europe.  We

4     reserved our rights in our pretrial order --

5            MR. GONZALEZ:  Withdrawn.

6            MS. AGUIAR:  Fine.  Done.

7            THE COURT:  Anything else?

8            MR. DREYER:  No.

9            THE COURT:  See you everybody tomorrow at 9:30.  Thank

10    you.

11            (Adjourned to April 3, 2012 at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2   Examination of:                              Page
 3   JACOB JACOBY
 4   Direct By Mr. Plevan . . . . . . . . . . . . 741
 5   Cross By Mr. Orr . . . . . . . . . . . . . . 772
 6   Redirect By Mr. Plevan . . . . . . . . . . . 831
 7   Recross By Mr. Orr . . . . . . . . . . . . . 848
 8   Redirect By Mr. Plevan . . . . . . . . . . . 850
 9   JOHN LAZOPOULOS
10   Direct By Mr. Gonzalez . . . . . . . . . . . 852
11   Cross By Ms. Aguiar  . . . . . . . . . . . . 890
12                      PLAINTIFF EXHIBITS
13   Exhibit No.                               Received
14    1, 5, 7, 68, 69, and 207  . . . . . . . . . 690
15    162 and 165  . . . . . . . . . . . . . . . 769
16                      DEFENDANT EXHIBITS
17   Exhibit No.                               Received
18    133  . . . . . . . . . . . . . . . . . . . 805
19
20
21
22
23
24
25
```