F8vdfrem

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x

3    FRESH DEL MONTE PRODUCE INC.,

4                    Plaintiff and
                     Counterclaim Defendant,
5
                 v.                        08 CV 8718 (SHS)
6
     DEL MONTE FOODS COMPANY and
7    DEL MONTE CORPORATION,

8                    Defendants and
                     Counterclaim Plaintiffs.
9
     ------------------------------------x
10                                         New York, N.Y.
                                           August 31, 2015
11                                         2:43 p.m.

12   Before:

13                      HON. SIDNEY H. STEIN,

14                                         District Judge

15                          APPEARANCES

16   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Attorneys for Plaintiff/Counterclaim Defendant
17   BY:  ANTHONY J. DREYER
          LAUREN E. AGUIAR
18        JORDAN A. FEIRMAN

19   O'MELVENY & MYERS LLP
          Attorneys for Defendants/Counterclaim Plaintiffs
20   BY:  ABBY RUDZIN
          SARA PETERSON

21

22

23

24

25

F8vdfrem

| 1 | THE CLERK:  Fresh Del Monte Produce versus Del Monte

| 2 | Foods, 08 Civ. 8718.

| 3 | Counsel, please state your names for the record.

| 4 | MR. DREYER:  For the plaintiff Fresh Del Monte Produce

| 5 | Inc., Anthony Dreyer.  With me is my partner Lauren Aguiar and

| 6 | my associate Jordan Feirman.  Good afternoon, your Honor.

| 7 | THE COURT:  Good afternoon.  Please be seated.

| 8 | MS. RUDZIN:  And Abby Rudzin here for the movant,

| 9 | which is Del Monte Foods Inc., which is a successor to the

| 10 | defendant in the case.  And with me is my colleague Sara

| 11 | Peterson.

| 12 | THE COURT:  Good afternoon.

| 13 | All right.  This is a motion to clarify or to modify

| 14 | the injunction that I entered following the trial of this

| 15 | action in 2013.  The motion has been around for a while, and I

| 16 | have some questions for each of you and then I am going to hear

| 17 | what you have to say.  I want to see if we have agreement or

| 18 | lack of agreement on a couple of things.

| 19 | I am going to refer to the plaintiff the same way I

| 20 | did during the trial, as Fresh, and the defendant will just be

| 21 | Del Monte or Del Monte Corporation, even though every time I

| 22 | deal with this case there are new entities but that is the

| 23 | general line.

| 24 | Is everyone agreed that "pear chunks" contains

| 25 | blackberry juice and acai juice and acai is a berry?

F8vdfrem

1          Fresh, are we agreed on that?

2          MR. DREYER:  We are, your Honor.

3          THE COURT:  Del Monte?

4          MS. RUDZIN:  I'm not sure whether acai is a berry, but

5   I'm note sure that it matters because blackberry is obviously a

6   berry.

7          THE COURT:  We've got a berry.

8          MS. RUDZIN:  OK.  And I just want to say it is unclear

9   whether it is juice or a concentrate.

10          THE COURT:  Well, that is where I am going.  Go ahead.

11          MS. RUDZIN:  It is reconstituted juice, which I think

12   means juice from concentrate.

13          THE COURT:  Is it reconstituted -- well, the label

14   which is attached to the papers here as 182-5, the label says,

15   "Reconstituted juice blend (white grape juice, pear juice,

16   blackberry juice)."  So I think what you're telling me,

17   Ms. Rudzin, is you agree it's reconstituted blackberry juice.

18   OK.

19          And I take it Fresh, with that amendment, agrees as

20   well?

21          MR. DREYER:  I'm not sure, your Honor.  If you recall,

22   during the post-trial briefing, Del Monte took the position

23   that it may have been a concentrate or a puree, and we invited

24   somebody from the company to submit a declaration to that

25   effect and no one did.

F8vdfrem

1          THE COURT:  Well, let's talk about that for a moment

2     and then I'll go back to what I wanted to do.

3          That seems to be sort of an unresolved issue here.

4     You said, if I remember, oh, yes, we'll withdraw pear chunks

5     from the injunction as long as you tell us that there's what?

6     And they did not tell you that and, therefore, you never in

7     haec verba withdrew it.  So that's a loose end hanging up

8     there.

9          MR. DREYER:  Correct.  If they were to represent that

10    the acai and the blackberry -- and, again, we believe acai is a

11    berry -- the acai and the blackberry ingredients were

12    concentrates or purees.  And the reason for that is --

13          THE COURT:  Wait.  Let me think of that.

14          MR. DREYER:  Sure.

15          THE COURT:  Well, the reason is obvious.  It's because

16    Paragraph 1 -- Paragraph A of Exhibit B was not at issue.

17          MR. DREYER:  Correct.

18          THE COURT:  And you agree, as well, Del Monte, that

19    Paragraph A of Exhibit B to the License Agreement was not at

20    issue?

21          MS. RUDZIN:  We do.

22          THE COURT:  OK.

23          MS. RUDZIN:  I think where the disagreement is is we

24    don't believe juices were an issue in the litigation at all,

25    because we don't believe that Paragraph B -- neither the

F8vdfrem

1   Paragraph A or B gives FDP the right to use the marks on

2   juices.

3          THE COURT:  Mr. Dreyer, were you cut off by either

4   myself or Ms. Rudzin?

5          MR. DREYER:  I don't believe so, your Honor.

6          Just to make the record clear, the position was if the

7   acai and the blackberry were from concentrates or purees,

8   solely from concentrates or purees, we would withdraw the

9   request that they be covered by the injunction.

10          THE COURT:  Again, because everyone is agreeing that A

11   to Exhibit B of the License Agreement was not at issue in the

12   trial?

13          MR. DREYER:  Correct, your Honor.

14          THE COURT:  OK.  So now let's talk for a moment about

15   what Ms. Rudzin was saying.

16          Mr. Dreyer, what is Fresh's position if the blackberry

17   juice and the acai juice -- strike that.

18          Is a juice a concentrate or a puree or totally

19   something different?  Does a juice fit within concentrate and

20   puree?

21          MR. DREYER:  I don't believe it does, your Honor.

22          THE COURT:  And why?

23          MR. DREYER:  Because a concentrate is something that's

24   sold as a concentrate where the ingredient is a concentrated

25   puree as a pulp.  That's not what we understood to be at issue

F8vdfrem

1     in this product.

2             THE COURT:  What is a concentrate?

3             MR. DREYER:  My understanding is it is a juice or

4     other type of liquid form that has at least some of the water

5     taken out and then added back in later.

6             THE COURT:  Well, how does that differ from a

7     reconstituted juice?

8             MR. DREYER:  I don't know what the reconstituted juice

9     is in this case.  I don't know how it is reconstituted.  There

10    was no evidence of that at trial, because this argument that

11    this product wasn't covered was never raised until after we

12    had --

13            THE COURT:  The product was covered, pear chunks were

14    covered.

15            MR. DREYER:  Correct.

16            THE COURT:  What you are saying is the argument they

17    are making now wasn't covered, but you are agreed that pear

18    chunks were covered?

19            MR. DREYER:  Correct.  This product was covered --

20            THE COURT:  I take it your position is that it was

21    covered only in terms of the Lanham Act issues?

22            MR. DREYER:  It was covered both as a Lanham Act

23    product and a breaching project.

24            Let me explain that, your Honor.  Our damages expert,

25    Scott Phillips, put in a damages report both on the contract

F8vdfrem

1    and Lanham Act piece of the case.  For his exhibit of damages

2    for the contract damages, he specifically enumerated every

3    product we asserted that Del Monte sold that breached the

4    contract.  And this product, this acai product, was

5    specifically listed under the products we asserted breached the

6    contract.

7              THE COURT:  But the jury never saw that, right?

8              MR. DREYER:  What the jury saw was the roll up to the

9    final damages revenue which included the revenue for that

10   product.  Both our expert included it and their expert included

11   it.

12             THE COURT:  And when you say the "roll up," what was

13   it included within?  Was it included within the nonutilized

14   fruit issue or a line or no?

15             MR. DREYER:  Correct.

16             THE COURT:  And the jury saw that?

17             MR. DREYER:  Correct.  To break it down -- the short

18   answer is yes, your Honor.  To break it down a bit further, Ms.

19   Stamm, who is Del Monte's expert, submitted a rebuttal report.

20   In her rebuttal report, she went through all the products that

21   we listed as containing nonutilized fruit.  She identified two

22   that she and Del Monte Corp. asserted did not contain

23   nonutilized fruit.  One was a superfruit product, if you

24   remember that product line -- Sun Fresh product, excuse me, Sun

25   Fresh product.

F8vdfrem

1          THE COURT:  I remember the little refrigerator.

2          MR. DREYER:  Exactly.

3          THE COURT:  To keep these things cold for the

4     interminable length of the trial.

5          MR. DREYER:  And the other was an Orchard Select

6     product.  She did not -- she said those products don't contain

7     nonutilized fruits so they should be taken off the list.  We

8     agreed.  She left in her report --

9          THE COURT:  I'm sorry.  Say that again.

10         MR. DREYER:  Sure.  Again, Mr. Phillips -- and this

11    was submitted in our papers, Exhibit 2.5 to his report and it

12    is Exhibit 3 to Mr. Feirman's declarations.

13         THE COURT:  Let me get it out.

14         MR. DREYER:  Sure.  I can hand up a copy as well, your

15    Honor.

16         THE COURT:  I have it all.

17         (Pause)

18         I say that so quickly and it looks like the Feirman

19    exhibit I left downstairs and I just have the Rudzin exhibit.

20         MR. DREYER:  I will be more than happy to hand it up,

21    your Honor.  May I approach?

22         THE COURT:  Yes.

23         (Pause)

24         Yes.  All right.  This is what I remember.  Go ahead.

25         MR. DREYER:  So the heading --

F8vdfrem

1          THE COURT:  Nonutilized product and then within it

2     acai/blackberry.

3          MR. DREYER:  Right.

4          THE COURT:  And the jury got this?

5          MR. DREYER:  No.  This was the roll up into what the

6     jury got.  If you'll recall, this was produced in 2010.  We had

7     settlement discussions.  We had summary judgment motions.

8          During the trial, Del Monte supplemented its revenue

9     reporting and so there was a separate exhibit that ultimately

10    went to the jury.  I just want to explain how we got there, if

11    I may, your Honor.  So clearly two years before trial we took

12    the position that these were all of the products that contained

13    either pineapple or nonutilized fruit and therefore we are told

14    by Del Monte breached the contract.

15         They then submitted a rebuttal report by Ms. Stamm.

16    Ms. Stamm went through this list that's in what I just handed

17    your Honor, and said two of the products on this list don't

18    belong here, they don't contain nonutilized fruit.  She

19    mentioned one of the Sun Fresh products.  She mentioned one of

20    the Orchard Select products.  She did not mention the acai

21    product, and, in fact, included the acai product in her

22    calculation of revenue for the nonutilized fruit products.

23         So that was the state of play going into trial.  And I

24    would note that although your Honor's Pretrial Order requires

25    the parties to identify all defenses to all claims, if you look

F8vdfrem

1    at page 7 of the Joint Pretrial Order that your Honor signed,

2    they did not identify this issue as a defense to our claim that

3    the acai product breached the contract.

4            So now we are at trial.  The issue is never argued.

5    Ms. Stamm creates a new exhibit that updates her damages

6    figures.  She has a line item for nonutilized fruit, and the

7    2009 number for nonutilized fruit hits the number that she had

8    in her damages report, $1 point I believe 3589, and that amount

9    based on her damages report included the acai product.

10           And I can hand it up to your Honor.  It is Exhibit 4

11   to Mr. Feirman's declaration.  I'm sorry, that is Exhibit 4 to

12   Ms. Rudzin's declaration.

13           THE COURT:  That I have.

14           (Pause)

15           MR. DREYER:  Forgive me, your Honor.  Exhibit 3 to

16   Ms. Rudzin's declaration, the supplemental declaration.  It is

17   the declaration filed 6/6/14, your Honor.

18           THE COURT:  Yes.  I am looking at it.

19           What are you showing me on it?

20           MR. DREYER:  So if you look at --

21           THE COURT:  Nonutilized fruit product not containing

22   pineapple?

23           MR. DREYER:  Right.  So if you look at fiscal year

24   2009, the revenue is $1.358 million.

25           THE COURT:  Yes.

F8vdfrem

1          MR. DREYER:  That hits exactly to what Mr. Phillips

2     had in his report.  She didn't break it down product by

3     product, but it's clear she included it because the revenue

4     hits exactly.

5          THE COURT:  And we don't know what the jury was

6     utilizing in terms of damages.

7          MR. DREYER:  No, I understand.  So let me get to that,

8     your Honor.  I just wanted to explain how we got to the jury

9     because it is a little complicated given the way that Del Monte

10    produced their revenue here.

11         If you recall, in the middle of trial Del Monte

12    updated its revenue figures, and what went to the jury was

13    Trial Exhibit 544, which is Exhibit 3 to Ms. Rudzin's

14    supplemental declaration.  And if you look at fiscal year 2009,

15    again there is the 1.358 amount.

16         THE COURT:  Yep.

17         MR. DREYER:  And then 2010 -- sorry, forgive me, your

18    Honor.

19         (Pause)

20         In 2010 it is $1.41 million, and that's what in the

21    supplemental reports.

22         THE COURT:  No.  It is 1.6.

23         MR. DREYER:  Forgive me, your Honor.  I apologize.  I

24    thought I had it.

25         It is Trial Exhibit 544, which is --

F8vdfrem

1          THE COURT:  Exhibit 3.

2          MR. DREYER:  Exhibit 3.  Forgive me, your Honor, too

3   many Exhibit 3s.

4          So under "Fiscal Year 2009," you have nonutilized

5   fruit products not containing pineapple 1.358 million, which we

6   know from her original report includes --

7          THE COURT:  Right.  I understand your point.

8          MR. DREYER:  And then the roll-up, 2010, 2011, 2012.

9   So we know at least for 2009, the revenue from the acai berry

10  product is included in what went to the jury.

11         On top of that, your Honor, if you look at the total

12  revenue of $338 million, both sides agree that the jury applied

13  a 1.75 percent royalty to the damages that were awarded to

14  Fresh.  So if you multiply that royalty times $338.4 million,

15  you get roughly to the damages award that the jury awarded in

16  this case.

17         So I apologize for the circuitous path but that's how

18  we got there.

19         THE COURT:  So your argument is, reasoning backwards,

20  the jury included the pear chunks product in their calculation;

21  that's where you are going?

22         MR. DREYER:  Correct.  And there was also a

23  demonstrative that Mr. Phillips used that went to the jury that

24  used the same $338 million revenue figure which included the --

25         THE COURT:  I'm sorry.  Go ahead.

F8vdfrem

1          MR. DREYER:  We had a similar demonstrative that had

2     the same revenue of $338 million for the nonutilized fruit

3     products and the pineapple product.

4          THE COURT:  So this point put forth on behalf of Fresh

5     is that the jury included pear chunks, Fresh believes, in their

6     damage calculations reasoning backwards from the royalty rate

7     that they found, that they applied.

8          MR. DREYER:  Reasoning backwards from the royalty rate

9     that both sides agree was applied here and looking at the

10     documents that were submitted to the jury and knowing where

11     those numbers came from, yes, your Honor.

12          THE COURT:  But do you agree with Del Monte, or

13     let's -- I'll ask it more neutrally.  Do you agree with me that

14     at trial itself pear chunks, the exhibit, was used for Lanham

15     Act purposes?

16          MR. DREYER:  I don't, your Honor.  Well, I agree that

17     it was used for Lanham Act purposes but not solely for Lanham

18     Act purposes.

19          THE COURT:  And the "not solely" goes to damages?

20          MR. DREYER:  For the contract claim.  In other words,

21     we had a Lanham Act claim and we had a breach of contract

22     claim.

23          THE COURT:  OK.

24          MR. DREYER:  We asserted that the pear chunks product

25     violated the Lanham Act and also breached the contract.  So it

F8vdfrem

1    was used for both purposes.

2              THE COURT:  Now, I'll also ask this one neutrally or

3    as neutrally as I can.

4              Exhibit B -- again, I mean the License Agreement, the

5    core document here -- Paragraph B, "Exclusive Rights," that's

6    what was at issue in the trial, not the nonexclusive rights --

7    we've already been over this -- not the nonexclusive rights

8    under A, right?

9              MR. DREYER:  Correct, your Honor.

10             THE COURT:  OK.  It deals with refrigerated pineapple

11   products and refrigerated nonutilized fruit, and "nonutilized

12   fruit" includes berries.

13             If B is berries for these purposes and A is

14   concentrates and purees, where is juice?

15             MR. DREYER:  Well, it wasn't an issue in this case.

16   Quite frankly, it is an issue that is now before Judge Oetken

17   in another case.  So we don't argue that --

18             THE COURT:  Between these parties?

19             MR. DREYER:  Between these parties.

20             And Judge Oetken or a jury will decide that issue.  We

21   don't contend that the case before you is about beverages.  We

22   have never argued that.  We are not contending that now.  That

23   is an issue that is before Judge Oetken.  Neither side I think

24   should take whatever decision you render on this motion to

25   Judge Oetken and say, aha, here, the case has now been

F8vdfrem

1   resolved.  That is a different issue.

2           Now, there are different ways in which you get the

3   juice.  One certainly would be a refrigerated pineapple

4   product.  We believe that includes juice.  But that issue

5   wasn't before you, your Honor.

6           What was before you clearly, as I just laid out, was

7   cut-fruit products and who has the right to sell cut-fruit

8   products if they're made from one of the five fruits.  And

9   there was never any argument at trial, never any argument

10  leading up to trial, that Del Monte had this other defense,

11  that you shouldn't have this product on your list.  Even though

12  our expert includes it as a nonutilized fruit, you shouldn't

13  have it on your list because it's really in there as a juice or

14  something else.

15          And so we are completely prejudiced.  We could have

16  raised that issue with the jury.  We could have litigated that

17  issue.  We were all here.  We had the cut fruit in the

18  courtroom.  Instead, they raise this as a defense after trial.

19  Quite frankly, your Honor, we don't think it is appropriate.

20          THE COURT:  All right.  Thank you.

21          Ms. Rudzin, let me proceed from that point.

22          The Pretrial Order says nothing about juices or

23  concentrates, does it?

24          MS. RUDZIN:  No, it doesn't mention orange juice,

25  concentrate or puree.  So to Mr. Dreyer's point that you didn't

F8vdfrem

1    raise this as a defense, I say you didn't raise it as a claim.

2    You didn't say that you have the right to make juice under

3    Paragraph B so we didn't have to put up a defense to that

4    claim.  And as --

5              THE COURT:  No.  No.  He's -- go ahead.

6              MS. RUDZIN:  I was just going to say, as you were

7    pointing out with Mr. Dreyer, there were two claims at issue in

8    the lawsuit.  There were lots and lots of products that were

9    shown to the jury -- and witnesses testified about them -- that

10   weren't claimed to be breaching the contract because they don't

11   contain even a single molecule of the five fruits.  So the fact

12   that the pear chunks product was put before the jury and that

13   witnesses testified about it doesn't tell us whether they were

14   claiming it was a breach of contract.  And they haven't pointed

15   to a single sentence in the whole trial record where either a

16   witness or a lawyer argued that the pear chunks product

17   breaches the Wafer License.

18             THE COURT:  Breaches the?

19             MS. RUDZIN:  The Wafer License -- the license.

20             Now, it's true that the experts included it in their

21   damages reports.  As you pointed out, those didn't go to the

22   jury.  The jury wasn't told by either expert here's my sales

23   figure and, by the way, it includes this pear chunks product.

24   Neither expert uttered the words "pear" or "juice" at trial.

25   So I don't think you can infer from the jury's verdict, which,

F8vdfrem

by the way, didn't adopt either experts' damage number, but

even if it had used the sales figure, you can't infer from that

that the jury was agreeing with the component parts when they

didn't even know what the component parts were.

THE COURT:  So if "juice" is not mentioned at the

trial, pear chunks just for limited purposes, concentrates not

mentioned, what am I doing opining on whether a juice, a berry

juice, is in or out of this injunction?  Why should I be

opining one way or the other here?

MS. RUDZIN:  I think you shouldn't, your Honor, and

that's -- the basis of our motion today is --

THE COURT:  No, but you're asking me to clarify or

modify the injunction.  You're asking me to make a statement as

to it.

MS. RUDZIN:  Right.  I'm asking you to limit the

injunction to cut pieces of the five fruits because that's all

the jury decided was a breach.  I'm asking you to leave for

another day whether juices, concentrates or purees are theirs

or ours because that wasn't at trial.

Think about what we're taking about here.  We're

talking about an injunction against my client, which

manufactures food products, being told you can't make certain

food products.  All we're asking for is a clear statement of

what that covers so that we can fully comply.  And we --

THE COURT:  Why should I -- I think Fresh is saying I

F8vdfrem

1   don't have any power to modify an injunction.  Why should I be

2   doing that as opposed to -- goodness gracious, I hope not --

3   having another litigation over "juice"?

4           MS. RUDZIN:  Because we're not asking you to decide

5   who has the rights to juice.  We're asking you to clarify --

6           THE COURT:  That was an issue before Judge Oetken?

7           MS. RUDZIN:  That's one of the issues, yes.  We're

8   just asking you to clarify that you didn't decide it.

9           If I could -- your Honor, could I hand up a PowerPoint

10  that I prepared, which I am not going to go through because you

11  obviously are well prepared on the issues, but there is one

12  slide I would like to show you.

13          THE COURT:  Very well.  Have you shown the other side?

14          MS. RUDZIN:  No.  I am handing it to them right now.

15          THE COURT:  A little surprise, Mr. Dreyer.

16          MR. DREYER:  We'll look at it together for the first

17  time, your Honor.

18          MS. RUDZIN:  So, your Honor, I will start with --

19          THE COURT:  Was this a presentation that you were

20  thinking of doing that --

21          MS. RUDZIN:  I was but you clearly know all the issues

22  so I don't need to go through it.

23          If you look at slide 4, this is the clause of the

24  injunction that's at issue.

25          THE COURT:  Wait.  I'm sorry.  Let me get my version.

F8vdfrem

1          (Pause)

2          All right.  I mean, Fresh's point is it contains

3      "berry" and it is intended to be refrigerated or chilled at the

4      point of sale.

5          MS. RUDZIN:  Right.  But it only contains berry juice

6      or concentrate.

7          So if you turn to slide 5, this is where we show the

8      two possible interpretations of the sentence in the injunction.

9          THE COURT:  You have given me this PowerPoint.  Let me

10     just look at the appreciating one.  I think Exhibit B, there

11     are things that the jury saw.

12         MS. RUDZIN:  Right.  And the point on that slide, your

13     Honor, I think we've been through is that some of these

14     products were presented on both claims and some were presented

15     only on the Lanham Act claim.

16         THE COURT:  I am going to mark this slide deck as Del

17     Monte Exhibit A, if that is all right.

18         MS. RUDZIN:  Certainly.

19         THE COURT:  All right.  Injunctions are supposed to be

20     narrow.  I know that.

21         We shouldn't enjoin people from doing things that are

22     legal.  I know that.

23         And now we come to the contract, go ahead.  The

24     injunction.

25         MS. RUDZIN:  Right.  4 is the injunction.  And if you

F8vdfrem

1    turn to 5, this is where we show you the ambiguity in the

2    injunction and the two possible interpretations.  The top one

3    being that it enjoins us from making a product that contains

4    one of the five fruits in any form, including juices,

5    concentrates and purees, which were not at issue in the trial;

6    we all agree on that.

7            Alternatively, the second one is that it only enjoins

8    us from using the mark on cut pieces of the five fruits,

9    because, as Mr. Dreyer said, that's what the trial was about,

10   cut fruit.

11           We think the second interpretation is the only

12   appropriate one, and that's why we're asking you to clarify or

13   modify the injunction to just add the word "cut pieces of."  So

14   what I'm saying, your Honor, to answer your question about,

15   well, how can I decide whether you have the right to do juices,

16   concentrates and purees, I'm saying nobody is asking you to do

17   that.  I'm just asking you to only enjoin what the jury

18   actually decided, which was uncut pieces, and leave the

19   question of juices, concentrates and purees for another day.

20   But it's not fair to say, well, we haven't decided that so I am

21   not going to say anything on it, because there is an injunction

22   that could be read to preclude us from doing products we

23   everybody in this room agrees have a legal right to do.  That's

24   the issue.

25           MR. DREYER:  May I respond, your Honor?

F8vdfrem

1          THE COURT:  Yes.

2          MR. DREYER:  First of all, the notion that, quote, all
3     the jury decided was cut fruit was a breach, that's not what
4     the jury decided, that's not part of the verdict form.  It
5     sounds great but that is not what was litigated.  Moreover, two
6     years before trial we put Del Monte Corp. on notice that we
7     believed that the acai product contained nonutilized fruit and
8     was a breaching product.  They had two years to raise this
9     issue that, no, it should not be considered a product
10    containing nonutilized fruit because it's in some sort of
11    liquid form.  They never did.

12          In terms of the notion that the injunction is
13    ambiguous, I would remind your Honor that in the briefing on
14    what the scope of the injunction should be, we proposed
15    language that was almost identical to the injunction you
16    ordered, that they would not be allowed to sell products
17    containing any of the five fruits.  Del Monte Corp., with prior
18    counsel, counsel that tried the case, objected to that language
19    and said that language clearly would include the acai product.
20    They didn't think it was ambiguous at the time.  They said it
21    would include the acai berry product, and we said exactly, it
22    should.  We maintained all along that that was a breaching
23    product.  We maintained all along that it contains nonutilized
24    fruit.  And the injunction you entered, other than not defining
25    the word "five fruits" but listing them individually, tracks

F8vdfrem

1    almost exactly what we proposed and exactly what they said

2    would cover the product that we're now arguing over.

3         THE COURT:  Well, when they didn't provide the

4    representation to you, you didn't say, all right, then we're

5    maintaining our position that pear chunks are included,

6    correct?

7         MR. DREYER:  I believe what we said is if they

8    provided some evidence that this would have to be withdrawn,

9    they never provided the evidence.  It is now two years later

10   and, therefore, there is nothing to withdraw.

11        THE COURT:  No.  Therefore, your claim is still in the

12   case and covered by the injunction; that is your point?

13        MR. DREYER:  Correct, your Honor.

14        THE COURT:  OK.

15        MS. RUDZIN:  A couple of points, your Honor.

16        First of all, I wasn't counsel in the case so maybe

17   I'm misremembering but I think I looked at the record pretty

18   well.  The injunction that Mr. Dreyer's client proposed listed

19   17 products that we are prohibited from making, and it included

20   the pear chunks product.  That's why we said no, you can't

21   include the pear chunks product.  We weren't saying your

22   language is too broad, because we were reading it the way we

23   still read it today which is it should only cover physical

24   pieces of the five fruits.  And I thought --

25        THE COURT:  No, but that does seem to be narrower than

F8vdfrem

1    the way the case was litigated because it was litigated

2    under -- I keep on returning to the License Agreement -- under

3    B as refrigerated nonutilized fruit, not including pineapple.

4    The universe at that time, at least in everyone's mind, I

5    think, or let me say in the parties' minds, the universe

6    consisted of refrigerated nonutilized fruit, one part of the

7    universe, and the other part of the universe, making up

8    100 percent of the universe, was concentrates and purees under

9    A.  It didn't seem to be placed in the universe for a separate

10   thing called juice.

11              MS. RUDZIN:  Well, I think that's because juice was

12   never in the universe.  I'll take you back to FDP's complaint

13   where --

14              THE COURT:  I know.  You have it in your deck here.

15              MS. RUDZIN:  Yes.  They said everybody -- we all know

16   that we were the ones who made the juice, not FDP.

17              THE COURT:  You want to show me 7, is that what you

18   are showing me?

19              MS. RUDZIN:  Yes, the cut-fruit products.

20              THE COURT:  OK.  I've got it.

21              MS. RUDZIN:  7.  They claimed the breach of the

22   license was the cut-fruit products.  Now, if you turn to slide

23   8, please, this shows -- this was the issue throughout the

24   litigation.  They acknowledged in their summary judgment brief

25   concentrates and purees, not relevant.  The Pretrial Order

F8vdfrem

doesn't mention juices, concentrates or purees.  No trial

witness testifies about who has the right to use the mark on

juices, concentrates and purees.  And as Mr. Dreyer pointed

out, the verdict form doesn't specify, your opinion doesn't

specify.  And I think that your assumption that A and B and the

Wafer License add up to a hundred percent is where we disagree.

Juice, they don't get any rights to juice.  So --

THE COURT:  Well, no, no.  It is not that you and I

disagree, this Exhibit B is the universe, right?  Because they

were -- the predecessors by several generations, I believe, of

these parties were negotiating the universe.  They weren't

leaving out things; they were splitting up the world.

MS. RUDZIN:  Yes, your Honor, they were splitting up

the world, and the world gave we had juice, they didn't.

THE COURT:  I'm sorry.

MS. RUDZIN:  We had juice, they didn't, when the world

was split up.  And the way the license is structured, we have

all rights.  We can use "Del Monte" on bread, on candy, on

anything we want.  They can only use "Del Monte" on things we

explicitly said --

THE COURT:  Right.  That goes back.  That is part of

what's underlying your position here.  You have the mark.

MS. RUDZIN:  Right.  So we get to use it on juice

because we didn't give them the right to use it on juice, and

they get to use it on concentrates and purees in certain

F8vdfrem

circumstances but only on a nonexclusive basis.  So how can you enjoin us from making a product that contains only concentrate or puree or juice?  They don't have rights to it.

Now, the elephant in the room is why was it in their expert report and we didn't object?  Obviously, your Honor, I assume my predecessors made a mistake.  But Del Monte already paid for that mistake because we already paid millions of dollars in damages on products that wasn't a breach, and that's my client's problem.  But as far as the injunction goes, going forward we can't be enjoined from making something we've had the legal right to make and didn't give away 25 years ago when we signed this contract, which is the right to use the mark on juices, concentrates and purees.

THE COURT:  All right.

MR. DREYER:  Your Honor, may I respond?

THE COURT:  Yes.

MR. DREYER:  I find it interesting, despite our invitation to get some sworn client affidavit, that this ingredient is from concentrates and purees.  Now, two years have passed.  We don't have that.  We have counsel making a statement in court.  We have a clear record that -- and, again, this is not about beverages, this isn't a beverage product. You don't finish running a race or going to the gym and open up a can of pear chunks as a beverage.  That is a different case. This is about a cut-fruit product that was among the list of

F8vdfrem

almost two dozen products that both sides agreed contained

nonutilized fruit.

Is it a mistake?  I don't know.  I know that Ms. Stamm

and her client were focusing on that list very carefully in

2010, when they took two products off of it and not this one.

What I think happened, your Honor -- and I'll never be able to

prove this, this is a creative lawyer's argument -- after the

fact, after the case went to the jury after Del Monte Corp.

lost, then all of a sudden in their post-trial briefing they

come up with a gotcha:  This isn't really a cut-fruit product,

it's a juice product, and it should have been included.

Well, it wasn't --

THE COURT:  You mean that is their argument?

MR. DREYER:  I think that is what their argument is,

your Honor.

THE COURT:  The record sounds as if you are saying

that now on behalf of Fresh.  It's their argument.

MR. DREYER:  Yes.  I'm sorry.  Yes.  It is Del Monte's

argument that they came up with this after the fact, after the

Pretrial Order, after the trial, after the jury award, after

the jury was given revenue figures that included this product,

when they could have raised this argument a year before trial,

two years before trial, on the eve of trial, or even at trial.

It didn't occur to anybody because they considered this to be a

nonutilized fruit product just like we did.

F8vdfrem

1          I think the record is completely clear on that, your

2     Honor.

3          MS. RUDZIN:  Your Honor, can I just say one thing on

4     this?

5          THE COURT:  I just want to look at my notes and then I

6     will give you an opportunity.

7          (Pause)

8          All right.  Basically, in a roundabout way, I think we

9     have covered everything that I had on my list of questions.

10         Was there anything, Fresh, that you wanted to say,

11     that you wanted to add?  Regardless of whether I modify or

12     clarify, on one hand, or don't, on the other, I'm not sure you

13     are entitled to fees and costs here.  I mean, the standard

14     there is pretty high.  It seems to me we have a legitimate

15     dispute.

16         Make your best argument, if you wish, as to why,

17     assuming I agree with your substantive position, I should grant

18     fees and costs.

19         MR. DREYER:  Well, I think it's because --

20         THE COURT:  No bad faith here, right?

21         MR. DREYER:  Forgive me, your Honor.  I didn't mean to

22     speak over you.

23         I think the basis principally is Del Monte's

24     submission to the Court of 5/18/12, when it cites the

25     injunction language we asked for and said it would include

F8vdfrem

juice products.  And the language, of course, covered the

language that we asked for.  The list of products was something

different entirely.

        But more to the point, your Honor, at a minimum, I

believe that we should be entitled to the 1.75 percent royalty

for any sales after the date of trial for any of the breaching

products, the products that were among what the jury found

violated the contract.

        THE COURT:  Doesn't that also require a knowing

violation?

        MR. DREYER:  No, I don't think it requires a knowing

violation.  I think it is part of the sell-off period.  If

you'll recall, they were given roughly until the end of 2012 to

sell off their existing inventory.  They represented that they

did.  They submitted revenue figures for what we thought were

all of the products.  And we were paid a 1.75 percent royalty

on -- as damages for all of the products that contained

pineapple or nonutilized fruit, and at a minimum we should be

entitled to that here, your Honor.

        And, your Honor, I just want to make one thing clear.

We don't believe the injunction needs to be modified.  We

certainly don't believe it should address juices or beverages;

that is a different trial.  What we do believe and, quite

frankly, we think it is clear on its face, it covers all of the

products that were litigated at trial as having breached the

F8vdfrem

1    contract.  This is really only about this one product, however,

2    the acai berry product, that we identified as breaching, and

3    that the only argument they made was that subparagraph B

4    doesn't extend to preserved fruit.  They never made this juice

5    argument as a defense to the acai berry product.  Having not

6    raised it at trial, having not raised it in the Pretrial Order,

7    having not even raised it at any point up until the jury

8    verdict, I don't think they should be entitled to raise that

9    argument here with respect to that product.

10                   THE COURT:  All right.  Ms. Rudzin.

11                   MS. RUDZIN:  A few things, your Honor.

12                   I think there are two different questions here.  There

13    is the question of whether you should modify or clarify the

14    injunction.  And the parties agree that the injunction doesn't

15    extend to juices, concentrates and purees because that wasn't

16    at issue in the trial.  So that's why we're entitled to have

17    the injunction clarified.

18                   It's great that Fresh thinks, oh, it's fine the way it

19    is, but we have pointed out the ambiguity, and it is not fair

20    to us to say you can't make this universe of products that's

21    ambiguous and undefined.  We're not asking the court to say we

22    have the right to make juice.

23                   As I pointed out in the slide, we're asking the Court

24    to just say we don't have the right to make refrigerated

25    product with cut pieces of the fruit.  They can sue us again if

F8vdfrem

1   they want to talk about juices, concentrates and purees,

2   although, as Mr. Dreyer said, that is already before Judge

3   Oetken.  We can't have an injunction that could be read to

4   preclude us from making products that we have the legal right

5   to make.  So this is not a case of, well, I just don't need to

6   decide it.  We're asking you to say "I haven't decided it."

7   That's all we're asking for.

8           As for the pear chunks product in particular,

9   Mr. Dreyer stood up here and said the record is clear, the jury

10  decided this was a breaching product.  But where?  They don't

11  cite to anything in the trial record suggesting that they

12  argued to the jury that the pear chunks product was a breach of

13  the license.  They say we presented this at trial, witnesses

14  testified about it.  I don't disagree.  And if you look at

15  slide I think it is 16 in our presentation, these are all the

16  products that were presented to the jury that the witnesses

17  testified about that weren't part of the breach of contract

18  claim.

19          Yes, the experts gave total damage figures to the jury

20  that included the pear chunks product, but the jury wasn't told

21  that.  They don't cite any lawyer argument or witness testimony

22  about whether the pear chunks product was a breach.  So, yes,

23  we didn't come out and say --

24          THE COURT:  What we're talking about, really -- again,

25  I'm mindful of the need to decide only what needs to be

F8vdfrem

1   decided -- what we're really talking about is pear chunks,

2   period.

3           MS. RUDZIN:  Well, I disagree, your Honor.  Yes, we

4   need to decide the pear chunks product.  But putting that

5   aside, we want the mountain of clarification that the

6   injunction doesn't preclude us from making some other product

7   that contains, I don't know, banana puree, because bananas are

8   one of the five fruits but it is only a puree.  So the

9   injunction could be read to prohibit that.  And we all agree it

10   is not supposed to be read to prohibit that.  So that's why

11   we're asking you to clarify that you haven't decided we can't

12   sell refrigerated product with banana puree.

13           As for the pear chunks product in particular,

14   Mr. Dreyer says, well, this was a change in position.  I don't

15   know because I wasn't counsel back then.  But if you turn to

16   slide 13, this is an excerpt from a declaration we put in on

17   the post-trial briefing.  And we explained that we were

18   stopping production -- this is paragraph 2 -- as a result of

19   the jury's verdict, we've stopped producing refrigerated

20   products that contain the five fruits.  We did not stop making

21   the pear chunks product.

22           And I don't think that this employee was lying under

23   oath.  She was giving you the same ambiguous language that's in

24   the injunction.  When she talks about stopping refrigerated

25   product that contain the five fruits, she means the five fruits

F8vdfrem

1    in physical form.  And she went on, in paragraphs 4 and 5, to

2    describe what products were being discontinued and

3    reformulated, and she doesn't mention the pear chunks product.

4         Now, I'll tell you one other fact, your Honor, and

5    that's that Del Monte didn't stop making the pear chunks

6    product but they did change the label to comply with the jury's

7    verdict on the Lanham Act claim.  So why would we violate the

8    injunction by selling a product that we were prohibited from

9    making but change the label to comply with the jury's verdict?

10   The answer is we wouldn't because everybody knew that on the

11   pear chunks product the jury verdict was about the labeling.

12        And so to Mr. Dreyer's point of, well, this is

13   frivolous and you knew this would be covered and we should get

14   our attorneys' fees, I mean, no, we didn't think that at the

15   time.

16        THE COURT:  OK.  I understand.  Thank you.

17        Last round.  Yes, sir.

18        MR. DREYER:  Thank you, your Honor.

19        We didn't enumerate specific products to the jury for

20   anything.  We didn't enumerate all of the specific pineapple

21   products because it was understood between the parties, and

22   never disputed, that the acai product was one of the many that

23   contained nonutilized fruits.  So to say everyone knew what was

24   out, I guess that is everyone but us, their expert and our

25   expert, but I guess everyone knew it was out.

F8vdfrem

1              In terms of what's on slide 13, I'm not really sure

2      who this helps, because this does not say that Del Monte is

3      continuing to sell the acai product; it's completely vague.  So

4      maybe there is a gotcha in here that we didn't carefully --

5              THE COURT:  No.  I'm sorry.

6              Go ahead, sir.

7              MR. DREYER:  But we didn't know what they were selling

8      at the time.  When we got sales figures, it was not entirely

9      clear.

10             THE COURT:  You knew they were selling pear chunks

11     because it was part of your presentation.

12             MR. DREYER:  It was part of our presentation --

13             THE COURT:  And here they say what they're

14     discontinuing, and they're not discontinuing pear chunks.  So

15     you knew they were selling pear chunks.

16             MR. DREYER:  We didn't know they were selling pear

17     chunks, and at this time it was an open issue.  They said don't

18     issue the injunction they've asked for because the wording

19     covers pear chunks.  That ruling came down after this list.

20     And the very language that we proposed that they say don't do

21     it, Judge, it includes pear chunks if you sweep in this

22     product -- again, after the fact and after trial -- that was

23     the injunction you issued.  So I think it was certainly

24     understood by us that the pear chunks product would have and

25     certainly should have been discontinued.

F8vdfrem

1          THE COURT:  All right.

2          MS. RUDZIN:  Your Honor, just one point.

3          THE COURT:  The very end.

4          MS. RUDZIN:  The very end.

5          If you turn to slide 11, this is a quote from Fresh's

6     reply brief, after it saw that declaration, where they not only

7     conceded that the injunction shouldn't cover the pear chunks

8     product if the fruit wasn't in cut form or at least was in a

9     puree or concentrate, but they said the declaration from DMC's

10    director makes no mention of this product.  They knew, they

11    knew back in 2012 we had to stop making that product, and they

12    were prepared to agree it shouldn't be covered by the

13    injunction.  It was only in 2014, after they had sued us again,

14    that they sent us a letter and said, hey, this pear chunks

15    product is covered by the injunction, that's what highlighted

16    the ambiguity and that's what caused us to file the motion.

17         THE COURT:  No.  I saw that they raised the issue and

18    then you decided to bring the motion; I saw that.  I think they

19    did it in January and you moved in March or June.

20         Well, why didn't you represent in a sworn statement

21    that none of the product -- five fruits that are contained in

22    that product are other than as a concentrate or puree?

23         MS. RUDZIN:  I have no idea, your Honor, I wasn't

24    their lawyer.  And it might be because they thought it was

25    reconstituted juice so they couldn't say concentrate or puree,

F8vdfrem

1    I don't know.

2              THE COURT:  Well, that would have raised right then,

3    in 2013, what is the issue ahead.  All right.  It is not in the

4    record.

5              All right.  Thank you.

6              MS. RUDZIN:  Thank you, your Honor.

7              THE COURT:  I appreciate it.

8              We'll go off the record.  We're done.  Thank you.

9              (Discussion off the record)

10

11                                   -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25